**SELECT CREATIONS, INC., a Wisconsin corporation, Plaintiff,**

v.

**PALIAFITO AMERICA, INC., an Illinois corporation, Defendant/Third Party Plaintiff,**

v.

**Miryoung (a/k/a "Joy") LEE; Jerrold Lee; Mantae Company, Limited; Sam Petrovich; Thomas Meisenheimer and Select Creations, Inc.; Third Party Defendants.**

No. 91–C–1240.

United States District Court, E.D. Wisconsin.

Dec. 1, 1992.

Order Correcting Opinion Dec. 21, 1992.

Kenneth R. Nowakowski, Whyte & Hirschboeck, Milwaukee, WI, Robert H. Storm, Canellos & Storm, Wauwatosa, WI, for plaintiff.

Harold A. Laufer, Davis & Kuelthau, Milwaukee, WI, John K. Lyons, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for defendant Paliafito, Inc.

David R. Cross, Mitchell S. Moser, Quarles & Brady, Milwaukee, WI, Kenneth L. Bressler, Lieberman Rudolph & Nowak, New York City, for defendants Miryoung Lee, Jerrold Lee and Mantae Co., Ltd.

**1.** Cites to the transcript are in the following format: [volume] Tr. [hearing number, *i.e.*, January hearing will be blank, April hearing will contain "2d"] [page or pages]: [lines from first page cited, lines from subsequent page cited] ([witness]).) Cross-cites to a proposed finding of fact are in the following format: FF ¶ [number].

*DECISION AND ORDER*

WARREN, Senior District Judge.

## I. FINDINGS OF FACT

### A. ACTORS

1. Paliafito America, Inc. ("Paliafito") is an Illinois corporation with its principal place of business at 1420 Kensington Road, Suite 207, Oak Brook, Illinois. (1 Tr. 157–58:22–25, 1–4 (Paliafito).) [1] Paliafito was previously known as Wisconsin Area Athletic Clinics ("WAAC"). WAAC is incorporated in Wisconsin. (1 Tr. 147:23—148:2; 2 Tr. 363:5–11 (Paliafito).)

2. Paliafito had the same rights under the Agreement as WAAC did since the Agreement was assigned by WAAC to Paliafito, as permitted under Section 16 of the Agreement ("[Mantae] acknowledges that WAAC contemplates assignment of its rights herein to Paliafito America, Inc. ... and agrees that this Agreement may be assigned to such an entity...."). (1 Tr. 147–48:23–25, 1–6 (Paliafito); DX 11A § 16.)

3. Third party defendants Miryoung ("Joy") Lee and Jong Sik ("Jerrold" or "Jerry") Lee (collectively, "the Lees") are husband and wife (Third Party Defendants' Answer to First Amended Counterclaim and Third Party Complaint and Jury Demand ("Mantae's Ans." or "Mantae's Ctcl.") ¶¶ 6, 7) and are Korean nationals residing in the United States. (Mantae's Ans. ¶¶ 6, 7.) Joy Lee, who has been living in the United States fourteen years, is a resident alien with permanent resident status. (2 Tr.2d 205:24–25; 206:1–11; 207:22—208:10, 10 Tr.2d 1031:6–8 (Lee).) Jerrold Lee spends ninety to ninety-five percent of his time in Korea. (3 Tr.2d 261:5–7 (Lee).)

4. Joy Lee is also known as Miryoung Song, Miryoung Song Deering, Miryoung Deering, Miryoung Melody Lee, and Miryoung Joy Lee. (10 Tr.2d 1032:3–20 (Joy

The Court did not consider Paliafito's supplementary proposed findings of fact because the Court's Scheduling Order did not permit such submission.

The Court did accept Paliafito's Fourth Offer of Documentary Evidence because the Court stated that it would allow such a submission of evidence.

Lee).) The name on her passport is Mi Ryoung Deering Song. (2 Tr.2d 205:5–8 (Joy Lee); DX 713.) Joy Lee was born Miryoung Song and married into the name Deering, becoming Miryoung Song Deering. Sometimes she used her maiden name as her middle name. Joy Lee divorced, eventually married Jerrold Lee and adopted the name Lee. Though given the name Melody by her English teacher when she came to the U.S. because Miryoung is hard to remember, she did not like the name Melody and changed it to Joy. Joy Lee testified that many Koreans adopt American names as "nicknames." She further testified that she has not used any of the above names in order to deceive Paliafito. (10 Tr.2d 1031:24—1033:14 (Joy Lee).)

5.[2] Joy Lee currently owns 100% of third party defendant Many Amazing Ideas, Inc. ("MAI"). (2 Tr.2d 219:2–6 (Joy Lee).) MAI was formerly known as Mantae America, Inc. (DX 59.) Mantae's predecessor company was Best International, which was also owned by the Lees. (4 Tr.2d 287:5–11 (Joy Lee); DX 24 ¶ 6.)

6. Joy Lee also controls Grip Toys, Inc., as president of the corporation. (DX 262; DX 263.)

7. Joy Lee and Jerrold Lee work together in the production and marketing of GRIP BALL: Jerrold Lee is in charge of manufacturing, and Joy Lee is in charge of sales worldwide. (3 Tr.2d 259, 260–61:6–13, 18–25, 1 (Joy Lee).)

8. Third party defendant MAI is a New York corporation with its principal place of business in California. (Mantae's Ctcl. ¶ 1; DX 12; DX 9.)

9. MAI also has an office at 990 Avenue of the Americas, Suite 18–S, New York, NY. (DX 5.)

10. MAI is the assignee of all of the right, title and interest in and to a "pitch and catch" game marketed in association with the mark "GRIP BALL" (the "GRIP BALL Game" or the "Game"). (DX 105.)

11. Third party defendant Mantae Company, Limited ("MCL") is an alien corporation organized under the laws of the Republic of Korea with its principal place of business in or near Seoul, Korea. (DX 11A, at 1, ¶ 1; DX 248; DX 248T; DX 249; DX 249T.)

12. MCL manufactures GRIP BALL. (1 Tr. 168:7–9, 19–23 (Paliafito); 10 Tr.2d 1034:7–18 (Joy Lee); DX 11A, at 1, ¶ 3.)

13. Joy Lee owns fifty percent of MCL. (Mantae's Ans. ¶ 8.) Jae Duc Kim, a Korean national, owns the other half. (2 Tr.2d 219:7–12 (Joy Lee); 10 Tr.2d 1034:13–18 (Joy Lee).)

14. Puff Pac Production, Limited ("Puff Pac") is an alien corporation organized under the laws of the Republic of Korea with its principal place of business in Korea. (DX 267; DX 268.)

15. Puff Pac also manufactures the Game. (DX 241 ¶ 7; 10 Tr.2d 1039:2–4 (Joy Lee).)

16. Jerrold Lee and his family own Puff Pac. (10 Tr.2d 1034:2–3 (Joy Lee).)

17. MAI, Ltd. ("MAI, Ltd.") is an alien corporation organized under the laws of the Republic of Korea with its principal place of business in Korea. (DX 265; DX 266.) MAI, Ltd. was created in March 1991. (10 Tr.2d 1036:14–17 (Joy Lee); DX 265 at ¶ 7; DX 266 at ¶ 7.)

18. MAI, Ltd. manufactures the Game. (10 Tr.2d 1039: 2–4 (Joy Lee).)

19. Jerrold Lee and his family own MAI, Ltd. (10 Tr.2d 1037:14–15 (Joy Lee).)

20. Best General Merchandise Corp. (a/k/a "Chusik Hosea Kyongyong" and Maru Joint Stock Trading Company) ("Best General") is an alien corporation organized under the laws of the Republic of Korea with its principal place of business in Korea. (DX 246; DX 247; DX 268A.)

21. Jaeil Kim owns Best General and is a friend of Joy and Jerrold Lee. (10 Tr.2d 1039:15–24 (Joy Lee).)

**2.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraphs five through twenty-four because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at a trial on the merits.

22. Best General is affiliated with MAI. (DX 243.)

23. Joy Lee used her office as an American contact office for Best General's U.S. business operations. (10 Tr.2d 1073:9–25 (Joy Lee); DX 245.)

24. Third party defendant Samuel Petrovich resides in Wisconsin and is President of Select Creations, Inc. ("Select"). (Answer and Defenses of Counter-defendants Select Creations, Inc., Sam Petrovich and Thomas Meisenheimer ("Select Ans.") ¶ 10; DX 406.) Petrovich is the sole owner of Select. (3 Tr. 468:8–10 (Petrovich).)

25. Third party defendant Thomas Meisenheimer resides in Wisconsin and is an employee of Select holding the title of Vice President of Marketing and New Product Development. (Select Ans. ¶ 11; DX 406, at 2; DX 407.)

26. Plaintiff/third party defendant Select is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin. (Select Ans. ¶ 12.) Select also maintains an office in California. (Select Ans. ¶ 12.)

27. Select's California office, Select Creations West, employs Robert Hooper ("Hooper") and John Burke ("Burke"). (1 Tr. 170:4–6 (Paliafito); DX 50.)

28. Hooper is Select's Executive Vice President. (DX 406, at 1; DX 407.)

29. Burke is Select's Vice President for Sales. (DX 406, at 1; DX 407.)

30. At one time, Paliafito was the exclusive United States distributor of GRIP BALL, by virtue of a contract with MAI and MCL, and had hired Select to serve as its mass-marketing consultant. (DX 11/11A; DX 65; 1 Tr. 169:9–18 (Paliafito).)

## B. FACTS RELATING TO REQUESTS FOR ATTACHMENT AND INJUNCTIVE RELIEF

### 1. Corporate pool

31.[3] The Lees, husband and wife, sell GRIP BALL internationally. Joy is in charge of sales. Jerrold is in charge of manufacturing. (3 Tr.2d 260:18–24 (Joy Lee).)

32. The Lees control MCL, Puff Pac, and MAI Ltd., the Korean manufacturers of the Game. (FF ¶¶ 12, 15, 18.)

33. The Lees control MAI and Grip Toys, Inc., the sellers of the Game. (FF ¶¶ 5, 6.)

34. Best General shares Korean and U.S. offices with MAI. (FF ¶¶ 80–83.)

35. Joy Lee testified that she created this corporate pool because she did not want to "put ... all eggs in one basket." That is, if something happened at one facility so that it could not continue to produce the Game, another facility could provide it. (10 Tr.2d 1037:4–9 (Joy Lee).)

### 2. Evolving corporate names

36. In the mid–1980s, the Lees conducted business in the United States through Best International. (DX 272 ¶ 1.)

37. They later incorporated this business in New York. (DX 257.)

38. The Lees incorporated the business under the name Mantae America, Inc. in New York. (DX 12; DX 272 ¶ 1.)

39. Last year, the Lees changed the name of the business from Mantae America, Inc. to Many Amazing Ideas, Inc. (PFF ¶ 92.)

40. In April 1991, the Lees formed a company, MAI, Ltd., under the laws of Nevada. (DX 262.)

41. In November 1991, they changed the name of MAI, Ltd. to Grip Toys, Inc. (DX 262; DX 263.)

### 3. Evolving corporate relationships

42. MAI's contract with Kiddie Wonder states "[Mantae America, Inc.] is the exclusive world-wide distributor of the ... line of removable stickers which are manufactured by [Mantae America, Inc.'s] *parent* company

---

**3.** Plaintiffs Select, Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraphs thirty-one through sixty-three because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at a trial on the merits.

Mantae Co., Ltd. of Korea. . . ." (DX 250 (emphasis added).)

43. A plaque outside Mantae's Walnut Office reads "Mantae America, Inc., a *branch* of Mantae Co., Ltd. Korea." (DX 251 (emphasis added).)

44. MAI's company stationery reads "Mantae America, Inc., a *division* of Mantae Co., Ltd." (DX 251A (emphasis added).)

45. In September 1991, Joy Lee testified in her deposition in the *New Market Concepts* case that Mantae Co., Ltd. was owned fifty percent by Mantae America, Inc. (3 Tr.2d 240–41, 45:22–25, 1–22, 1–23 (Joy Lee).)

46. Joy Lee testified to the Court that MAI and MCL were related because she owned fifty percent of MCL and, at the time in question, fifty percent of MAI. (3 Tr.2d 246–47:8–16, 8–11 (Joy Lee).)

### 4. Lack of corporate formalities

47. Joy Lee is the sole director of MAI. (3 Tr.2d 265:18–20 (Joy Lee).)

48. Joy Lee has held the position of MAI's secretary, secretary-treasurer, vice president, and president. (DX 59, at 3; DX 118, at 5; DX 11A, at 1, ¶ 2; DX 272; DX 236.)

49. MAI has had one or two directors' meetings. (3 Tr.2d 266:2–7 (Joy Lee).)

50. Joy Lee has paid the monthly rent on her residence with MAI funds. (DX 240; 12 Tr.2d 1307:22–24 (Joy Lee).)

51. The New York apartment is a combination of corporate office and apartment from which business is conducted and where Joy Lee stays while in New York in order to save hotel expenses. (12 Tr.2d 1399:21—1400:9 (Joy Lee).)

52. Joy Lee has bank statements sent to her home. (DX 235 at HAN 5–8.)

53. Joy Lee keeps some business records at home. (DX 490, at 1, numbered paragraph 1.)

### 5. Lack of capital in the U.S.

54. Mark Paliafito testified Joy Lee told him that MAI "was always running so lean." That is, it had little or no money in its bank accounts, because it remitted virtually all of its earnings from the United States to Korea. (1 Tr. 185–86:14—25, 1 (Paliafito).)

55. Joy Lee testified that she explained to Mark Paliafito why money was sent to Korea. (11 Tr.2d 1115:19—1116:17 (Joy Lee).) Joy Lee explained that money had to go to Korea to produce Games for Paliafito to sell. She stated that larger facilities were required and, since mortgages do not exist in Korea, cash was needed to buy the facilities. She also stated that ninety days lead-time was needed to purchase raw materials from suppliers and she needed cash up front to purchase the (velcro) hook and loop fastener from Taiwan. (DX 138/138T, No. 10; 11 Tr.2d 1134:16—1135:21 (Joy Lee).)

56. Mark Paliafito overheard conversations of Joy Lee indicating that MAI would bounce checks, and write drafts when there was no money in MAI's bank account to cover the checks. (1 Tr. 186:14–20 (Paliafito).)

57. Joy Lee testified that the reason checks bounced is because Paliafito made promises to pay money owed to MAI at certain times and did not keep the promises. (12 Tr.2d 1398:3–13, 1399:15–20 (Joy Lee).)

58. Mark Paliafito testified that Joy Lee would demand payment for goods delivered to Paliafito a week after delivery. (1 Tr. 186:23—187:1 (Paliafito).)

59. Joy Lee testified that MAI was in need of money because Paliafito was often late in making payments and because MAI had an obligation under Korean law to pay for the Games within a certain period. (10 Tr.2d 1053:15—1055:15 (Joy Lee); 11 Tr.2d 1227:8—1228:3; 12 Tr.2d 1399:11–20 (Joy Lee).)

60. In 1991 and into 1992, MAI frequently had negative balances in its U.S. bank accounts. (DX 3500, Tab A.)

61. Joy Lee testified that the reason MAI was overdrawn was that Paliafito had promised to pay at certain times and she had relied on payment, which was not forthcoming. (6 Tr.2d 610:3—614:10 (Joy Lee).)

62. As of March 31, 1991, MAI had approximately $200,000 total in its U.S. bank accounts. (DX 3500, Tab A, at 4.)

63. MAI generated $40,000,000 in U.S. sales. (DX 496, at 1.)

64. Additionally, in 1991, Joy Lee obtained $1,000,000 from Paliafito in payment for the exclusive U.S. distribution rights. (PFF ¶¶ 193, 194, 195, 197.) However, Joy Lee testified that the $1,000,000 was to expand facilities to manufacture the Game. (11 Tr.2d 1113:15–24 (Joy Lee).)

65. Paul Moss drafted a summary of pending Target Stores orders for GRIP BALL for December 1991 through mid–1992 totaling approximately $2,300,000. (DX 472.)

66. Scott Hupe estimated that Paliafito would have about $1,000,000 in profits from a 600,000 Game order from Target. (2 Tr.2d 152:1–6 (Hupe).)

### 6. Inconsistent statements and misstatements regarding corporate structure [4]

67. In response to a customs inquiry, Mantae represented that "Mantae America, Inc. and Mantae Co., Ltd. are not related.... Similarity of the name is coincidental." (DX 253.)

68. Joy Lee testified that the letter to Customs by Kevin Lee was written without her knowledge; she was in Korea at the time. DX 253 was prepared by Kevin Lee, an employee of MAI who had been in the United States for only three months, and spoke very little English. David Huh translated the document to English from Korean. (3 Tr.2d 237:1—238:19; 12 Tr.2d 1285:3–17 (Joy Lee).) MAI has contacted Customs after inquiries from that department. (12 Tr.2d 1476:7—1477:6; 1477:20–25; 1478:24—1479:9; 1480:4–6 (Levesque).) Paliafito is also dealing with Customs to clear up any problems they may have. (3 Tr. 449:24—450:4 (Paliafito).)

69. MAI represented that it was not related to other Mantae entities on 191 import transactions. (DX 2501.)

70. In fact, MAI and MCL are related. (FF ¶¶ 5, 12, 17.)

71. Joy Lee testified that Best General was not related to MAI. (3 Tr.2d 276:14–20 (Joy Lee).)

72. On March 3, 1992, Kenneth L. Bressler, MAI's attorney, submitted a letter to the Court stating "[t]he fact is that Best General is unrelated to MAI and the Lees." (DX 242.)

73. MAI's international marketing vice-president, Eddie Kim, wrote to Yacov Comfort, a GRIP BALL customer, that Best General was an "affiliated company with" MAI. (DX 243.)

74. Steve Lim of MAI filed a fictitious business name statement for "Best General Merchandise USA," listing the same address as that of Joy Lee's home. (DX 245; 3 Tr.2d 279–82:21–25, 1–25, 14–25, 1–8 (Joy Lee).)

75. DX 55, DX 129, DX 130, and DX 131 are letters to Paliafito from Joy Lee written on Best General Merchandise, Inc.'s stationery. At the bottom of the stationery, a San Jose, Costa Rica office is indicated. The stationery also indicates the existence of a Los Angeles office at 20254 Paseo Del Prado, Walnut, California, with phone and fax numbers of (714) 594–9828 and (714) 594–8597, respectively, and the existence of a New York office, at 990 Avenue of the Americas, Suite 15–E, New York, New York, with phone and fax numbers of (212) 239–0028 and (212) 239–0058, respectively. (DX 55; DX 129; DX 130; DX 131.)

76. MAI's address is 20254 Paseo Del Prado, Walnut, California; its phone and fax numbers are, respectively, (714) 594–9828 and (714) 594–8597. (*See, e.g.,* DX 9.)

77. Mantae's former New York office had the address 990 Avenue of the Americas, Suite 15–E, New York, New York, with phone and fax numbers of (212) 239–0028 and

---

4. Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraphs sixty-seven through 167 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

(212) 239–0058, respectively. (DX 251A.) Mantae's current New York office, at 990 Avenue of the Americas, Suite 18–S, New York, New York, has the same phone and fax numbers. (*See, e.g.,* DX 5.)

78. The address for Best General Merchandise, Inc. on DX 54 and DX 55, and the Korean address shown for Best International Corporation, MAI's predecessor, on DX 56, are the same. (DX 54; DX 55; DX 56.)

79. Joy Lee testified that it is common for Korean companies to use addresses and phone numbers of friends' offices abroad as "contact" offices because its easier for a U.S. buyer to call an office in the U.S. than to call Korea. (10 Tr.2d 1073:9–25 (Joy Lee).)

80. Joy Lee testified that Jaeil Kim, Best General's owner, was not employed by Mantae Mexico. (2 Tr.2d 212:1–2 (Joy Lee).)

81. MAI addressed an invoice to Jaeil Kim at Mantae Mexico. (DX 269.)

82. On July 16, 1991, Kenneth Bressler, a MAI attorney, filed a certificate of interest pursuant to local rule in the action *Mantae America, Inc. v. Drybranch, Inc.,* No. 91 Civ. 4822 (S.D.N.Y.) (McKenna, J.), in which he certified that MAI had no "corporate parents, subsidiaries, or affiliates." (DX 255.)

83. On December 6, 1991, John Santalone, a MAI attorney, filed a certificate of interest pursuant to local rule in the action *Bai v. Tarching Imports,* No. 91 Civ. 6896 (S.D.N.Y.) (Motley, J.), in which he certified that MAI had no "corporate parents, subsidiaries, or affiliates." (DX 256.)

84. Bert Levesque, MAI's chief financial officer, signed an employment agreement with "Mantae America, Inc. and its *affiliated* Companies." (DX 157 (emphasis added).)

85. In August 1991, MAI's attorneys filed a certificate of amendment with the Secretary of State of New York in which Mantae America, Inc. changed its name to "Many Amazing Ideas, Inc." (DX 59.)

86. In October 1991, two months later, MAI's same attorneys represented to the Supreme Court of New York that MAI's name was Mantae America, Inc. (DX 49.)

87. The Lees represented that MAI was a California corporation to Paliafito. (DX 11A.)

88. In fact, MAI is a New York corporation. (PFF ¶ 39.)

89. Keith Nowak wrote a letter to Thomas Handler, Paliafito's attorney, stating that Joy and Jerrold Lee together owned fifty percent of MAI and fifty percent of MCL. (DX 119 ¶ 18.)

90. Joy Lee testified to the Court that Jerrold Lee never owned any part of MCL. (2 Tr.2d 221–22:16–25, 1–2 (Joy Lee).)

91. The Lees insisted that Paliafito give them post-dated checks in the amount of nearly $500,000, payable to Jong Sik Lee, personally, which were then sent to Korea. (DX 42.)

92. Joy Lee wrote a schedule, (DX 41), which showed payments that were due from Paliafito to Mantae. It indicated the date the check should be dated, the check amount, and to whom it should be made payable. It showed the following dates, check amounts, and payees: (1) May 24, 1991, one check for $110,000 and one check for $80,000, payable to Mantae America Inc.; (2) May 31, 1991, one check for $49,000, payable to Jong Sik Lee; (3) June 7, 1991, two checks for $49,000 each payable to Jong Sik Lee; (4) June 14, 1991, two checks for $49,000 each, payable to Jong Sik Lee; (5) May 31, 1991, one check for $26,877.40, payable to Jong Sik Lee. (DX 41.)

93. Joy Lee gave DX 41 to Paliafito. She instructed Paliafito to make the checks payable as shown on DX 41, and Paliafito did so. (2 Tr. 216:5–12 (Paliafito).)

94. DX 42 comprises copies of ten checks made payable to Jong Sik Lee by Paliafito. All are in amounts under $50,000, with most being $49,000 or $49,500. (DX 42; 2 Tr. 216:18–24 (Paliafito).)

95. Mark Paliafito testified that Mantae typed out and delivered to Cho Hung Bank Paliafito checks drawn in amounts just under $50,000. (DX 87; 3 Tr. 442–43:18–25, 1–17 (Paliafito).)

96. Mantae never told Paliafito why they typed the checks out in amounts under $50,-000. (3 Tr. 444:1–4 (Paliafito).)

97. These checks were made payable to Jong Sik Lee because Joy Lee told Paliafito to do so. Some checks were actually made out by Mantae. (2 Tr. 217:11–15 (Paliafito).)

98. The Paliafito checks made payable to Jong Sik Lee totaled $469,877.40. (DX 42.)

99. The Paliafito checks made payable to cash and delivered to Mantae totaled $2,459,-621.77. (DX 43.)

100. Mark Paliafito testified that Joy Lee said the checks were made payable to cash because MAI needed to get money back to Korea in a hurry, and they wanted to avoid depositing the checks in their U.S. accounts. (2 Tr. 219–20:21–25, 1 (Paliafito).)

101. Joy Lee testified that the reason MAI asked for checks made out to cash was so it could get cashier's checks without delay. Joy Lee testified that the reason cashier's checks were required was because Paliafito was late in making payments. (MAI EXS 53, 54; 12 Tr.2d 1392:21—1393:14; 1394:8–24 (Joy Lee).) Paliafito complained to Eddie Kim about the problem, but continued to pay in this manner. (2 Tr. 269:21—270:19 (Paliafito).) When Joy Lee received from Paliafito checks made payable to cash, she or someone else at Mantae would go to the bank, usually accompanied by someone from Paliafito, to get cashier's checks. The checks may have been sent to Korea. (2 Tr. 221:2–10 (Paliafito).)

102. Mark Paliafito testified that when he accompanied MAI personnel to Bank of America to have the Paliafito checks, previously made out to cash, changed into cashier's checks, the cashier's checks were made out to either MAI or cash. (2 Tr. 244:18–24 (Paliafito).)

103. Mark Paliafito believes that MAI took the money from the U.S. and put it in Korean or other foreign banks because MAI's accounts in America never had any money in them, MAI bounced some checks, and Joy Lee was prodding Paliafito for money every day. (2 Tr. 245:5–9 (Paliafito).)

### 7. Risk of Joy Lee fleeing the United States and failing to honor a judgment

104. As Paliafito notes: (1) the GRIP BALL fad may disappear from the United States in the near term, (8 Tr.2d 781–82:19–25, 1–9 (Carlson)); and (2) GRIP BALL constitutes ninety percent of MAI's U.S. income. (4 Tr.2d 321:14–17 (Joy Lee).)

105. However, Joy Lee has lived in the United States for fourteen years and testified that she does not intend to leave. (10 Tr.2d 1029:11—1031:22 (Joy Lee).) Her children are U.S. citizens, and live and go to school in California. (10 Tr.2d 1029:13—1030:9 (Joy Lee).) In the period since Paliafito filed its attachment motion, he has increased the size of its warehouse. Joy Lee has bought a house for $265,000. (12 Tr.2d 1303:21—1304:1 (Joy Lee).)

106. After being threatened with litigation, Joy Lee told Don Murray, president of New Market Concepts: "You stupid American, don't you know that we [Joy and Jerrold Lee] [are] here on green cards and even if you win your case we'll take your money and leave." (4 Tr.2d 332:1–8 (Murray).) Harry Gates corroborated Murray's testimony on this point. (4 Tr.2d 335–40:5–25, 4–25, 1–25, 1–25, 1–25, 1–21 (Gates).)

### C. POSSIBLE FRAUDULENT PROCUREMENT OF PATENT

107. In 1988, Aljac Enterprises, Inc. imported the Game (called "Magic Catch") into the United States from Sewon Co., a Korean company. (Summary of Relevant Testimony from the Deposition of Allan Genauer ("Genauer Summary"). ¶ 7; 5 Tr.2d 442:12–25 (Genauer); DX 700.) Genauer was the one who gave the Game the name "Magic Catch." (5 Tr.2d 463:15–17 (Genauer).) [5]

108. Aljac placed the Game on sale in the United States that same year. (Genauer Summary ¶ 7; 5 Tr.2d 443, 472:1–3, 16–22 (Genauer); DX 701; DX 702.)

**5.** The Court notes that Genauer was paid $5000 to testify in this action. (5 Tr.2d 478:19–22 (Genauer).)

109. Genauer testified that Aljac sold two versions of the Game in 1988. (Genauer Summary ¶¶ 7, 8, 13, 14; 5 Tr.2d 449–50:20–25, 1 (Genauer).) He stated that the first version of the Game's "catch pad" consisted of: (1) a concave plastic plate, with a slight extrusion (or hump) at the center; (2) a small piece of foam, attached by glue to the inside center of the plate; (3) a larger foam pad; which was backed by a cotton muslin sheeting and which was the same size as (4) the front layer of hook and loop touch fasteners, which covered the entire face of the plate; and (5) a rim or ring that surrounded the periphery of the plate and held the "catch pad" together. He stated that the "catch pad" of the second version of the Game sold by Aljac in 1988 was constructed in the same manner, with the exception that the plastic plate lacked the slight extrusion of the first version and had the outline of a baseball glove etched onto it. (Genauer Summary ¶¶ 5, 8, 13; 5 Tr.2d 450:2–20 (Genauer); DX 704A; DX 705A.)

110. Ywo Chul, former president of Sewon G.M. Co., Ltd., the Korean manufacturer of MAGIC CATCH, testified at another proceeding that the first version of the Game had two problems: (1) "sticking was poor;" (2) "when object was thrown, rim rebounced;" and (3) "at the back of plate, the color of blue ink is stained because it is insufficiently colored." (MAI EX 154, at 2–5.)

111. However, Grenauer testified that the defect was "in regard to the cosmetic end of it" and that "[t]here was no defect in the construction or in the usage of the product." (5 Tr.2d 474:9–17 (Grenauer).)

112. Ywo Chul testified that the second version changed the shape, improved the "sticking function," changed the rim construction so as not to disengage and remedied the discoloration problem. (MAI EX, at 10.) Ywo Chul testified that the second version was based on improvements suggested by Jerrold Lee. (MAI EX, at 7–9.)

113. In August 1988, Joy Lee's Best International bought a game from Aljac Enterprises, Inc. (5 Tr.2d 445–46:16–25, 1–10 (Genauer); Genauer Summary ¶ 14; DX 703.)

114. In 1988, Genauer applied for a United States patent on the Game, based on documents provided to Genauer by the president of Sewon Corporation. This patent application was later abandoned. (5 Tr.2d 452–53:13–25, 1–14 (Genauer); DX 60 Exhibit 7.)

115. Joy Lee testified that prior to April or May of 1989, she was selling the version of the Game with a hump on the back of the catch pad. (10 Tr.2d 1067:7–17 (Joy Lee).)

116. Keith Nowak handled Joy Lee's patent application. (6 Tr.2d 619–20:23–25, 1–4 (Joy Lee).)

117. On March 8, 1990, Nowak filed with the United States Patent and Trademark Office ("PTO") Joy Lee's application for a patent on the Game. (DX 104, at PTO 3–25.) This application was transmitted to the PTO by the United States mails. (DX 104, at PTO 25.)

118. As part of her application, Joy Lee submitted an inventor's declaration that she is "the original, first and sole inventor" of the Game. (DX 104, at PTO 18–19.)

119. In response to the PTO's rejection of Joy Lee's patent application on grounds of obviousness, Nowak twice filed with the PTO correspondence amending the claims in the patent application. (DX 104, at PTO 30–38, PTO 70–80.) The first, if not both, of these correspondences with the PTO, was placed for delivery with the United States mails. (DX 104, at PTO 38.)

120. In Nowak's response to the second rejection, and to a patent protest that cited (for the first time in the history of the patent prosecution as established by the file wrapper) two Korean patent documents, he differentiated Joy Lee's game from other prior art solely on the grounds that prior art did not combine two intermediate flexible layers, a rigid concave back, a touch fastener, and a retaining ring. (DX 104, at PTO 72–77.)

121. Nowak distinguished the Korean Utility Model, filed in Korea by Yu Chul and Sewon GM Corporation, solely on the grounds that the Korean Utility Model "does not show, or suggest, the use of applicant's intermediate flexible layers, nor any of the remaining elements [of the claims in the application]. It does appear to provide some

type of 'cover ring.' However, there is no teaching with respect to the purpose of the 'cover ring'.... [T]here is no teaching of the multiple layer structure of applicant's invention." (DX 104, at PTO 77.)

122. In conjunction with Nowak's response, Joy Lee submitted a declaration in which she stated "that she does not know, and does not believe that the invention of the instant application has been in public use or on sale in this country ... for more than one year prior to this application." She also declared that on about May 10, 1989, she conceived of "her invention" and described it in writing, that it was subsequently reduced to practice, and that "[s]ales of the completed game, known by the name 'Scatch' or 'Magic Catch Game' were made as early as July 18, 1989." (DX 104, at PTO 81–82, 63; DX 106.)

123. The PTO Examiner filed a "Notice of Allowability" on December 7, 1990, in which he determined to be true Nowak's representations regarding the Korean Utility Model: he stated that the "reference discloses a cover ring (retaining ring) 2, but does not disclose the overall combination, including the multi-layer structure as recited in lines 5–14 of claim 1." (DX 104, at PTO 65.)

124. In the "Petition to Make Special under 37 C.F.R. § 1.102(d)," transmitted to the PTO by means of interstate facsimile, Nowak warranted to the PTO that he "ha[d] made or caused to be made a careful and thorough search of the prior art or has good knowledge of the pertinent prior art" and that he believes all claims are allowable. (DX 104, at PTO 91–92.)

125. On February 26, 1991, the United States Patent & Trademark Office granted to Joy Lee United States Letters Patent No. 4,995,617 on the Game. (DX 110.)

126. The catch pad described in the patent is "a multilayer mitt" composed of: (1) "a rigid concave rear layer;" (2) "a first intermediate flexible layer," composed of polyurethane foam, which occupies "a surface area less than the surface area of said rear layer;" (3) "a second intermediate flexible layer," also composed of polyurethane foam, which occupies "a surface area substantially equal to the surface area of said rear layer;" (4) "a front layer having substantially all of its front surface defined by a multitude of irregular filamentary formations;" (5) which was "retained in place by a retaining ring with an inner edge of said retaining ring extending over a portion of said front layer." (DX 110, column 4, claims 1, 3.)

127. The Game, as imported and sold by Genauer in 1988 and as purchased by Joy Lee in 1988, appears to have the same features as the "invention" for which Joy Lee obtained U.S. Patent No. 4,995,617. (DX 704; DX 705; DX 110, column 4, claim 1, 3; *compare* FF ¶ 109 with FF ¶ 126.)

128. Sometime in 1991, Genauer had a telephone conversation with Joy Lee. During this conversation, Joy Lee acknowledged that Genauer was the first to import the Game to the United States, but said that Genauer did not sell the Game anymore and that she had taken over the Game and spent money improving it. (5 Tr.2d 450–51:21–25, 1–24 (Genauer).)

129. In this case, Joy Lee testified that she developed the game in 1988 and 1989, and that she started selling her patented version of Grip Ball in the United States *between April and May of 1989.* (10 Tr.2d 1058, 1067:3–5, 7–10 (Joy Lee).)

## D. POSSIBLE IMPROPER USE OF VELCRO® NAME.

130. Throughout 1990 and 1991, MAI represented that the Game included two "Velcro® Grip–Mitts™" and a Velcro™-covered ball. (DX 23, DX 24; DX 25, at 1, ¶ 1, at 2, ¶ 2 (press release approved by MAI and its attorneys, 1 Tr. 181–82:19–25, 1–9 (Paliafito).)

131. "Velcro®" is a hook and loop fastener manufactured by Velcro Industries B.V. ("VIBV"). VIBV, through itself and its licensees, has maintained the exclusive right to use the trademark "Velcro®" in connection with its products. (DX 26, Exhibit A, ¶ 2.)

132. VIBV has never granted a license to the Lees, MCL, or MAI to use the registered trademark "Velcro®" in connection with the

Game or any other product. (DX 26, at 2, ¶ 5.)

133. Moreover, the Game, as manufactured by MCL and imported into the United States by the Lees and MAI, does not contain, nor has it ever contained, Velcro® brand touch fasteners. (DX 26, at 2, ¶ 5.)

134. The packaging inserts falsely stating that the product contained Velcro® were produced by Mantae in Korea and shipped to Paliafito with the Games. (1 Tr. 178–80:14–25, 1–25, 1–12 (Paliafito).) Joy Lee testified that she was buying material from a company that represented that the material was Velcro. (12 Tr.2d 1365:15—1268:11 (Joy Lee).)

135. MAI EX 71 is a supplier's invoice which indicates that MAI received "Velcro" product. However, the invoice does not indicate whether MAI received a trademarked Velcro product or a generic velcro hoop and loop material. (MAI Ex. 71); 12 Tr.2d 1365:15—1368:11 (Joy Lee).)

### E. EVENTS LEADING UP TO THE EXECUTION OF THE EXCLUSIVE DISTRIBUTORSHIP AGREEMENT

136. The patented GRIP BALL Game was first sold by MAI through regional distributors who were assigned various geographic areas of the country. Joy Lee testified that because of the growing success of the Game, she determined that one national distributor would be needed. (10 Tr.2d 1067:18—1068:16 (Joy Lee).)

137. Joy Lee testified that MAI sought a national distributor with experience and expertise as well as adequate financial backing to create and then fill demand. (MAI EX 75, at 1; 10 Tr.2d 1069:13—1070:3 (Joy Lee).)

138. Joy Lee gave the regional distributors the opportunity to submit marketing proposals in order to obtain the national rights. (10 Tr.2d 1069:13—1071:9 (Joy Lee).) MAI also received interest from Hasbro. (11 Tr.2d 1080:17–23; 1083:7–24 (Joy Lee).)

139. Manufacturing in Korea requires that each of the three factories acquire material from the supplier pursuant to a local Letter of Credit ("LC"). (10 Tr.2d 1059:3–25 (Joy Lee).)

140. Thereafter, the finished product is forwarded to an exporter who also must pay pursuant to a local Letter of Credit. In the instance of manufacturing the Game in Korea, the exporter and manufacturer could be the same party. (10 Tr.2d 1060:1–21 (Joy Lee).)

141. Joy Lee testified that in order to properly manufacture, lead time is required. The process begins upon receipt of an LC from the buyer. Normally, thirty to ninety days are required to manufacture and export prior to receipt of the LC. Suppliers also require at least thirty days lead time. In addition, transfer of goods to the U.S. normally takes about thirty days, which includes twenty days on the water, plus five days of customs clearance. (10 Tr.2d 1065:15—1066:15 (Joy Lee).)

### 1. Paliafito seeks to distribute the Game

142. In December 1990, Mark Paliafito and Mike Barker and their attorneys, George Johnson and Richard Hart, through Paliafito's predecessor in interest, WAAC, began negotiations with the Lees, Nowak, MCL, and MAI to obtain the exclusive rights to distribute and market the Game in the United States. (1 Tr. 126–27:14–22, 1–12 (Paliafito).)

143. Initially, the Paliafito group proposed to proceed by way of joint venture arrangement with Keith Andes and his company, Andes America, Inc., a fact known by the Lees, MCL, MAI, and Nowak. (10 Tr.2d 1078:11–25 (Joy Lee).)

144. Andes America, Inc., which is owned and operated by Keith Andes, was one of the regional distributors. Andes had an eleven-state region comprised of Alabama, Tennessee, North Carolina, Kentucky, Ohio, Indiana, Illinois, Michigan, Wisconsin, Arkansas and Missouri. (6 Tr.2d 488:22—489:6; 491:12–24 (Andes).)

145. In 1990, Andes sold the Game to Paliafito, (6 Tr.2d 489:22—491:1 (Andes)), which in turn sold the Game from carts located in shopping malls. (1 Tr. 125:4—126:5 (Paliafito).)

146. In early 1991, Keith Andes, along with Hardtke and Paliafito, discussed forming a joint venture ("Andes/Paliafito") to obtain the national distribution rights to the Game from MAI. (6 Tr.2d 492:4—493:15 (Andes).)

147. In order to obtain the rights from MAI, Andes/Paliafito prepared a marketing proposal setting forth the responsibilities each participant would have, as well as a plan for marketing the GRIP BALL Game on a national level (the "Marketing Plan" or the "Plan"). (MAI EX 1; 2 Tr. 334:14–16; 335:1—337:27 (Paliafito).)

148. The stated purpose of the Marketing Plan was "to focus on the intention of Andes/Paliafito America, Inc. to successfully market the [Game] ... and to acquire and maintain exclusive U.S.A. distributing and marketing rights ..." (MAI EX 1, at 1.)

149. The Marketing Plan was based on a draft plan prepared by Scott Hupe. (MAI EX 87; 4 Tr. 651:5–13 (Hupe).)

150. Andes testified that the final version of the Plan was reviewed by Paliafito prior to its submission to MAI. (6 Tr.2d 499:1–3 (Andes).)

151. The Marketing Plan presented to MAI was signed by Keith Andes, Mark Paliafito, Terry Hardtke, Scott Hupe and Mike Barker. (MAI EX 1, at 1; 1 Tr. 136:23—137:4 (Paliafito).) Joy Lee testified that she relied on the Plan in entering into the Agreement. (10 Tr.2d 1091:15—1092:7 (Joy Lee).)

152. Manufacture of the Game takes place in Korea in three different locations. Joy Lee testified that the reason for the separate corporate entities is as follows. The Game was initially manufactured by Puff Pac, which is owned by Jerrold Lee and his family. Mantae Company, Ltd. was the second facility to manufacture the Game. Prior to the time MCL manufactured the Game, MCL was entirely owned by Jae–Duck Kim. Fifty percent of the company's stock was assigned to Joy Lee when MCL started manufacturing the Game. At the same time, the Lees started a company in the U.S. called Mantae America, Inc., which was then owned by Joy and Jerrold Lee. A separate company was organized in the U.S. because it is owned by different people. In March 1991 MAI, Ltd. was formed to manufacture the Game. It was formed because the other facilities were too small and because Jerrold Lee was overseeing manufacturing in Korea and wanted to have quality control over all the facilities. Joy Lee also wanted to avoid the potential problem of having the entire manufacturing process halted if one of the factories had a problem. (10 Tr.2d 1033:17—1037:15 (Joy Lee).)

153. The Marketing Plan was presented to MAI on or about January 27, 1991, at a meeting held in California (the "January 27th Meeting"). Scott Hupe, who was represented to have had six years of experience in the industry, made a presentation of the group's marketing strategy and presented Joy Lee with the Plan. (MAI EX 1, at 2; 1 Tr. 133:22—134:23 (Paliafito).)

154. Joy Lee reviewed the Marketing Plan at the January 27th Meeting, as reflected on her original version of the Plan, which has her contemporaneously hand-written notations throughout. (MAI EX 1, at 1, 4, 6, 9, and 11; 10 Tr.2d 1094:13–17 (Joy Lee).)

155. The Marketing Plan stated that the GRIP BALL Game would be distributed out of Tennessee by Andes and out of California by Hardtke. (MAI EX 1, at 2, 3 (Andes).)

156. Joy Lee testified that she had had previous experience with Andes and felt comfortable with his knowledge of the product. Joy Lee also stated that she knew Hardtke, had visited his facility in California and was comfortable with his operation. (10 Tr.2d 1100:22–25; 1101:1–25; 1102:1 (Joy Lee).)

157. Joy Lee had not met anyone else in the Andes/Paliafito group prior to the January 27th Meeting. (10 Tr.2d 1075:6–10 (Joy Lee).)

158. Paliafito believed that "it [was] extremely important that the talents of Mr. Hardtke and Mr. Andes are integrated into [its] plans. Their active role in this massive marketing initiative is crucial to the project's success." (MAI EX 87, at 8; 1 Tr.2d 17:5—18:25 (Hupe).)

159. Paliafito also planned to utilize warehouses in California, Tennessee and Wisconsin to effectively manage distribution. (MAI EX 87, at 12.)

160. The Plan also set forth a method for selling the Game. To limit cash flow problems, sales would be concentrated on small retail ("mom and pop") dealers because "cash flow is usually immediate with these accounts." (MAI EX 1, at 6.)

161. According to Mike Barker, a member of the Andes/Paliafito group and a principal of Paliafito, the "toy fair, coupled with [Paliafito's] concern for the small mom and pop stores, will be the driving force behind our success in this venture—you know that, I know that and Terry knows that." (MAI EX 149, at 1.)

162. Joy Lee testified that cash flow plan was crucial to her because if sufficient cash flow was not present, she was concerned that the business would fail. (10 Tr.2d 1084:19—1085:17 (Joy Lee).)

163. Joy Lee testified that she asked at the January 27th Meeting how the Andes/Paliafito Group would finance the distribution of the Game and was told that financing would not be a problem. (10 Tr.2d 1089:14–21 (Joy Lee).)

164. According to the Marketing Plan, Mark Paliafito was to be "the investment vehicle through which all initial and future financing related to all areas." [sic] (MAI EX 1, at 3.)

165. Joy Lee testified that Mark Paliafito was represented to be from a family worth $4,000,000 to $5,000,000. (10 Tr.2d 1089:14–25; 1090:1—1091:4 (Joy Lee).)

166. Scott Hupe stated that "we knew that Mr. Paliafito could finance the endeavor." (1 Tr.2d 15:18–19 (Hupe).)

167. On March 1, 1991 Paliafito drafted a press release which states in part: "Lee, who turned down sizable offers from other major companies, said, 'I feel very comfortable in the ability of the Paliafito Organization financially and from a sales and marketing perspective. I was hoping to find a small company with the resources that can compete with the majors.'" (MAI EX 75, at 1, ¶ 4.)

### 2. January 1991 meeting

168. On January 27 or 28, 1991, representatives of the proposed joint venture, Andes/Paliafito America, Inc., met with Joy Lee, Howard Finelt, Keith Nowak, and others in Walnut, California to negotiate an exclusive distribution agreement for Grip Ball. (1 Tr. 127:13–22 (Paliafito).)

169. Prior to this meeting, on January 23, 1991, Joy Lee sent a facsimile transmission, (DX 9), to Keith Andes enclosing a proposed contract. In this contract, Joy Lee represented that: (a) Mantae America was a California corporation; (b) she owned the U.S. patent rights to GRIP BALL; (c) the Game employed "Velcro (owned by 3–M Company) in a mitt-like device and a Velcro tennis ball;" and (d) the Lees, MCL and MAI intended to grant Andes and the Paliafitos the complete marketing and distribution rights for the sale and distribution of the Game. (DX 9, at 1, ¶¶ 1, 2, 7 (numbered paragraph 2).)

170. This draft contract, (DX 9), was transmitted by facsimile from Andes to Mark Paliafito and was in his possession and was used during the January meeting as the basis for negotiation. (1 Tr. 130–33:21–25, 1–25, 1–25, 1–7 (Paliafito).)

171. Mark Paliafito testified that during the course of the January meeting, Joy Lee represented to the Andes/Paliafito group that she had invented GRIP BALL and that Joy Lee never indicated to the group that she had previously purchased the Game from Aljac Enterprises. (1 Tr. 128:11–23 (Paliafito).)

172. At the meeting, MAI presented a summary to Paliafito representing that MAI had sold more than 500,000 sets of GRIP BALL in 1990. (DX 8; DX 118, at 2; 1 Tr. 130:3–9 (Paliafito); 4 Tr.2d 347–48:11–25, 1–6 (Joy Lee).) Nowak later faxed a second copy of this document to Paliafito's attorney, Thomas Handler. (DX 118, at 2.)

173. Edward Kim and Jerrold Lee prepared the 1990 sales summary. This document was used during Mantae's negotiations with Paliafito. (4 Tr.2d 350–51:15–25, 1–13 (Joy Lee).)

174. Edward Kim testified that Mantae sold "maybe 200,000" units in 1990. (4 Tr. 352–53:9–25, 1 (Edward Kim).)

175. Kim based this statement on representations that Joy and Jerrold Lee made to him at the time that Mantae was negotiating with Paliafito in early 1991. (4 Tr.2d 353:1–10 (Edward Kim).)

176. Mark Paliafito testified that in reliance on the representation that Mantae had sold 500,000 Games in 1990, Paliafito entered into the Agreement and paid $1,000,000 for the exclusive United States rights to GRIP BALL. (2 Tr. 389–90:17–25, 1–6 (Paliafito).) Andes testified that he cannot recall whether Mark Paliafito cared about the 500,000 figure. (6 Tr.2d 528:7 (Andes).)

177.[6] Throughout the negotiations, Mantae represented that it intended to grant Paliafito the exclusive rights to market and distribute the Game in the United States. (DX 9, numbered paragraph 2; DX 11A § 1.)

178. In notes labeled "Andes Group," (DX 273), Joy Lee wrote of a $1,000,000 purchase price and stated "when we sign with Hasbro we will refund $500,000." (DX 273; 4 Tr.2d 356–57, 359:24–25, 1–14, 1–20 (Joy Lee).)

179. Joy Lee testified that she and Mark Paliafito discussed the possibility of MAI and Paliafito, as a team, using Hasbro to distribute GRIP BALL. She stated that if that occurred, MAI would refund $500,000 to Paliafito and Paliafito would receive one-half the revenues from GRIP BALL and concentrate on other products for MAI. (4 Tr.2d 359:1–20; 11 Tr.2d 1181:8–10 (Joy Lee).)

180. During the meeting, the parties negotiated the minimum unit purchase requirement. Hupe testified that Mantae wanted a high minimum unit purchase requirement (3,000,000—5,000,000) while Paliafito desired a lower requirement (800,000). (4 Tr. 657–58:17–25, 1–15 (Hupe).)

**3. Due diligence issue**

181. There were questions as to Joy Lee's ownership of the Patent. (MAI EXS 150, 151, 153; 6 Tr.2d 505:4–6; 506:21—509:15; 519:25—520:4; 521:22—522:5; 522:13—523:19; 524:15—526:7 (Andes).)

182. The Andes/Paliafito Group retained a patent attorney, one Alan Wheeler, to review the Patent, (2 Tr. 299:24—301:7 (Paliafito)), and to investigate claims made by Aljac against the Patent. (MAI EX 150, No. 10; MAI EX 151, at 2; 6 Tr.2d 511:14–23; 513:17—514:6; 520:15–18; 522:13–22 (Andes).) Handler, the partner of Richard Hart, Paliafito's attorney and later President, was given the responsibility of following up on the issue. (6 Tr.2d 511:14–23; 513:25—514:10 (Andes).)

183. There were also questions as to MAI's finances; Andes/Paliafito wanted financial statements from MAI, but MAI refused to provide them, believing such information to be irrelevant since it was Andes/Paliafito that had financial obligations, not MAI. (6 Tr.2d 509:16–25; 520:11–14 (Andes); 12 Tr.2d 1298:14—1299:10 (Joy Lee).)

184. Andes wished to verify the accuracy of MAI's statement that it had sold 500,000 games in 1990. (6 Tr.2d 515:1—517:12 (Andes); MAI EX 152.)

185. Andes also wanted to verify Joy and Jerrold Lee's integrity. (MAI EX 153, at 1; 6 Tr.2d 525:21—526:3 (Andes).)

186. According to a February 5, 1991 letter from Paliafito, these issues were material to the deal going forward. (MAI EX 153, at 1.)

**4. February due diligence**

187. On February 6, 1991, Keith Nowak wrote to Paliafito's attorney, Thomas Handler, refusing to give full disclosure of Mantae's financial condition. He stated that Mantae was a closely-held corporation and that its owners were quite sensitive about the confidentiality of the company's business.

6. Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraphs 177 through 220 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

He did state, however, that Joy and Jerry Lee owned fifty percent of MAI and MCL and that Jae–Duck Kim, a Korean national, owned the other fifty percent of both corporations. Nowak also stated that "Mantae, Ltd.," a Korean company, actually manufactured the Game. (DX 119 ¶¶ 4, 5, 18.)

188. A meeting was held in New York on or about February 8, 1992 (the "February 8th Meeting") for the purposes of conducting due diligence and then signing a letter of intent. (1 Tr. 140:21–25; 142:22–25 (Paliafito); 6 Tr.2d 504:1—505:3 (Andes).)

189. Paliafito was represented throughout the negotiations and at the meeting by counsel. (1 Tr. 126:2–5 (Paliafito); 6 Tr.2d 504:11–18 (Andes).)

190. While traveling from Tennessee to the February 8th Meeting, Keith Andes created a list of due diligence issues that needed to be resolved at the meeting. He titled the list "Rats in the Woodpile." (MAI EX 150; 6 Tr.2d 517:14—520:18 (Andes).)

191. Keith Andes testified that it became clear at the February 8th Meeting that Paliafito wanted to proceed with the deal regardless of the due diligence issues. According to Keith Andes, Paliafito was not concerned with the Patent because it really wanted the right to purchase good quality products from MAI. (6 Tr.2d 527:21—528:5 (Andes).)

192. In contrast, Mark Paliafito testified that Nowak addressed Paliafito's patent concerns. He said that after Andes raised the issue of patent validity, "Keith Nowak said to Keith Andes that's a great story, but I don't think you have any basis for it . . . said don't worry about the patent . . . said it was all malarkey."

193. Andes also said that he did not recall that Paliafito was concerned with the number of Games claimed to have been sold by MAI. (6 Tr.2d 528:6–7 (Andes).)

· 194. Andes decided not to proceed with the deal because the due diligence matters and especially the Patent issue had not been resolved. (MAI EXS 91–93.)

195. Instead, Andes was to continue distributing the Game in his eleven-state region.

(4 Tr. 773:15–19 (Hupe); 6 Tr.2d 528:8–21 (Andes).)

196. Paliafito felt as if it had been left "high and dry" with no one with experience to operate the national distribution center. (4 Tr. 761:24—762:2 (Hupe).) However, Hupe also testified: "Being young and aggressive the five of us in our company did the best we could to run the best distribution facility we could, put the basic principles I've up there and you have listed on the board to work and we moved our quota in seven months." (4 Tr. 763–54:22–55, 1–6 (Hupe).)

### 5. February 8, 1991: New York meeting

197. On February 8, 1991, another meeting was held between the parties in New York at the offices of Lieberman, Rudolph and Nowak. Prior to, and at, this meeting, Paliafito attempted to obtain financial information about Mantae. Mantae refused to provide such information. (1 Tr. 143:3–8 (Paliafito).)

198. At the February 8th Meeting, Keith Andes backed out of the deal after stating his concern over due diligence matters and patent issues. (1 Tr. 142–43, 144:22–25, 1–2, 13–15 (Paliafito).)

199. Mark Paliafito informed Joy Lee and Nowak that Andes had decided to withdraw from the deal. Despite his withdrawal, Mantae chose to continue negotiations. Mantae stated that it had no problem with Andes' departure. (1 Tr. 144, 145–46:5–15, 24–25, 1–10 (Paliafito); 2 Tr. 412–13:18–25, 1–10 (Paliafito); 10 Tr.2d 1098–99:9–25, 1–14 (Joy Lee).) Joy Lee testified that she understood then that Andes would remain a distributor, as he had been before Paliafito and MAI began negotiating. (4 Tr.2d 360:5–8.)

200. The parties discussed the 1,500,000 unit minimum purchase requirement. Hupe testified that this requirement was negotiated right up until the signing of the Agreement. (4 Tr. 772:9–14 (Hupe).)

201. Hupe testified that the 1,500,000 minimum purchase requirement was based on Joy Lee's representation that she had sold 500,000 units in 1990. (4 Tr. 658–59:20–25, 1–10 (Hupe).)

## F. AGREEMENT

202. On February 11, 1991, MAI and MCL, on one hand, and WAAC, on the other hand, signed a letter of intent. (DX 121.)

203. On February 15, 1991, MAI and MCL, on the one hand, and WAAC, predecessor in interest to Paliafito, on the other hand, entered into the exclusive distributorship contract (the "Agreement"). (DX 11A.)

204. The Agreement was drafted by Keith Nowak, Mantae's attorney. (1 Tr. 149, 151:5–10, 5–6 (Paliafito).)

205. The Agreement was executed in Milwaukee, Wisconsin on February 15, 1991. (4 Tr.2d 359:21–24 (Joy Lee).) The Lees attended on behalf of Mantae, and Mark Paliafito and Michael Barker attended on behalf of WAAC. The Agreement was signed by Mark Paliafito, for WAAC, and by Joy Lee, for MAI and MCL. (1 Tr. 146–47, 151:11–25, 1–2, 14–18 (Paliafito); DX 11A.)

206. The Agreement was signed on or about February 15, 1991. (DX 11A.)

207. The Agreement provides that MAI would grant Paliafito the exclusive right to distribute the Game in the United States subject to certain conditions. (DX 11A).

208. Paliafito was required to purchase a minimum of 1,500,000 units during calendar year 1991 and 3,000,000 units in 1992. (DX 11A, ¶ 4.)

209. Paliafito was required to pay for the Games either by irrevocable letter of credit or with fifty percent of the purchase price in cash upon order and fifty percent upon delivery. (DX 11A, ¶ 7.1.) The terms of credit could be changed with thirty days written notice. (DX 11A, ¶ 7.2.)

210. Joy Lee testified that the terms of payment were very important to MAI because it guaranteed payment for goods delivered. She stated that, absent payment by letter of credit or cash, the manufacturer would have its own cash flow problems because it is required to pay for the materials, labor, and other factors to make the Games. (10 Tr.2d 1109:1–25 (Joy Lee).)

211. The Agreement set forth a pricing structure pursuant to which Paliafito was to purchase Games from MAI, (DX 11A, ¶ 3.1), which was not to be changed during the first twenty-four months. (DX 11A, ¶ 3.2.)

212. Paliafito was required to order goods in minimum lots of 10,000 units, (DX 11A, ¶ 4.4), and give MAI sixty days written notice for orders to be delivered by sea and thirty days by air. (DX 11A, ¶ 10.2.) For orders in excess of 10,000 units, Paliafito was required to give MAI ninety days written notice if by sea and sixty days if by air. (DX 11A, ¶ 10.3.) The notice was important to MAI because it takes time to manufacture the Games and, with additional planning, MAI could get lower prices for materials and labor. (10 Tr.2d 1117:20—1118:24 (Joy Lee).)

213. Paliafito was also required to work with MAI's prior regional distributors "to the extent reasonable and possible." (DX 11A, ¶ 13.3.) Joy Lee testified that this was also very important to MAI because of the existing business ongoing by the prior distributors and the knowledge of the Game held by the prior distributors. (11 Tr.2d 1132:3—1133:2 (Joy Lee).)

214. MAI represented that it had all rights to the Patent. (DX 11A, ¶ 18.1.) MAI explicitly disclaimed, however, any representation or warranty that the Patent was valid. (DX 11A, ¶ 20.2.)

215. Paliafito was required to expend $00.70 per Game on advertising, (DX 11A, ¶ 12.2), to "cooperate and consult" with MAI in all advertising and to give MAI the right to approve all such advertising. (DX 11A, ¶ 12.3.)

216. The Agreement was subject to MAI's prior distribution agreement with Andes. (DX 11A, ¶ 18.4(a).)

217. The Agreement also provides for the payment by Paliafito to MAI of $1,000,000, for the rights, payments for which were to be made in four installments, the first due on signing, the second on March 1, 1991, the third on May 1, 1991 and the final payment on July 1, 1991. (DX 11A, ¶ 2.)

218. Upon termination of the Agreement, Paliafito had the option to continue to sell Games on a non-exclusive basis. (DX 11A, ¶ 17.5.)

219. At the time she signed the Agreement, Joy Lee knew that Keith Andes was not involved in the Agreement. (4 Tr.2d 359–60:25, 1–11 (Joy Lee).)

220. Mantae made the following representations in the Agreement: (1) that MAI was a California corporation;[7] (2) that Joy Lee was the inventor of the Game; and (3) that MAI had the exclusive right to market, sell and distribute the Game in the United States and desired to grant to Paliafito the exclusive right to market, sell and distribute the Game, subject to the rights of the existing distributors. (DX 11A, at 1, ¶¶ 1, 2, 5, 6.)

221. Mark Paliafito testified that these representations were significant to Paliafito. (1 Tr. 148–49:7–25, 1–4 (Paliafito).) Andes testified, however, that no one from Paliafito cared about due diligence matters. (6 Tr.2d 527:15–24.)

222. Although the Agreement stated that Mantae was a California corporation, (DX 11A, at 1, ¶ 1), Mantae is, in fact, a New York corporation. (DX 12.)

223. Section 1.1 of the Agreement states that "[Mantae] hereby grants to WAAC the exclusive and complete marketing and distribution rights in the United S[t]ates and U.S. Territories, to [GRIP BALL];" Mantae also represented in the Agreement that it would not "enter into any agreement with any entity to distribute [the Game] in the U.S. or its Territories." (DX 11A § 1.1, 18.6.)

224. Mark Paliafito testified that these representations were especially important to Paliafito. (1 Tr. 148–50:20–25, 1–25, 1–6 (Paliafito).)

225. The Agreement also contains an integration clause. Under this clause, the parties agreed that the Agreement "set forth the entire agreement and understandings between the parties . . . and supercede[d] and merge[d] all prior discussions, agreements and/or writings between them." (DX 11A § 20.3.)

226. On the same day that the parties executed the Agreement, Keith Nowak sent a letter to Hasbro without Paliafito's knowledge or consent, offering for sale the exclusive rights to the Game for the mass market in the United States and other countries, including Canada, Australia, New Zealand, and the countries of South America. (DX 276.) Joy Lee testified, however, that she told Paliafito she was still dealing with Hasbro. (11 Tr.2d:8–110.)

227. Joy Lee testified that the letter to Hasbro was sent in the morning and the Agreement with Paliafito was signed in the afternoon. (11 Tr.2d 1183:7—1187:5 (Joy Lee).) Joy Lee testified that MAI kept Paliafito fully informed as to the Hasbro matter. (11 Tr.2d 1187:7—1188:5 (Joy Lee); MAI EX 4, DX 277.)

228. Joy Lee testified that the lack of Paliafito financing caused MAI to bring in Games on a D/A basis, instead of on an LC basis, which was a huge risk for MAI since if the Games were not paid for by MAI, the Korean manufacturer would lose its export license. Joy Lee also stated that lack of financing caused great disruption in the Korean manufacturer's planning. (10 Tr.2d 1117:20—1118:24 (Joy Lee); 10 Tr.2d 1053:15—1054:21 (Joy Lee).) Paliafito notes, however, that between July 12, 1991 and October 18, 1991, it paid Mantae $4,137,649 for Games shipped. (DX 415, DX 415A.)

229. According to Karl Carlson, Senior Toy Buyer for Target stores,[8] Paliafito was inexperienced in the toy business. (8 Tr.2d 776:22—780:22; 823:17—824:7 (Carlson).[9])

---

7. On February 6, 1991, Nowak faxed Paliafito's attorney MAI's stock ledger, which states that MAI is incorporated under the laws of New York. (DX 118, at 5.)

8. Target is a mass merchant in the discount store industry with 470 stores around the country. Carlson is responsible for over $300,000,000 in annual toy purchases. Carlson was not paid for his testimony. (8 Tr.2d 770:25–773:2 (Carlson).)

9. Michael Ross, a salesman in the sporting goods industry, testified that, for the length of time that Paliafito had been in existence (less than one year), he believed that Paliafito "performed within or beyond [his] expectations." (1 Tr. 85: 12–13 (Ross).)

## G. SECTION TWO: PAYMENT FOR RIGHTS

230. Section Two of the Agreement required Paliafito to pay to Mantae $1,000,000 for the exclusive distribution rights. (DX 11A § 2.)

231. On February 15, 1991, Paliafito made the first $250,000 installment payment for the rights. (DX 15; 1 Tr. 163:9–19 (Paliafito).)

232. On March 1, 1991, Paliafito made the second $250,000 installment payment. (DX 16; 1 Tr. 164:7–17 (Paliafito).)

233. On June 26, 1991, Paliafito made the third $250,000 installment payment. (DX 17; 1 Tr. 164–65:24–25, 1 (Paliafito); 2 Tr. 325:2–6 (Paliafito).)

234. Mark Paliafito testified that Joy Lee told him the third installment payment, initially due on May 1, 1991, could be delayed to allow Paliafito to pay for unordered product that was arriving and she preferred Paliafito to pay for inventory rather than making the rights payment. (2 Tr. 325, 413–14:2–14, 21–25, 1–4 (Paliafito).)

235. Joy Lee testified she made some complaints to Paliafito regarding late payment. (11 Tr.2d 1113:25—1114:4 (Lee); 2 Tr. 327:16–20 (Paliafito).) On April 29, 1991, Joy Lee requested Paliafito to forward payment of $250,000. (DX 136.)

236. On April 29, 1991, Joy Lee asked Paliafito to send its May 1st rights payment as soon as possible. The money was needed in Korea to keep things running smoothly, because Jerrold Lee had made promises based upon the terms of payment set out in the Agreement. This reason may or may not have been told to Paliafito. Joy Lee was told by Jerrold Lee that MAI, Ltd.'s bank in Korea asked that the check be made out to Jerrold personally. (DX 136; 11 Tr.2d 1211:5–11; 1212:7–23; 1213:8–13 (Joy Lee); *see* MAI's Opposition to Paliafito's Request For Determination of Foreign Law.)

237. On July 8 or 9, 1991, Paliafito delivered the final rights payment to Mantae. (1 Tr. 165–67:8–25, 1–25, 1–9 (Paliafito).)

238. Mark Paliafito testified that the three checks dated July 11, 1991 and constituting the final payment (check numbers 1377, 1378, and 1379), (DX 18), were deposited in Mantae's account at the Hanmi Bank on July 10th, and posted to Paliafito's bank account on July 11th, one day before Paliafito received a letter of termination from Mantae. (1 Tr. 166:20–25 (Paliafito); DX 18; DX 86, at 3 (bank statement at 2, column 1).) Joy Lee told her company to treat any money coming in from Paliafito as payment on accounts receivable, not rights under the contract. (12 Tr.2d 1312:4–19 (Joy Lee).) The checks contained in DX 18 do not indicate on their face that they were in final payment for rights under the contract. (DX 18 (*compare* MAI EX 46 (bounced check for final payment on rights)).) [10]

239. Mantae's financial officer, Bert Levesque, treated these three checks as the July payment for the sales rights on Mantae's books. (DX 717 at 1; 12 Tr.2d 1408:19–25 (Joy Lee).)

240. These three checks are listed in Mantae's books as having been received prior to the termination notice. (DX 716; DX 718; 12 Tr.2d 1409–10:24–25, 1–3 (Joy Lee).)

241. Mark Paliafito testified that Mantae never raised any objection to Paliafito with respect to Paliafito's tender of payment under the Agreement. (1 Tr. 167:16–19 (Paliafito).) In contrast, Joy Lee testified that on May 31, 1992 she showed Mark Paliafito a draft of a twenty-day notice letter for failure to make timely payments. (12 Tr.2d 1266–68 (Joy Lee).)

242. Section Two also required Paliafito to pay $437,047.92 for start-up product inventory and $27,600 for Game display sets. Paliafito paid for the product inventory and

---

10. A July check was given to MAI in late June or early July 1991, and was post-dated July 10th. Joy Lee testified that MAI deposited the check on July 8th so that it would clear Paliafito's bank by July 10th and that Paliafito was aware of this. (12 Tr.2d 1201:1–24; 1202:13–1204:25 (Joy Lee).) The July check bounced on July 9th. (12 Tr.2d 1201:5–1203:15 (Joy Lee); 2 Tr. 328:6–13; 329:11–330:17 (Paliafito).) Mark Paliafito testified, however, that the check was to be canceled. (2 Tr. 409–410:22–25, 1–6 (Paliafito).)

GRIP BALL display sets. (Mantae's Ans. ¶ 56; DX 15.)

243. Joy Lee testified that Paliafito kept promising that their bank would provide it with factoring. Joy Lee stated she did not want to hear promises and, on June 11th, asked Mark Paliafito for a letter from his bank saying that factoring is possible and indicating when MAI could expect its money. Joy Lee testified that no such letter was provided. (DX 144; 12 Tr.2d 1272:14—1273:6 (Joy Lee).)

## H. SECTION FOUR: 1,500,000 UNIT MINIMUM PURCHASE REQUIREMENT

244. Section 4.1 of the Agreement provides:

"WAAC (PAI) shall purchase from MA (MAI) (subject to ML's (MCL's) ability to manufacture and ship) not less than a minimum quantity of One Million Five Hundred Thousand (1,500,000) Product units during calendar year 1991, wherein a Product unit is defined herein as two paddles and one ball."

245. As of October 24, 1991, the date upon which Mantae informed Paliafito that it would no longer deliver product to Paliafito, Paliafito had purchased from Mantae more than 1,500,000 game units. (DX 93; DX 94; 4 Tr. 660, 664:17–25, 5–18 (Hupe).)

246. In 1991, the total number of Games sold by both Paliafito and Mantae, including Games sold after October 1991, reached 2,300,000 units. (DX 300, at 4.)

247. Section Twelve of the Agreement required Paliafito to: (1) "aggressively advertise" the product; (2) expend $00.70 on advertising for each game sold; and (3) give MAI the right to advance approval for all advertising prior to release. (DX 11A §§ 12.1, 12.2, 12.3.) Section 12.3 of the Agreement states:

12.3. WAAC further agrees to cooperate and consult with MA in all such advertising and that MA shall have the right to advance approval for all such advertising prior to releases. Approval, or disapproval by MA, shall be given within thirty (30) days of a request for approval by WAAC, and such approval shall not be unreasonably withheld.

248. Paliafito performed its obligations under Section Twelve of the Agreement and spent approximately $1,100,000 million on advertising or $00.73 per unit. If "co-op advertising" (the advertising allowance or credit given to retailers) is included, total advertising expenditures total $1,300,000 or $00.90 per unit. (DX 90; DX 92 at 2; 4 Tr. 665, 667–68, 670:8–11, 22–25, 1–16, 2–15 (Hupe).)

249. In late April or early May 1991, Paliafito and Mantae reached an oral modification of the per-unit advertising requirement, in a meeting between Mark Paliafito, Michael Barker, and Joy Lee in Joy Lee's office in Walnut, California, by which the per unit advertising requirement was reduced to $00.40 per game. Subsequently, Joy agreed that Paliafito would only be required to spend whatever it thought necessary. (1 Tr. 156, 158–59, 160:15–23, 5–25, 1–25, 16–19 (Paliafito).)

250. Scott Hupe testified that Paliafito performed under the terms of the contract. (4 Tr. 668–69:20–25, 1–9 (Hupe).)

251. Scott Hupe testified that Mantae never asked Paliafito for documentation to substantiate any advertising expenditures. (4 Tr. 669:10–12 (Hupe).)

252. Mark Paliafito testified that prior to July 12, 1991, Joy Lee never raised any questions about Paliafito's compliance with Section Twelve of the Agreement. (1 Tr. 155–56:16–25, 1 (Paliafito).)

253. Paliafito aggressively advertised GRIP BALL in the territory. (1 Tr. 155:16–23 (Paliafito)). Mr. Kislevitz testified that the advertising hurt rather than helped, however, because Paliafito did not have goods on the shelf to meet demand and thereby opened the door to knockoffs. (8 Tr.2d 754:8—755:2 (Kislevitz).)

254. The advertising may have caused problems because the goods were not on the shelf to meet demand thereby allowing more knockoffs to enter the market. (8 Tr.2d 754:8—755:2 (Kislevitz).)

255. In addition, Paliafito told *The Wall Street Journal* that "Mantae was waiting for people to call and order the Game. Our emphasis is to get out there and demonstrate it." (DX 14; 12 Tr.2d 1219:5—1220:1 (Joy Lee).) Paliafito also told *The Wall Street Journal* that its "warehouse is empty." Joy Lee testified that this opened the door to knockoffs, as the competition now knew Paliafito could not ship. (DX 14; 12 Tr.2d 1220:1–10 (Joy Lee).) Paliafito did not consult with MAI prior to making those statements to *The Wall Street Journal*. (12 Tr.2d 1220:23—1221:12 (Joy Lee).)

## I. SECTION THIRTEEN: WORKING WITH DISTRIBUTORS

256. Joy Lee strongly suggested to Paliafito that it meet with Eleanor's of California and use her as a regional distributor because she has customers, always pays on time, and pays with cash or on a very short term. (12 Tr.2d 1322:1—1323:7 (Lee).)

257.[11] Section Thirteen of the Agreement required Paliafito to "attempt to work with [certain identified, non-exclusive] distributors [Eleanor's, New Market Concepts, Tradewinds, and Joneek] to the extent reasonable and possible." (DX 11A § 13.)

258. Mark Paliafito testified that Paliafito worked with the enumerated distributors to the extent reasonably possible. He further stated that the only disputes with these distributors were the result of Mantae's actions, not Paliafito's actions. (1 Tr. 161–63:6–25, 14–25, 1–6 (Paliafito).) Joy Lee testified otherwise. In particular, Joy Lee stated that she strongly suggested to Paliafito that it meet with Eleanor's of California and use her as a regional distributor because she has customers, always pays on time, and pays with cash or on a very short term. Joy Lee stated that Paliafito did not try to work with Eleanor's, which caused Eleanor's to start selling a knockoff. (12 Tr.2d 1322:1—1323:7 (Joy Lee).)

## J. PALIAFITO'S PROBLEMS WITH MANTAE

### 1. Shipment of Games to Andes

259. Soon after the Agreement was executed, Paliafito discovered that Mantae shipped goods to Keith Andes without notice to Paliafito. (DX 20; 1 Tr. 175:4–11 (Paliafito).)

260. When Paliafito brought this to Joy Lee's attention, Joy Lee stated that "I don't have to promise to your guys that I am not going to sell GRIP BALL to U.S. buyers because I never did and I am not doing as of this moment." (DX 131, at 2.)

261. Andes admitted that he testified in his *New Market Concepts* deposition that, after March 1991, he had purchased additional games from Mantae. (6 Tr.2d 539:10–19 (Andes).)

### 2. Offers of distributorships

262. In early March (less than three weeks after the Agreement had been executed), Eddie Kim, Mantae's employee, approached Boreson & Associates and Sports Motion to sell them exclusive distributorships in certain parts of the United States. Mark Paliafito testified that MAI did this without Paliafito's knowledge or consent. (DX 21; DX 22; 1 Tr. 174–75, 177–78:7–25, 1–3, 10–25, 1–3 (Paliafito); 2 Tr. 410–11:23–25, 1–10 (Paliafito).)

263. Joy Lee testified that the letters by Kim, (DX 21 and 22), were written because MAI wanted to keep open all contacts for Paliafito. (12 Tr.2d 1370:4—1371:22 (Joy Lee).) Paliafito used one of the companies to whom Kim wrote, Sports Motion, as a subdistributor. (MAI EX 69; 12 Tr.2d 1372:2–17 (Joy Lee).)

### 3. Knockoffs

264. Knockoff games (games that resemble and operate in the same manner as the Game) were present in the marketplace long before Paliafito began advertising the

---

**11.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraphs 216 through 257 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to

Game.[12] (DX 5; 1 Tr. 63–64, 67:21–25, 1–20, 5–20 (Ross).)

265. In March 1991, Keith Nowak wrote a letter, (DX 7), to Arthur Fischer, attorney for C & W Enterprises, a company selling Stickball—a knockoff of the Game—indicating that MAI would not assert its patent rights against Stickball. (DX 7 ¶ 2).

266. Sales representatives selling knockoff products showed this letter to customers. (1 Tr. 113, 114, 120:8–22, 7–19, 2–15 (Ross).)

#### 4. Shipment of unordered goods

267. Mark Paliafito and Scott Hupe testified that on many occasions, Mantae would present Paliafito with unordered Games. When these Games arrived at Paliafito's warehouse, Joy Lee would demand immediate payment for the Games and ask for a check payable to cash or to Mantae America. She said that if Paliafito did not pay her for the unordered Games immediately, she would ship the product to someone else. Mark Paliafito argued with Joy Lee about this, but Paliafito would end up paying her for the Games, most of the time paying for the units as they arrived. (2 Tr. 215, 220–21:6–10, 2–25, 1 (Paliafito); 4 Tr. 673:4–15 (Hupe).)

268. The Agreement implies that Mantae was not supposed to ship Games to Paliafito unless Paliafito had ordered them. (DX 11 § 10; 2 Tr. 258–59:17–25, 1–12 (Paliafito).) [13]

269. According to Mark Paliafito, "[m]ost of the times we had orders for the goods and we'd ship them out and try to pay her as quickly as we can." (2 Tr. 259:5–10 (Paliafito).) He also testified that Joy Lee would demand payment a week after delivery. (1 Tr. 186:23—187:1 (Paliafito).)

270. Joy Lee testified that she did not threaten to sell the goods to somebody else

in the U.S. Joy Lee states she told Mark Paliafito that if he could not buy the Games then she would sell them to MAI's Canadian distributor, Art Carrington, who already had a Letter of Credit in place in Korea. (12 Tr. 1275:12—1277:22 (Joy Lee).) Mark Paliafito stated that he did not know whether Joy Lee was going to sell the Games in the U.S. or abroad. (2 Tr. 220:20–23 (Paliafito).)

### K. CUSTOMS PROBLEMS

271. Throughout the latter half of 1990, 1991, and the beginning of 1992, the Mantae organization imported Games into the United States at undervalued prices. The Mantae organization brought the Game in at prices ranging between $03.00 and $04.50 per Game, depending upon the type of packaging, while the actual buyers of the Game paid between $04.25 to $06.80 per Game. (DX 2500, Tab B; DX 501 at DH 212; DX 29; DX 495 at bates, at 469, 471 (see Paliafito's Bench Memorandum No. 1).) Joy Lee testified, however, that Paliafito, as an importer and national distributor, was also responsible for customers. (10 Tr.2d 1060:5–207 (Joy Lee); see also 4 Tr.2d 446:2—447:14 (Paliafito) (Paliafito was the importer).)

272. The Mantae organization imported the Game via two methods. The primary method was to directly import the merchandise into the United States and then "resell" such merchandise to the actual buyers, Paliafito and others, at a higher, previously agreed-to price. (DX 2500, Tab C; DX 29; DX 30; DX 31.) The imported price would be less than the resale price.

273. Employing the second method, Mantae brought Games into the United States through invoices that listed an importer of

the extent an attempt is made to use them at trial on the merits.

**12.** It appears, however, that the knockoff problem grew after Paliafito advertised the Game. (8 Tr.2d 754:8–755:2 (Kislevitz).)

**13.** Section 10 of the Agreement provides:
   10. *Product Delivery*
   10.1. MA and ML agree that WAAC will have top priority over any other entity placing orders with MA for Product delivery of the minimum quantities set forth in Article 4.

10.2. For all accepted orders fulfilling the minimum quantities set forth in Article 4, MA shall deliver such orders within sixty (60) days from written order placement for delivery by sea, and within thirty (30) days from written order placement for delivery by air freight.
10.3. For all orders accepted in excess of the minimum quantities set forth in Article 4, MA shall deliver such orders within ninety (90) days from written order placement for delivery by sea, and within sixty (60) days from written order placement for delivery by air freight.

record unrelated to Mantae, such as Paliafito, stating a price lower than the actual purchase price. Mantae would then send an invoice to the unrelated importer for the "excess" balance due. (DX 32; DX 33; DX 34; DX 40; DX 41.)

274. For example, Paliafito had agreed to pay $05.10 for clamshell-packaged Games, FOB Korea. (DX 29; DX 30; DX 31; 1 Tr. 191–93:3–23, 7–13, 2–7 (Paliafito).) On several occasions, when Paliafito imported product directly from Korea, Paliafito received commercial invoices from MAI, Ltd., signed by Jong Sik Lee, showing a per-unit price of $03.85. (DX 32; DX 33; DX 34; see also DX 39 (shipping schedule written by Joy Lee) 2 Tr. 209:16–18 (Paliafito).) Mantae would later invoice Paliafito for the difference between the agreed-upon price and the price on the commercial invoice, and Paliafito would pay the invoice. (DX 40; 2 Tr. 214–15:19–25, 1–10 (Paliafito).) Joy Lee testified that the difference was used to pay for her U.S. business expenses and not to defraud Customs.

275. Mark Paliafito testified Joy Lee told Paliafito that if Paliafito refused to pay according to the two-tiered terms, she would ship Games elsewhere. (2 Tr. 212–13, 311, 384–85:19–25, 1–12, 11–21, 25, 1–22 (Paliafito).) Joy Lee denied this. (12 Tr.2d 1275:12–16.)

276. Mark Paliafito testified that the Mantae organization's stated purpose behind the scheme was that "it would help save money in customs and other places." (2 Tr. 385:9–12 (Paliafito).) Mantae denies this.

277. Joy Lee testified that it was Paliafito's function as the importer to pay customs duties. Thus, she said, there was no way MAI could be saving money. (12 Tr.2d 1158:3–24 (Joy Lee); 3 Tr. 446:2—447:14 (Paliafito).) Joy Lee testified that, when purchasing from MAI, Paliafito paid a delivered price which included duty and all other charges accruing after exportation. (12 Tr.2d 1157:1—1158:24 (Joy Lee).)

278. MAI had its customs lawyer, Elon Pollack, review the Customs matter before this litigation commenced. (12 Tr.2d 1376:7—1380:6 (Levesque).)

279. Mantae produced duplicate sets of commercial invoices for its import transactions, listing two different prices on the invoices. (DX 711, at 1 ($03.25 unit price, invoice no. MAI–910716A), 2 ($05.00 unit price, invoice no. MAI–910716A).)

280. MAI has contacted Customs after inquiries from that department. (12 Tr.2d 1476:7—1477:6; 1477:20–25; 1478:24—1479:9; 1480:4–6 (Levesque).) Paliafito is also dealing with Customs to clear up any problems they may have. (3 Tr. 449:24—450:4 (Paliafito).)

281. On February 27, 1991, the Customs Service served a request on Mantae, (DX 252), asking if Mantae Co., Ltd. and Mantae America, Inc. were related and, if so, to describe their relationship and how this relationship affected the price paid for the product. (DX 252.)

282. On March 14, 1991, in response to the Customs Service inquiry, Kangho Lee, also known as Kevin Lee, (2 Tr.2d 210:16–21 (Joy Lee)), Mantae's vice president, sent a letter on behalf of Mantae, (DX 253), disclaiming any relationship between the two entities. He wrote:

> Mantae America, Inc. and Mantae Co., Ltd. are not related. Mantae Co., Ltd. manufactures the product and Mantae America, Inc. is the exclusive importer to the U.S. market. Similarity of the name is coincidental.

(DX 253 (emphasis added).)

283. Joy Lee testified that the letter to Customs by Kevin Lee was sent without her knowledge as she was in Korea at the time. DX 253 was prepared by Kevin Lee, an employee of MAI who had been in the country for only three months and spoke very little English. David Huh translated the document to English from Korean. (3 Tr.2d 237:1—238:19; 12 Tr.2d 1285:3–17 (Joy Lee).)

284. Throughout the rest of 1991 and well into 1992, Mantae continued to represent to the Customs Service that Mantae Co., Ltd. and Mantae America, Inc. were not related, and also represented that Puff Pac, MAI, Ltd., and Best General, on the one hand, and MAI, on the other hand, were not related.

These representations were made on 191 import entry summaries that MAI caused to be given to Customs. (DX 2501.)

## L. MANTAE'S PROBLEMS WITH PALIAFITO

285. On or about May 13, 1991, Joy Lee prepared a three-month review of her relationship with Paliafito. (DX 138; 11 Tr.2d 1215:19–24 (Joy Lee).) Joy Lee met with Paliafito to review the problems she saw. (11 Tr.2d 1238:11–18 (Joy Lee).)

286. Joy Lee testified she told Paliafito that she felt they were not doing their job as a national distributor. (11 Tr.2d 1226:17–24 (Joy Lee).)

287. Joy Lee testified that her specific complaints included the following.

a. She was being accused of selling behind Paliafito's back, which she states is not true. (11 Tr.2d 1219:1–16 (Joy Lee).) Paliafito asserts MAI did do this. (*See* ¶¶ 218–220.)

b. MAI was accused of choosing an expensive air freight company to ship Games which also was not true. (11 Tr.2d 1221:14—1222:24 (Joy Lee).)

c. MAI was being forced to pay interest charges in Korea because Paliafito was not paying on time. (11 Tr.2d 1222:25—1223:15 (Joy Lee).) Mark Paliafito testified, however, that Paliafito paid interest to Mantae at an annual rate of eighteen percent. (Paliafito Aff., at ¶ 6.)

d. Paliafito took the position it was loaning MAI money when it was really being asked to simply pay for merchandise. (11 Tr.2d 1225:2–22 (Joy Lee).) Paliafito notes, however, that Mantae demanded that Paliafito post a letter of credit at least *ninety* days before Mantae could deliver ordered product. Section Ten of the Agreement required Mantae to deliver ordered product within *sixty* days. Consequently, because Mantae asked Paliafito to finance Mantae's production of the Games for an extra thirty days, Paliafito was, in effect, loaning money to Mantae.

e. Payment delays. (11 Tr.2d 1227:8—1228:3 (Joy Lee).)

f. Allegations by Paliafito regarding breach of contract claims. (11 Tr.2d 1228:4—1229:9 (Joy Lee).)

g. Paliafito's requests for price reduction. (11 Tr.2d 1229:23—1230:17 (Joy Lee).)

h. Paliafito's poor relations with prior distributors. (11 Tr.2d 1230:18—1233:2 (Joy Lee).)

i. Allegations against MAI by Paliafito, without attempts to discuss the matter first with Joy Lee. (11 Tr.2d 1233:4—1234:15 (Joy Lee).)

j. Paliafito's failure to understand that MAI needed to be paid on time in order to expand manufacturing so as to meet demand. (11 Tr.2d 1234:16—1236:17 (Joy Lee).)

288. Most importantly, Joy Lee testified that Paliafito was obtaining orders for the Game but could not finance the purchase as required in the Agreement. Joy Lee testified that, because there was no financing, she was left with no choice but to finance the manufacture of the Games herself, or risk losing the market due to the fact that, if demand was not satisfied, competing products would take over. (12 Tr.2d 1181:14—1182:8 (Joy Lee).)

289. On May 15, 1991, Joy Lee requested that the Agreement be amended to give MAI a security interest in Paliafito's accounts receivable and inventory when MAI extended credit so that MAI would be assured of being paid. (DX 139, at 2, ¶ 3; 11 Tr.2d 1238:19—1239:23 (Joy Lee).)

290. By May 17, 1991, Paliafito owed MAI $350,000 for Games already shipped to (but not ordered by) Paliafito and $250,000 payment for the rights. Jerrold Lee explained to Paliafito that Paliafito's cash flow problems might cause MAI's bank to stop shipment of goods. (MAI EX 11.) Jerrold Lee demanded immediate payment of the $600,000. *Id.*

291. As of May 20, Paliafito owed MAI over $460,000, plus over $400,000 for 85,320 Games being shipped at Paliafito's request. (DX 41; 12 Tr.2d 1248:14—1249:9 (Joy Lee).) Joy Lee met with Mark Paliafito to review the situation, (DX 41), and suggested that

Paliafito pay MAI the $406,300 in two payments: one in the amount of $106,650 made out to MAI and due on June 5, 1991, and another payment of $298,620 made out to Jerrold Lee. This payment was due on July 15, 1992. Joy Lee testified that she suggested this dual payment system in order to assist Paliafito because she knew they did not have the money to pay the entire amount all at once, while at the same time MAI needed money to pay its bills. (12 Tr.2d 1257:12—1258:2 (Joy Lee); 12 Tr.2d 1248:2—1250:25 (Joy Lee).)

292. At the end of May 1991, Paliafito represented to Joy Lee that they were working with their bank to get financing and would have money to pay MAI. (12 Tr.2d 1159:8—1162:10 (Joy Lee).) Joy Lee testified that, by that time, Paliafito's cash flow problems were causing problems for the manufacturers because they did not have money to buy materials for more Games. (12 Tr.2d 1161:13—1162:10 (Joy Lee).) Joy Lee informed Mark Paliafito that: "Our [MAI's] current financial situation does not allow us to continue the shipment without receiving the payment. With this situation at our hand, if promises are not fulfilled, everything could fall apart so easily." (MAI EX 12, ¶ 5.) Joy Lee testified that MAI feared that the GRIP BALL business would fall apart. (12 Tr.2d 1262:1–10 (Joy Lee).)

293. Joy Lee testified that, in the two weeks since her three-month review with Mark Paliafito, Joy Lee had not received information regarding financing, and that Paliafito was still unable to obtain financing. She believed that there were accounts receivable for Paliafito to factor and simply did not understand why Paliafito could not get financing. (12 Tr.2d 1266:8—1268:5 (Joy Lee).)

294. Joy Lee testified that at the meeting with Mark Paliafito she showed him a draft breach of contract letter alleging breach of Section Two (because the May 1st rights payment was late) and Section Seven (because Paliafito was unable to finance the Game pursuant to the Agreement). (DX 27; 12 Tr.2d 1268:6—1270:9 (Joy Lee).) Mark Paliafito denies this.

295. Joy Lee testified that Mark Paliafito asked Joy Lee not to give him the breach letter and told her that he was working very hard to get financing. Joy Lee did not understand why obtaining factoring was so difficult given the accounts receivable and told Mark Paliafito he had to come up with a solution instead of just saying what he was going to do. (12 Tr.2d 1266:22—1268:5 (Joy Lee).)

296. In contrast, Joy Lee indicated that the purpose of the meeting was to find out whether Paliafito was going to be able to obtain financing to operate the distributorship as represented. Joy Lee testified she was upset that she was not receiving any information about Paliafito's obtaining financing and met with Mark Paliafito to tell him that he cannot keep saying that he is trying to obtain financing; he must come up with a solution.

297. Joy Lee testified she gave Mark Paliafito a copy of a letter dated May 30, 1991, (DX 28), from Joy Lee to Mark Paliafito, in which she complains that no one realizes what she did and "simply no one appreciates [her] efforts," and that, as a consequence, she is getting hurt, but "no one seems to give a damn." (DX 28 ¶ 3.)

298. Mark Paliafito testified that although Joy Lee apparently had a draft letter notifying Paliafito of breaches under the Agreement, (DX 27), Joy Lee chose not to give Mark Paliafito this letter and did not show it to him. She told Mark Paliafito that she did not want to give this letter to him and that it was not necessary. Mark Paliafito testified that no one associated with Mantae ever gave Paliafito a document by which Mantae notified Paliafito of a breach of the Agreement nor was any comment made during the course of the meeting on May 30, 1991, relating to the termination of the Agreement. (2 Tr. 222–23, 226:8–25, 1–20, 1–4 (Paliafito).)

299. On or about May 31, 1991, Joy Lee delivered a letter, (DX 44), to Mark Paliafito that she had received from Keith Nowak. In this letter, Keith Nowak wrote:

As a lawyer, I can write the best contract in the world but, unless the parties trust each other, that contract is worth noth-

ing. . . . Bottom line, the Paliafito Group has breached the contract by failing to pay the up-front payment on time, and by failing to pay for delivered product. You can terminate at any time. (DX 44, at 2, ¶¶ 3, 5; 2 Tr. 226–29: 5–25, 1–25, 1–21, 8–22 (Paliafito).)

300. Joy Lee testified that Paliafito kept promising that Paliafito's bank would provide Paliafito with factoring. Joy Lee stated she did not want to hear promises and, on June 11th, asked Mark Paliafito for a letter from his bank saying that factoring is possible and indicating when MAI could expect its money. Joy Lee testified that no such letter was provided. (DX 144; 12 Tr.2d 1272:14—1273:6 (Joy Lee).)

301. On June 17, 1991, Joy Lee wrote to Paliafito that: "MAI will provide as much assistance as possible to help the [financial] situation, but MAI does not have any obligation to bring merchandise without any proper financial procedure (L/C or cash [as provided in the Agreement])." (DX 149, ¶ 4; 12 Tr.2d 1279:23—1283:5 (Joy Lee).)

302. Joy Lee testified that she discussed MAI's obligation with Mark Paliafito and that he told Joy Lee that she had no choice but to bring in goods to fill demand; otherwise, MAI would lose markets. (12 Tr.2d 1281:21—1282:8 (Joy Lee).)

303. As of that date, Paliafito owed MAI over $570,000 for merchandise delivered, though not all ordered and accepted, plus the $250,000 rights payment. (12 Tr.2d 1207:5—1212:19 (Joy Lee).) Three checks totaling $250,000, however, were received from Paliafito and deposited by MAI the next day.

304. At least on one day in late August 1991, the Paliafito warehouse was empty. At the same time, MAI had 150,000 to 200,000 Games in inventory. (12 Tr.2d 1334:25—1336:23 (Levesque); MAI EX 127 (photos).)

305. The reasons for Paliafito's need for financing are set forth in a Confidential Financial Information Memorandum prepared by Paliafito in late April, or early May, for the purpose of obtaining financing. According to the Confidential Memorandum one reason was:

[t]he relatively short period of time during which the Company has existed has hampered the Company's ability to increase credit lines. This is largely due to the fact that financial institutions view the Company as a greater lending risk because of its lack of financial history.

(MAI EX 57, at 8.) The other key factors listed included: (1) that Paliafito had attained growth in demand (characterized by Hupe in his testimony as "runaway demand") which outdistanced its ability to finance inventory; (2) that from the date of shipment of an order, a substantial amount of Paliafito's capital base, depending on the size of the order, was committed, with little flexibility for fifty-five to eighty-five days; and (3) that Paliafito's advertising campaign was likely to increase demand for the Game. (MAI EX 57; 1 Tr.2d 33–34:5–25, 1–10 (Hupe).)

306. Jerrold Lee's records indicate that twenty-two percent of Paliafito's sales were financed by Paliafito under the terms of Section 7.1 of the Distribution Agreement, with the remainder being financed by MAI (forty-eight percent), and Target (thirty percent). (10 Tr.2d 1112:18—1115:18 (Joy Lee).) Section 7.2 of the Agreement, however, allows for modification of the form of financing. (DX 11A, § 7.2.)

307. Joy Lee testified that the lack of Paliafito financing caused MAI to bring in Games on a D/A basis, instead of on an LC basis. This was a huge risk for MAI because, if the Games were not paid for by MAI, the Korean manufacturer would lose its export license. Joy Lee also stated that lack of financing caused great disruption in planning for the Korean manufacturer. (10 Tr.2d 1117:20—1118:24 (Joy Lee); 10 Tr.2d 1053:15—1054:21 (Joy Lee).) Paliafito notes, however, that between July 12, 1991 and October 18, 1991, it paid Mantae $4,137,649 for Games shipped. (DX 415, DX 415A.)

308. Carlson had concern in September 1991 that there was no plan in place for spring of 1992, which hampered his ability to plan Target's business. (8 Tr.2d 819:16—820:23 (Carlson).) Carlson described Paliafito's activities at a meeting in September as "amateur hour." (8 Tr.2d 829:9—830:5 (Carlson).)

309. Andrew Kislevitz, an expert witness,[14] also believed that Paliafito did not know how to market the Game, (8 Tr.2d 746:8—748:8 (Kislevitz)), and that Paliafito did not meet the minimum requirements for a national distributor. (8 Tr.2d 763:15–18 (Kislevitz).)

310. Kislevitz also testified that Paliafito did not have a satisfactory plan for GRIP BALL. (8 Tr.2d 752:4–7 (Kislevitz).)

311. Kislevitz opined that Paliafito was opening the market to knockoffs by advertising the Game on television at a time when Paliafito could not fill demand. (8 Tr.2d 754:2—755:2 (Kislevitz).)

312. Kislevitz also believed that Paliafito did not know how to handle its debt and suggested methods for Paliafito to finance the purchase of Games through letters of credit out of Hong Kong via a show there. Kislevitz was "incredulous" that Paliafito did not listen. (8 Tr.2d 757:5—758:3 (Kislevitz).)

313. According to Kislevitz, "unless changes were made to protect their marketplace," there would not be a product left in two years. Kislevitz believed that Paliafito was not going to make the required changes and recommended to Joy Lee that she get out of the relationship because "the whole structure didn't make sense" because both Mantae and Paliafito had a profit margin. (8 Tr.2d 759:23—761:11 (Kislevitz).)

## M. PALIAFITO'S PROBLEMS WITH NATIONAL DISTRIBUTION

314. Target had the following specific problems with the Game: invoices were misdirected to the wrong department at Target; cash flow problems; required payments before paperwork was processed outside of normal terms of doing business; billing problems; failure to properly mark product containers; delivery; no marketing plan received. (8 Tr.2d 786:3—787:12; 790:1–15; 792:5—795:1; 798:1–12; 801:23—802:7; 809:1–22; 813:14—815:11, 815:17—816:10; 818:13—819:11; 820:12–23; 823:24—824:3 (Carlson); MAI EX 284.)

315. In addition, evidence was presented of numerous complaints registered against Paliafito by representatives and customers, as follows. (MAI EX 43.)[15]

a. John R. McCrory & Associates, Inc. questioned "What the hell is going on!" with regard to Paliafito's payments of commissions. (*Id.* at 1.)

b. Walgreen's requested information in Paliafito's possession that went unanswered. (*Id.* at 2.)

c. Forman Marketing complained concerning shipments to its customers which they had "received nothing but lies about." (*Id.* at 3.)

d. Failure to provide paperwork for a Target order. (*Id.* at 4.)

e. Forman Marketing complained, among other things, that "almost every order he [the customer] sent us was mixed up . . . ." (*Id.* at 5.)

f. Forman Marketing complained about failure to receive television advice holding up shipments. (*Id.* at 8.)

g. Other customers complained about failure to receive shipments. (*Id.* at 9.)

h. Failure to provide order information—"we are being hounded by Carol of Stearns as to the pro-numbers." (*Id.* at 10.)

## N. JULY 1991: THE LEES' DEALINGS WITH BERTRAND A. LEVESQUE

316. Before he went to work for Mantae, Bertrand A. Levesque was a vice president and director of Puff Pac Industries, Inc. ("PPI"), a publicly-held corporation. (DX 492; 13 Tr.2d 1393:20–23 (Levesque).)

317. Levesque testified that he wanted an arrangement in place with MAI before leaving Puff Pac. (12 Tr.2d 1496:10—1497:5 (Levesque).)

318. Levesque signed an employment agreement, dated July 1, 1991, with "Mantae America, Inc. and its affiliated Companies," to serve as Vice President/C.F.O. The employment agreement provides an annual sala-

---

14. *See* 8 Tr.2d 752:13–17 (the Court confirmed that Kislevitz was accepted as an expert witness).

15. This finding is made for the purpose of notice, not for the truth of the matter asserted.

ry of $65,000, an incentive bonus of one percent of net income, and a stock option to buy up to 2.5% of Mantae's outstanding common shares at a price of $00.01 per share during the first twelve months and the possibility of obtaining an option to purchase an additional 2.5% at the same price at the end of twenty-four months. (DX 157; 13 Tr.2d 1492–93:22–25, 1–19 (Levesque).) Levesque testified that he entered the July 1, 1981 agreement to make sure he had employment when he left Puff Pac. (12 Tr.2d 1496:22–25 (Levesque).)

319. According to Joy Lee, Levesque started working for Mantae sometime in June. (12 Tr.2d 1409:13–15 (Joy Lee).)

320. In early July, Levesque went to Korea on business for PPI. While there, on July 15, 1991, he faxed a letter to Dan Pharo and "Al" of PPI via international wires, from the offices of MAI, Ltd. (DX 491; 13 Tr.2d 1494–95:10–25, 1–23 (Levesque).)

321. The handwriting on DX 491 is illegible and there is no testimony by Levesque or anyone else as to the documents' content.

322. Levesque delivered his resignation from PPI, which was dated July 16, 1991, to Dan Pharo and Henry Saltiel on July 18, 1991. (DX 492; 13 Tr.2d 1393–94:24–25, 1–4 (Levesque).)

## O. JULY 12, 1991: TERMINATION LETTER

323. On July 12, 1991, Joy Lee sent Paliafito a letter explaining the problems MAI was having with Paliafito, along with a notice of termination. Joy Lee explained that an in-house marketing specialist was needed "to properly guide this operation," and that "Paliafito must acquire much more operating capital, which is apparently not currently available. We cannot rely on the *possibility* of an investor to supply that needed capital. In addition, not only is capital lacking, but the knowledge and experience to successfully carry the operation into the future is also lacking." (DX 46; DX 47, at 1.)

324. Joy Lee further stated:

"Paliafito is now capable of handling less than half of our current market flow. MAI is owed over $500,000, and all I re-

ceive is promises of when payment will be made, which promises are never honored. How can we continue like this and prepare for future sales? If we do not reorganize now, and project ourselves as a strong, capable, and organized company which is ready to meet this once-in-a-lifetime chance, other industry giants will."

(DX 47, at 2.)

325. Joy Lee suggested three options which would alleviate the problems being experienced by Paliafito. First, Joy Lee suggested that Paliafito continue to distribute, but not control sales and marketing. MAI and Paliafito would merge and invite a toy specialist to control sales and marketing. Financing would be split by MAI and Paliafito. Major decisions would be made by MAI. (DX 47, at 2.)

326. The second option comprised MAI taking over and giving Paliafito the profits from the sale of 1,500,000 Games sold in 1991, and Paliafito paying all outstanding amounts due MAI. (DX 47, at 2; 12 Tr.2d 1236:2–15 (Joy Lee).)

327. The third option was for MAI to pay Paliafito $1,000,000 and have the Agreement terminate immediately. (DX 47, at 3.)

328. Joy Lee attached an "official notice of termination," (DX 46), and advised Paliafito that if it "wish[ed] to renegotiate our Agreement along the lines described above, please contact me." (DX 47, at 3.)

329. Section 17.2(i) of the Agreement provides:

This Agreement, and the license granted hereunder, may be terminated by MA:

(i). Upon sixty (60) days written notice to WAAC for WAAC's material breach of this Agreement, and failure to cure such breach in accordance with Article 15; ...

Section 15.1 provides in part:

15. Breach and Cure

15.1 In the event either party hereto alleges a breach or violation of this Agreement, such allegation shall be made in writing, specifying the matter of the breach or violation. In the event the breach or violation is a monetary breach, the breaching party shall have twenty (20)

days after the receipt of notice to cure the breach or violation. In all other events, the breaching party shall have thirty days after the receipt of notice to cure the breach or violation, or in the event it is impossible to cure within thirty days, then the cure must be begun within thirty days and shall be cured as quickly as is reasonably possible, provided, however, all such cures must be implemented within ninety days unless MA agrees in writing to extend the cure period.

330. Mark Paliafito testified that Mantae never gave Paliafito written notice of breach prior to this date nor an opportunity to cure the purported breach, in violation of Section 15.1 of the Agreement. (2 Tr. 231:14–22 (Paliafito).)

331. Levesque testified that Paliafito never paid MAI pursuant to the Agreement. (12 Tr.2d 1426:23—1427:17 (Levesque).)

332. Mark Paliafito testified that after July 12, 1991, Paliafito and Mantae continued to do business with each other normally; Mantae continued to supply product and Paliafito continued to pay for the product. (2 Tr. 235–36, 416–17:16–25, 1–3, 12–23, 1–5 (Paliafito); 3 Tr. 461–62:24–25, 1–6 (Paliafito).)

## P. JULY 15, 1991: JOY LEE ASKS PALIAFITO FOR MORE MONEY AND RECEIVES IT IMMEDIATELY; JOY LEE MEETS WITH PALIAFITO TO DISCUSS TERMINATION LETTER AND SOLUTIONS

333. On July 15, 1991, Joy Lee met Mark Paliafito at the airport in Detroit and asked him for money for product delivered. Mark instructed his brother, John Paliafito, to give Mantae the money. John Paliafito did so, and Mantae deposited the check. (4 Tr.2d 394–95:4–8, 20–25, 1–13 (Joy Lee); DX 286.)

334. At a dinner meeting in Chicago shortly thereafter, Joy Lee, Keith Nowak, Mark Paliafito, Greg Waylock, and Richard Hart discussed the termination letter and solutions. (4 Tr.2d 396–97:24–25, 1–12 (Joy Lee).)

## Q. MID–JULY 1991

335. After MAI assigned the Andes Agreement to Paliafito, Paliafito terminated the Agreement with Andes based upon alleged breaches by Andes. (9 Tr.2d 910:20–25 (Hart).)

336. Thereafter, Andes sued both MAI and Paliafito. (9 Tr.2d 911:1–2 (Hart).)

337. Andes began making allegations with respect to the MAI patent and other matters some time prior to May 7, 1991. On May 7, 1991, in a fax from Nowak to Richard Hart, Paliafito was advised with regard to the threats being made by Andes, and advised of the fact that Nowak was investigating those allegations. (MAI EX 45, at 2, ¶¶ 1, 3). Although Hart did not specifically recall receiving the fax of May 7, 1991, he had no reason to believe that he did not receive it. (9 Tr.2d 919:13–16 (Hart).)

338. Hart and Nowak discussed the fax of May 7, 1991, and Hart was informed that Andes would prefer not to deal with Paliafito, but would prefer to deal with MAI, and Nowak and Hart agreed that MAI would meet with Johnson and Andes. (9 Tr.2d 921:10–16 (Hart).)

339. On May 15, 1991, Nowak sent Hart a second fax with a proposed letter to George Johnson regarding the Andes dispute. Nowak asked Hart to review and comment on the proposed letter. (DX 45, at 4, 5.) Hart did not recall whether he advised Nowak that he could forward the draft letter to George Johnson as a final letter. (9 Tr.2d 924.)

340. According to Hart, Paliafito generally wanted Andes as a distributor. (9 Tr.2d 923:17–21 (Hart).)

341. Hart testified that he knew the parties in the Andes action agreed to settle the litigation. (Tr.2d 912:7–11 (Hart).)

342. On July 12, 1991, Nowak again contacted Hart with regard to the Andes dispute. In particular, Nowak informed Hart that an extension of time to answer the Andes Complaint was in effect up to July 16, 1991 and, accordingly, it was important to complete the settlement. (DX 45, at 6, 7.)

343. Again on July 16, 1991, Nowak faxed George Johnson and copied Hart, with a

draft settlement agreement in the Andes litigation. Hart specifically recalled receiving the draft Agreement. (9 Tr.2d 930:18–21 (Hart).)

344. On July 18, 1991, Nowak faxed to Hart the proposed exhibits to the Andes settlement agreement and, in particular, EX A being an agreement by Paliafito to the settlement, EX A1 being a general release, EX B being the quota by Andes, EX C being the amount owed to Andes, and EX D being the Stipulation and Order of Dismissal. EX C was not included with the fax of July 18, 1991, but it was not required to complete the Agreement. (DX 45, at 16, 17.) Hart agrees that he saw all of the exhibits except EX C. (9 Tr.2d 934:9 (Hart).)

345. On July 30, 1991, Nowak again faxed exhibits for the Andes settlement agreement to Hart and requested that Paliafito execute both EX A and EX A1. (DX 45, at 22–23.) Hart did not, however, respond to that fax. (9 Tr.2d 935:5 (Hart).)

346. Further, on September 6, 1991, Nowak faxed to Hart EXS A and A1, and indicated that Johnson, Andes' attorney, was willing to immediately dismiss the Action against all parties once EXS A and A1 had been approved and signed by Paliafito. Nowak also informed Hart that correspondence from local counsel indicated that the Judge in the case wanted the case litigated or dismissed. (DX 45, at 23–28.) Hart testified that he never sent the attachments A and A1 back to Nowak. (9 Tr.2d 936:8–10 (Hart).)

347. On September 17, 1991, Nowak notified Hart by fax indicating that despite the numerous attempts to settle the Andes litigation, which settlement Hart had agreed to in principle, the settlement had still not been achieved. Nowak informed Hart that MAI could no longer risk the wrath of the Court and Paliafito's demand to profit from the settlement (*see* below, and, therefore, was going to agree to a dismissal of the Andes lawsuit against Miryoung Lee and MAI. (DX 45, at 29–31.)

348. Hart responded on September 19, 1991, stating that he agreed to all of the terms of the settlement, but setting forth two reasons why Paliafito was refusing to sign off on the settlement agreement.

349. First, Paliafito wanted a different price assigned to the Games given Andes as part of the settlement. Levesque informed Hart on several occasions that the bulk price was outlined in the Distribution Agreement. (DX EX 217.) However, Hart testified that this price was inapplicable to the Andes settlement. (9 Tr.2d 938–939:21–25, 1–2 (Hart).)

350. Second, Paliafito wanted a separate agreement regarding money owed John Paliafito. The draft Andes settlement agreement, to which Hart had agreed, and which was provided to Hart on July 16, 1992, included on the second page, ¶ 7, 8 lines down, that all amounts owed to John Paliafito would be paid by MAI. (MAI EX 45, at 11, ¶ 7, 1.8.) Paliafito, however, was not a party to this agreement and wanted a separate agreement to facilitate enforcement.

### 1. Mantae and Nowak settle the Andes litigation

351. Prior to July, Paliafito tendered the defense of the Andes action to Mantae. (DX 150.)

352. Mantae, which is obligated to defend and indemnify Paliafito under Section 13.4 of the Agreement, accepted the tender of defense and undertook to defend Paliafito. (*See* DX 173, at 2 (unfiled Stipulation of Dismissal signed by Nowak on July 19, 1991, as one of the "Attorneys for Defendants Miryoung Lee, Mantae America, Inc., Mark Paliafito, Wisconsin Area Athletic Clinics, Inc., John Paliafito, and Paliafito America, Inc.").)

353. In the Andes action, Nowak acted as the attorney for both Mantae and Paliafito in the settlement of the case. (4 Tr.2d 371–72:12–25, 1–17 (Joy Lee); 6 Tr.2d 548–49:8–25, 1–19 (Andes).)

354. Despite Mantae's July 12, 1991 letter terminating the Agreement, Hart believed that Mantae continued to represent Paliafito in the Andes litigation. (9 Tr.2d 941:9–17 (Hart).)

355. In a July 15th letter to George Johnson, (DX 278), faxed to Keith Andes, Nowak

extended a settlement proposal to Andes of Games, instead of cash. Also, Nowak suggested to Andes the possibility that he could become a MAI distributor for the Game. He wrote:

Also, you have been fully informed of the situation MAI is currently experiencing with the Paliafito group and MAI's potential need for cash. Obviously the situation could potentially result in certain advantages to Keith [Andes] as an MAI distributor.

(DX 278, at A1297, ¶ 2.)

356. In this letter, Nowak, MAI's and Paliafito's attorney, also told Andes that, to avoid compromising MAI's position, any settlement would have to include Paliafito. Nowak stated:

I have also considered your proposal to settle with MAI and not the Paliafito group. In my opinion to do this would give the Paliafito group a defense in any potential litigation which they do not now have, thus compromising MAI's position. Under our agreement with Paliafito we were required to indemnify against all suits by prior distributors and that agreement was in force when Keith filed the litigation. Therefore, any Settlement must include the Paliafito group.

(DX 278, at A1298, ¶ 1.)

357. Despite Nowak's statement that he could not settle without Paliafito, Nowak drafted and sent to Keith Andes and Joy Lee an agreement settling the dispute between Andes and Mantae America to the exclusion of Paliafito. (DX 285.)

358. As early as the middle of July 1991, Andes had entered into an arrangement with Joy Lee by which he could obtain Games. (6 Tr.2d 560–61:1–25, 1–13 (Andes).)

359. As part of the Settlement Agreement, Joy Lee gave Andes a check dated July 19th, which was deposited on July 23rd. She also gave him a certain number of Games and sold him a certain number of Games at a reduced price. (DX 279; DX 285 ¶ 3, 6, Ex. B; 4 Tr.2d 375–77:21–25, 1–25, 1–2 (Joy Lee).)

360. As part of the Settlement Agreement, Andes became a Mantae distributor,

despite the fact that he knew that Paliafito had purchased the exclusive rights to distribute the Game in the United States. (DX 285 ¶ 1; 6 Tr.2d 562, 565–67:17–25, 7–25, 1–25, 1–23 (Andes).)

361. Paliafito never agreed to the settlement agreement with Andes. (9 Tr.2d 943–44:21–25, 1–10 (Hart).)

362. Joy Lee knew that Paliafito had not agreed to the settlement, but went ahead and settled with Andes anyway. (4 Tr.2d:377–78, 380:19–25, 1–2, 10–17 (Joy Lee).)

363. Paliafito did not discover that Keith Andes and Joy Lee had settled the Andes litigation on behalf of Joy Lee and MAI only, by granting Andes a distributorship, and by shipping him Games, until September. (DX 207, at 3–4 (at 2–3 of the letter).)

364. In a September letter he faxed to Hart, Nowak denied that he had been representing Paliafito in the *Andes* case. He stated: "To suggest that I was representing PAI is as mendacious as your other claims." (DX 210, at 1, ¶ 4.)

365. In September, Mantae and Andes executed a Release, (DX 285, at A1 404–05), and a Stipulation of Dismissal, (DX 211), which was filed on September 27, 1991, dismissing Andes's claims against Mantae with prejudice, and allowing Andes to proceed against Paliafito. This Stipulation of Dismissal, unlike DX 173, identifies Nowak solely as one of the "Attorneys for Defendants Miryoung Lee and Mantae America, Inc." (DX 211, at 2.)

366. Soon thereafter, on September 30, 1991, Andes filed an amended complaint, which is pending solely against Paliafito, Mark and John Paliafito and Wisconsin Area Athletic Clinics, Inc. (DX 285; DX 211; DX 212; 6 Tr.2d 536–37:17–25, 1–5 (Andes).)

**2. Paliafito/Select mass marketing consultant agreement**

367. On April 11, 1991, Select and Paliafito entered into a contract (the "Select/Paliafito Agreement"), effective February 15, 1991. (DX 65.)

368. Under the Select/Paliafito Agreement, Select agreed to procure orders in the

toy industry's mass market for Paliafito for the Game in exchange for a five percent commission payment to itself and an additional commission payment to the Select sales representative procuring the order. (DX 65 § 4(A) & (C); 1 Tr. 169:5–20 (Paliafito); 4 Tr. 648–49:16–25, 1–10 (Hupe).) The Select/Paliafito Agreement provided that Select shall act as the mass merchandising consultant and perform the following services to the extent necessary to meet Paliafito's needs: "Contract with sales representatives, subject to the approval of Paliafito, to sell and promote Super Grip Ball in the mass market defined in the exhibit hereto." Under the Agreement:

> "Select shall receive a commission of five percent of the net list price received by Paliafito on all sales generated by Select and other entities with whom Select contracts for the sales and/or licensing of "Super Grip Ball" ... for purposes of this Agreement, the term "net list" shall mean the wholesale price less all applicable discounts."

(DX 65 § 2(B) and § 4(A).

361. Select/Paliafito agreed to forward "all orders received by Select, its agents and/or reps' ... to Paliafito," (DX 65 § 3(D)), to "act as the mass marketing consultant and perform [certain services] to the extent necessary to meet Paliafito's needs," (DX 65 § 2), and warranted that "it shall not enter into any contract with any party regarding the sales, promotion or advertising of [the Game] without the prior written consent of Paliafito." (DX 65 § 9(3).)

369. Under the Select/Paliafito Agreement, commissions were to be paid within thirty days of the date orders for GRIP BALL were shipped or within fifteen days of the date payment for orders was received by Paliafito, whichever was later. (DX 65 § 5(A).) Because under these terms Paliafito might have had to issue commissions payments on a daily basis, Paliafito and Select verbally agreed that the payments could be made once a month, usually on the 15th day of the month. (2 Tr.2d 110:7–21 (Hupe).) Select notes, however, that the Agreement has a no oral modifications clause. (DX 65 § 12(d).)

370. In the event of a commission dispute, Select (or any other representative) was free to visit Paliafito's office and review Paliafito's records. (9 Tr.2d 968:7–16 (Hart).)

371. In his affidavit in the New York action, Petrovich testified that "Select's duties under its Agreement with [Paliafito] was to be the *marketing agent* for the mass market." [sic] (DX 66 ¶ 3 (emphasis added).)

372. Robert H. Storm, Select's attorney, drafted the Select/Paliafito Agreement. (3 Tr. 482:5–12 (Petrovich).) Storm and Hart, Paliafito's attorney, negotiated the Agreement.

373. Scott Hupe testified that Paliafito could not exist in its business without relationships with Mantae and Select. (4 Hupe 650:20–25 (Hupe).)

374. Joy Lee knew that Select had a contract with Paliafito by which Select served as Paliafito's mass marketing representative and that Select's sales representatives were supposed to bring the GRIP BALL orders that they had obtained to Paliafito during the period of the contract. (4 Tr.2d 382, 387:5–23, 3–14 (Joy Lee).)

375. Select is selling GRIP BALL to the mass market today on behalf of Mantae. (4 Tr.2d 384–86:25, 1–24, 1 (Joy Lee).)

### 3. July 23, 1991: phone conversation between Meisenheimer, on behalf of Select, and Joy Lee

376. On July 23, 1991, Thomas Meisenheimer spoke to Joy Lee by telephone for *forty-two minutes*. (DX 1500, Tab E, call no. 36.)

377. After their conversation, Meisenheimer sent a fax stating, "Joy, Let's get it done! Tom." Meisenheimer testified that "Let's get it done" refers to "working together between Paliafito and Mantae to solve the difficulties and make things happen." (13 Tr.2d 1407:2–14 (Meisenheimer).) With this fax, however, Meisenheimer enclosed Select's and Meisenheimer's resumes apparently to vie for Mantae's business. Joy Lee remembers seeing this facsimile at that time. (4 Tr.2d 399–400:11–25, 1–18 (Joy Lee); DX 287.)

378. Later that day, Meisenheimer faxed to Joy Lee a letter, (DX 288), confirming a July 27th morning meeting with Joy Lee in Los Angeles and a second meeting with Joy Lee and the Paliafitos. In this letter, Meisenheimer stated his willingness to stay through Monday, July 29, 1991 "to assure us enough time to accomplish what we need to do." (4 Tr.2d 401–02:1–25, 1 (Joy Lee); DX 288, at 1 (last paragraph), at 2, ¶ 1.) Meisenheimer testified that he met with MAI in the morning of July 27, 1991 and met with Paliafito in the afternoon. Both meetings were before the July 27th settlement meeting at which time MAI and Paliafito, with Meisenheimer's assistance, tried to settle their dispute. Meisenheimer testified that he met with MAI and Paliafito separately before the settlement meeting in order to find out each side's view and to then act as a mediator. (13 Tr.2d 1406:6—1407:1 (Meisenheimer).) The quoted portion of the exhibit "to assure us enough time to accomplish what we need to do" may refer to settling with Paliafito.

### R. JULY 26, 1991: PALIAFITO RESPONDS BY LETTER TO MANTAE, REJECTING THE JULY 12, 1991 TERMINATION LETTER

379. On July 26, 1991, Paliafito sent Mantae a letter, (DX 312), considering Mantae's notice of termination "to be vague, without factual substantiation; and accordingly of no effect." (DX 312, at 1, ¶ 2.)

### S. JULY 12, 1991: JOHN PALIAFITO, SCOTT HUPE, RICHARD HART, JOY LEE, KEITH NOWAK, AND MEISENHEIMER MEET AND AGREE TO THE NINETY–FIVE/FIVE ARRANGEMENT

380. On July 27, 1991, MAI and Paliafito met in an attempt to settle their dispute. Before the meeting began, Hart insisted on withdrawal of the termination letter before any discussion could take place. (12 Tr.2d 1337:11—1340:9 (Joy Lee).) After Hart made that demand, Joy Lee and the Mantae group caucused separately. (12 Tr.2d 1338–39 (Joy Lee).) When Joy Lee returned, she said, in substance: "Okay, but here is what

Mantae wants." (4 Tr.2d 402–03:21–25, 1 (Joy Lee).)

381. Mantae and Paliafito orally agreed to the following modification of the Agreement: (1) for orders that Paliafito could not finance, Mantae would fill the orders, Paliafito would invoice the customers for these orders, and the proceeds would be split ninety-five percent to Mantae and five percent to Paliafito; (2) Mantae would withdraw the July 12 termination letter; and (3) Paliafito would keep Joy Lee abreast of all advertising efforts and would advise her of upcoming meetings with customers and invite her to attend. (2 Tr. 387:1–6 (Paliafito); 2 Tr.2d 98–99:5–25, 1–5 (Hupe); 4 Tr.2d 402–03:21–25, 1 (Joy Lee); 12 Tr.2d 1237–38:11–25, 1–6 (Joy Lee).) The agreement ostensibly reached at the July 27 meeting was subject to being memorialized in writing. (2 Tr. 453:12–20 (Paliafito); 12 Tr.2d 1340:5—1341:16 (Joy Lee); 12 Tr.2d 1433:10—1434:22 (Levesque).) No agreement was ultimately signed. (12 Tr.2d 1340:14–19 (Joy Lee).)

382. Under the Ninety-five/five Arrangement, it was clear that when Mantae filled and shipped an order, Mantae was responsible for paying commissions to Select, its sales representatives, and Uecker. (3 Tr. 457–58:23–25, 1–22 (Paliafito); 2 Tr.2d 160:17–22 (Hupe); 9 Tr.2d 989–90:25, 1–20 (Hart); 12 Tr.2d 1346:15–17 (Levesque).) However, "[t]o the extent Paliafito America, Inc. withholds payment to Mantae or Mantae otherwise does not get paid on these sales, no commissions shall be due to Select from Mantae." (DX 75, § 1.)

383. The Arrangement was to be finalized in writing. (3 Tr. 453:16–18 (Paliafito).)

384. Paliafito's attorney, Richard Hart, prepared a draft agreement and sent it to MAI on July 29. (MAI EX 24; 12 Tr.2d 1340:9—1341:20 (Joy Lee).)

385. Joy Lee felt that the draft agreement was substantially different than the understanding reached at the July 27th Meeting and was unacceptable to MAI because it permitted Paliafito to "cherry pick" which sales would be financed by MAI and which ones by Paliafito. Specifically, Joy Lee felt that, contrary to the parties' oral

agreement, it allowed Paliafito to finance sales to retailers who paid by letter of credit and required MAI to finance sales to retailers who demanded credit terms such as thirty or sixty days. Joy Lee felt that this would only increase MAI's cash flow problems. (12 Tr.2d 1341:21—1342:20 (Joy Lee).)

386. MAI refused to sign the agreement. (12 Tr.2d 1241:21—1242:20 (Joy Lee).)

387. Mark Paliafito testified that the parties did, however, agree to permit MAI to fill certain orders and receive ninety-five percent of the proceeds, with Paliafito invoicing the sale and retaining five percent as a commission ("Ninety-five/five Sales"). (2 Tr. 278:2–15; 286:4–7 (Paliafito).)

388. The parties agreed that the split would be ninety-five/five after the July 27 meeting. (12 Tr. 1337:5—1338:1 (Levesque).)

389. The sale to Target, which is the subject of Target's interpleader action, and for which approximately $268,000 is due, was a Ninety-five/five Sale. (1 Tr.2d 176:14—178:10 (Hupe); (8 Tr.2d 846:20—847:13 (Carlson).)

390. Commissions payable to Select and sale representatives for Ninety-five/five Sales were to be made by MAI. (8 Tr.2d 989:25—990:24 (Hart).)

391. On September 18, 1991, MAI and Select entered into an agreement whereby MAI would pay Select commissions on Ninety-five/five Sales. (DX EX 75.)

392. Richard Hart, Paliafito's president, understood that Select was to be paid by MAI for commissions on Ninety-five/five Sales, and was informed that MAI and Select were entering into a written agreement to that effect. Hart told Robert Storm, Select's lawyer, that he understood that Storm had to have a written agreement in order to protect his client. Hart, however, asked for a copy of the draft agreement, but did not receive one. (9 Tr.2d 990:25—991:18 (Hart).) A copy was sent on October 9, 1991. (9 Tr.2d 991:13—992:14 (Hart); DX 75.)

393. The proceeds from the Ninety-five/five Sales were to be sent to a post office box near MAI's and Paliafito's office, and a representative from MAI and Paliafito were to collect the proceeds from the box together. (12 Tr.2d 1344:19—1346:23 (Levesque).)

394. Paliafito turned over approximately $2,188,000 to MAI for Ninety-five/five Sales. (MAI EX 101, at 10.)

395. In late October, after MAI sued Paliafito in the New York State Supreme Court, Paliafito stopped turning over MAI's ninety-five percent share and canceled the post office box. Prior to that time, Paliafito turned over all amounts due to MAI for Ninety-five/five Sales. (12 Tr.2d 1346:19—1347:1 (Levesque).)

396. Paliafito admits that it is holding money that would go to MAI under the Ninety-five/five Sales as security. (2 Tr. 286:8—288:10, 3 Tr. 451:3–7 (Paliafito).)

397. Paliafito's balance sheet, which it submitted to potential lenders, shows accounts payable to MAI of $1,688,485.16 for Ninety-five/five Sales. (DX 17, at 3; 1 Tr.2d 107:16—108:16 (Hupe).) MAI's ledger sheet of Ninety-five/five transactions reflects virtually the same figure for monies owed to MAI. (12 Tr.2d 1347:18—1350:7 (Levesque).) Mark Paliafito testified that Paliafito has collected only a fraction of this amount. (2 Tr. 286:19–21 (Paliafito).)

398. Following this meeting, Meisenheimer informed Petrovich of the Ninety-five/five Arrangement. (4 Tr. 642:2–13 (Petrovich).)

399. By August 3, 1991, Select's attorney, Robert Storm, was aware of the Ninety-five/five Arrangement, and that Mantae would pay Select's commissions on orders that Mantae filled under the Ninety-five/five Arrangement. (7 Tr.2d 655:1–8 (Storm).)

400. Although the Ninety-five/five Arrangement was not reduced to a formal, executed writing, both Mantae and Paliafito performed under the terms of the Agreement and the Ninety-five/five Arrangement, Nowak recognized the existence of the Arrangement in a facsimile he sent Richard Hart, and Bert Levesque memorialized and confirmed many orders in a memorandum referencing the Arrangement of July 27, 1991. (DX 313; DX 174; 4 Tr.2d 403–05:7–25, 1–4, 2–7 (Joy Lee).)

401. Thereafter, the parties performed under the Agreement and the modification until Mantae cut off product to Paliafito. (9 Tr.2d 995:1–3 (Hart).) .

### T. PALIAFITO'S EFFORTS TO OBTAIN FINANCING

402. From at least mid-July to mid-October, Paliafito sought to obtain financing from a number of sources. (9 Tr.2d 946, 949:18–24, 20–25 (Hart).)

403. On more than one occasion, Paliafito requested that Mantae acknowledge in writing Paliafito as the assignee of all of WAAC's rights and obligations under the Agreements, the withdrawal of the termination letter, and the Ninety-five/five Arrangement between Paliafito and Mantae, to enable Paliafito to obtain financing. (DX 186, at 2, ¶ 2; DX 205; 9 Tr.2d 1002–04:6–25, 1–25, 10–22 (Hart).)

404. Mantae refused to retract the termination letter. (2 Tr.2d 141:6–7 (Hupe).)

405. Mantae also refused to acknowledge in writing the existence of the Ninety-five/five Arrangement between Mantae and Paliafito. (12 Tr.2d 1257:10–22 (Joy Lee).)

406. Levesque testified that MAI would not say that the Ninety-five/five Arrangement was in place because Paliafito was cherry picking and no written agreement could be reached because Paliafito would not agree in writing to what was agreed to at the July 27th Meeting. Joy Lee testified that she did not think it was fair that she should have to acknowledge one part of the Agreement she believed was reached at the July 27th Meeting when Paliafito would not memorialize the entire Agreement in writing. (12 Tr.2d 1257:10–22; 12 Tr.2d 1333:8—1334:12 (Levesque).)

407. The dispute over whether there was a contract helped to prevent Paliafito from going forward with financing proposals from

banks and factoring companies. (9 Tr.2d 956:20—25 (Hart).) Paliafito also had difficulties because of their lack of financial history. (MAI EX 57, at 8.) [16]

408. Following the termination letter, Paliafito continued to look for financing. When Paliafito would seek financing, the question of the Ninety-five/five Arrangement and the termination letter would come up and would prevent Paliafito from obtaining financing. (9 Tr.2d 957:1–23 (Hart).)

409. Thus, Mantae's refusal to acknowledge in writing the existence of the Ninety-five/five Arrangement between Mantae and Paliafito interfered with Paliafito's effort to obtain additional financing. (2 Tr. 390–91:10–25, 1–11 (Paliafito).)

410. Among others, Norwest Bank would not provide financing to Paliafito because Mantae refused to provide a retraction of the termination letter. (2 Tr.2d 140–41:1–25, 1–7 (Hupe).)

### U. AUGUST 3, 1991: PALIAFITO'S NATIONAL SALES MEETING

411. On August 3, 1991, Paliafito held a meeting in California for all GRIP BALL sales representatives, at which Joy Lee and Mantae gave a presentation. (DX 4; 1 Tr. 70–72:2–25, 1–25, 1–11 (Ross).)

412. Prior to the August 3, 1991 sales meeting, Robert Storm called Keith Nowak from Storm's home and spoke to him for eleven minutes about the sales meeting, the Ninety-five/five Arrangement and commissions. (DX 1500, Tab F, call no. 24; 7 Tr.2d 653–55:11–23, 2–25, 1–8 (Storm).)

413.[17] During the August sales meeting, no one associated with Mantae complained about Paliafito's performance or indicated that Paliafito had been terminated. (1 Tr. 70–71:20–25, 1–6 (Ross); 4 Tr.2d 406:7–11 (Joy Lee).) [18]

---

**16.** Paliafito earlier had difficulties obtaining financing because they did not have receivables. (9 Tr.2d 955:14–24 (Hart).)

**17.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraph 413 because they have not had the opportunity to engage in the necessary discovery to do

so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

**18.** At this time, however, MAI and Paliafito were engaged in negotiations for MAI to buy out Paliafito or to enter into a joint venture. (12 Tr.2d 1450:14–1456:14, 1439:1–10 (Levesque).)

414. At the sales meeting, Paul Moss and Steve Composto complained about not receiving commissions on time. They had the mistaken understanding that they were to get paid their commissions fifteen days after the close of the previous month in which ordered goods had been *shipped.* (4 Tr. 679–80:7–25, 1–17 (Hupe).) Section 5(A) of the Select/Paliafito Agreement provides in part:

> Paliafito shall pay such obligations as follows: with respect to items evidenced by paragraph 4(A) and 4(C), the terms will be payment in full within 30 days of the date orders of "Super Grip Ball" are shipped or within 15 days of the date payment for orders is received by Paliafito, whichever is later.

(DX 65 § 5(A).)

415. The commissions arrangement for Select sales representatives under the Select/Paliafito Agreement was discussed at the sales meeting. (1 Tr. 118:10–17 (Ross).)

416. Scott Hupe confronted Tom Meisenheimer as to why Meisenheimer had not told the sales representatives the terms to which Select had agreed. Meisenheimer acknowledged that he failed to inform the sales representatives of the correct terms of payment. (4 Tr. 680–81:18–25, 1–8 (Hupe).)

### V. AUGUST 13, 1991: MANTAE AND PAUL MOSS TAKE ORDERS FROM KARL CARLSON FOR 600,000 GAMES WITHOUT PALIAFITO'S KNOWLEDGE OR CONSENT

417.[19] On August 13, 1991, Karl Carlson, a senior buyer at Target, Paul Moss, and Bert Levesque discussed future Target orders. During the conversations, Carlson placed a verbal order for 600,000 units to be shipped by sea. (DX 455; DX 456; DX 500; 8 Tr.2d 838:16–23 (Carlson).)

**19.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraph 417 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

**20.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of para-

418. Paliafito was not aware that those orders had been placed. (2 Tr.2d 150:4–20 (Hupe).)

419. Carlson testified that he decided to place orders for GRIP BALL after receiving repeated phone calls from Paul Moss, the local Select marketing representative, obtaining the toy at Toys–R–Us and reading *The Wall Street Journal* article, (DX 14), on Paliafito's successful marketing strategy for GRIP BALL. (8 Tr.2d 774:4–11 (Carlson).) The article identifies Paliafito as having purchased the national marketing rights for GRIP BALL. (DX 14, col. 2.)

420. Carlson also testified that in mid-July he had problems associated with Paliafito and that he would not have purchased such large quantities of GRIP BALL had he not met and been impressed with Joy Lee. (8 Tr.2d 798:18—799:2, 817:9–20 (Carlson).)

### W. AUGUST 15, 1991: MCL CONFIRMS TARGET ORDERS TOTALING 1,000,000 SETS, 600,000 MORE THAN PALIAFITO WAS AWARE OF

421.[20] On August 15, 1991, Jerrold Lee faxed a confirming that MCL could fill Target orders totaling one million sets. (DX 457.)

422. Paliafito never knew that Target had ordered 600,000 of the 1,000,000 total order. (2 Tr.2d 150–51:21–25, 1–22 (Hupe).)

### X. AUGUST 17, 1991: HART WRITES TO AND NOTIFIES MANTAE OF THEIR BREACH OF AGREEMENT

423.[21] On August 17, 1991, Richard Hart sent a letter to Mantae stating that Mantae was in breach of the Agreement for failing to specify the reasons for termination of Paliafi-

graphs 421 and 422 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

**21.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraph 423 because they have not had the opportunity to engage in the necessary discovery to do

to and that Mantae's failure to withdraw the letter of termination interfered with Paliafito's ability to obtain financing. (DX 186.)

## Y. AUGUST 22, 1991: HART MEETS WITH LEVESQUE

424. On August 22, 1991, Richard Hart met with Bert Levesque in Chicago. Levesque testified that Hart told him that, under the contract, Paliafito was only obligated to purchase 1,500,000 sets in the first year, and that if Levesque did not work with him that is all Paliafito would buy. (12 Tr. 1339:1–24 (Levesque).)

## Z. AUGUST 30, 1991: JOY LEE DINES WITH CARLSON AT TARGET

425.[22] Sometime at or around August 30, 1991, Joy Lee had lunch with Karl Carlson. Paliafito was not informed of this meeting. (DX 459.)

## AA. AUGUST 1991: MANTAE AND SELECT PREPARE COMPLAINTS AGAINST PALIAFITO

426. Sometime in early August, probably earlier than August 12th to 15th, Petrovich instructed Storm to start preparing a complaint against Paliafito. (7 Tr.2d 657–58:24–25, 1–13 (Storm).) During this period of time, Storm was talking to Nowak. (7 Tr.2d 658:14–15 (Storm).) Storm testified, however, that he did not tell Nowak that Petrovich asked Storm to file a lawsuit against Paliafito until September or October. (7 Tr.2d 658:16–21 (Storm).)

427.[23] Nowak prepared a draft of Mantae's complaint against Paliafito before September 14, 1991. (DX 408.)

428. In this draft complaint, Mantae alleges that Paliafito "represented that it had the wherewithal to purchase sufficient numbers of the GRIP BALL Game product from Mantae to satisfy demand in the market place." (DX 408 at Bates 259 (Complaint ¶ 6).)

429. This draft complaint contains a reference to a fax from Mike Barker to Tom Meisenheimer suggesting that Meisenheimer "Go to Hell." Select had faxed or otherwise transmitted a copy of this letter to Mantae prior to September 14, 1991. (DX 408 at Bates 258, ¶ 11(ii); DX 180.)[24]

430. On or around September 7, 1991, Brian Bettis met Rob Hooper in California to discuss his radio-controlled air toy. Rob Hooper told Bettis that "the only reason Paliafitos got the product was because Joy Lee didn't believe that they can meet necessary quotas. . . ." (1 Tr. 23–24:23–25, 1 (Bettis).) Bettis explained further:

> The only reason Hooper said that the Paliafitos had a product like that from, and got the product rights to distribute it was because that for some reason she didn't feel that the quotas that I guess were on the contract as a stipulation of the contract could be met by Paliafitos, because they were young and for whatever reason, she didn't think they would meet the quota, and he said at that point she would take away the rights.

(1 Tr. 24:9–16 (Bettis).)

431. Bettis testified that Hooper told him that "the reason that Miss Lee had given the

---

so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

**22.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraph 425 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

**23.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraph 427 because they have not had the opportunity to engage in the necessary discovery to do

so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

**24.** The letter provides:

> Go to hell! I'm sick and tired of you bitching about these orders being shipped. I am working my ass off out here to keep everyone happy. Jamesway and Sheper are not shipped because all the God damn clamshells went to Toys 'R Us and Price Club. If Fontana has a beef then maybe it should be with Burke and Compasto. For what it's worth I will put these on the same priority as Childworld. Will they take net or mesh. We have a lot of mesh!

rights to Paliafito had to do with her belief that they would not meet the quotas." (1 Tr. 7:3–10 (Bettis).)

432. Hooper told Bettis that Joy just wanted to use Paliafito's rights payment as a capital infusion: "Mr. Hooper was trying to make me understand number one why Paliafito had this product ... the only reason was because besides a money injection, that there probably wasn't going to be a quota met that was on the contract." (1 Tr. 26:11–16 (Bettis) (emphasis added).) [25]

433. Bettis later met with Tom Meisenheimer in Chicago in mid-September. Meisenheimer told Bettis "that he was meeting with [Joy Lee] to discuss this thing that was about to happen regarding the Super Grip Ball, and Paliafitos." (1 Tr. 18, 19:4–25, 1–20 (Bettis).)

### BB. SEPTEMBER 9, 1991: CARLSON WRITES TO JOY LEE COMPLAINING OF LATE DELIVERIES, BUT SAYS TARGET WILL TAKE A "MAJOR POSITION WITH SUPER GRIP BALL AND MANTAE"

434.[26] On September 9, 1991, Karl Carlson wrote a letter, (DX 460), to Joy Lee complaining about Mantae's inconsistent delivery schedule. He wrote:

I remain concerned about the inconsistent delivery schedule and the difficulty in determining the accuracy of the information I receive. I have been forced to cancel my first planned promotion based on my ongoing concerns about deliveries. Nothing seems to happen as planned. For example, the first air shipment, made in late August, still has not been completely received.... Additionally, after getting my stores all excited about Super Grip Ball, I have failed to adequately ensure an in-

stock position. This costs me my personal credibility with our stores.

(DX 460 ¶¶ 3–4.)

435. Carlson also wrote in his letter, however, that Joy's "vision" expressed at a prior meeting convinced him to take a "major position with Super Grip Ball and Mantae." (DX 460 ¶ 6.)

### CC. MID – SEPTEMBER, 1991: ANDES AND JOY LEE DISCUSS DISTRIBUTION PROBLEMS

436. On September 10, 1991, Keith Andes wrote to Joy Lee referencing an upcoming Thursday morning meeting in New York. Andes discussed distribution arrangements for the Game and proposed "that temporarily until such distribution problems are resolved, that a simple understanding between Andes, Cabco, and Mantae be established...." (DX 283, at 1, ¶ 4.)

### DD. SEPTEMBER 11–12, 1991: STORM TALKS TO NOWAK AND JOY LEE ABOUT PALIAFITO

437. On September 11, 1991, Storm had a phone conversation with Nowak in which Nowak said that "Paliafito wants to buy 1,500,000 units and that's it." (DX 410 at Bates 204.)

438. The following day, Storm had a phone conversation with Nowak and another with Joy Lee and Nowak. (DX 1500, Tab F, calls no. 65 & 68; DX 410 at Bates 204, 207.) In the first, Nowak told Storm that "Joy wants Select to keep working to sell as many as possible," and that MAI "will have to sue." Nowak asked what Select would do. Storm told Nowak that Select was owed money and that Storm would have to check with Petrovich. (DX 410 at Bates 204.) Later that day, in a phone conversation with Nowak and Joy Lee, Storm was told by Nowak that Mantae "want[s] to use Select if Paliafito pulls out or [Mantae] buy[s] out [Paliafito]."

---

**25.** Hupe acknowledged, however, that, at least at the beginning, Joy Lee was trying to help Paliafito, and certainly was not trying to make Paliafito fail. (4 Tr. 765:7–23 (Hupe).)

**26.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of para-

graphs 434 through 435 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

Storm was also told that Mantae did not want to use the existing contract, but wanted a new one. (DX 410 at Bates 207.)

439. In that conversation Storm told Joy Lee that "the reps liked [the] product. problem is getting pd [paid] and dispute re amount of commission." (DX 410, at 207.)

### EE. SEPTEMBER 13, 1991: JOY LEE WRITES PETROVICH

440. On September 13, 1991, Joy Lee wrote Petrovich stating:

As we discussed on the phone, we are all losing time each day due to the failure to reach a decision on the Paliafito problem. If we do not solve the problem immediately, I believe the market, which is benefiting all of us, may be destroyed.

I suggest strongly that Select, as the mass marketing organization, should also have the responsibility to make the market successful for all of us involved with the product. Without your support in this matter, I must assume that you are not as interested, as is MAI, in the success of this product.

In short, I need an indication from you that you believe in this product as strongly as we do, or MAI must assume that it is using the wrong mass marketing organization. I will continue to do whatever is necessary in order to straighten out the problem with the Paliafitos. However, at this critical time, I need your full cooperation in order to solve this problem, which cooperation must be forthcoming immediately.

If we do not reach a decision in this matter by Monday, I must assume that your interest does not lie with the success of our product.

(DX 411.)

441. In the fall of 1991, Petrovich projected that 1992 sales of GRIP BALL would be $28,000,000. (3 Tr. 612–13:5–25, 1–3 (Petrovich).) At the time of the hearing, Select received a five percent commission or $1,400,000. (3 Tr. 510–11:23–25, 1–2 (Petrovich).)

442. Joy Lee testified that she was trying to get Petrovich to assist in resolving the problem through settlement. (12 Tr.2d 1277:21—1279:2 (Joy Lee).) At the time, MAI and Paliafito were discussing various options including buyout and joint venture. (12 Tr.2d 1350:14—1356:14, 1339:1–10 (Levesque).)

### FF. SEPTEMBER 13, 1991: JOY LEE AND NOWAK CALL PETROVICH FROM NEW YORK TO SCHEDULE A MEETING IN MILWAUKEE

443. On September 13, 1991, Joy Lee and Keith Nowak called Sam Petrovich from New York to schedule a meeting in Milwaukee and, among other things, to discuss problems they were having with Paliafito. Petrovich agreed to meet them, and to share with them problems that Select was having with Paliafito. (3 Tr. 493:9–25 (Petrovich).)

### GG. SEPTEMBER 13–14, 1991: JOY LEE AND NOWAK SOLICIT MIKE ROSS TO JOIN THEM IN SUING PALIAFITO

444.[27] On September 13, 1991, Mike Ross, Paliafito's sales representative to the sporting goods retailers, had several phone conversations with Joy Lee. (DX 6; DX 1500, Tab K, call nos. 35, 55; 1 Tr. 77–79:20–25, 1–25, 1–11 (Ross).)

445. Ross testified that Joy Lee told him that her relationship with Paliafito had broken down and "that she was going to have to ... get the product back." (1 Tr. 77–78:20–25, 1–3 (Ross).) Ross testified that when Joy Lee asked, he indicated that he thought that Paliafito had performed in an acceptable manner and that he did not have a gripe against Paliafito. Ross stated Joy Lee indicated that she was not satisfied with Paliafito's performance and told Ross that she was

---

27. Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraphs 444 through 446 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

going to get the Game back through litigation and "inquired firstly to [Ross] joining her in a suit against Paliafito for their lack of performance in regards to the product." (1 Tr. 78–79:15–25, 1–23 (Ross).) [28]

446. Ross states he indicated that he was satisfied with Paliafito's performance and did not think he had a claim against Paliafito. Ross testified Joy Lee told him "that it's important that we all stand together in this and that those that stand with me [Joy Lee] now will be a part of marketing this product in the future." (1 Tr. 79:3–11 (Ross).)

447. On the morning of Saturday, September 14, 1991, Storm had a telephone conversation with Nowak. (DX 1500, Tab K, call no. 58/59; DX 409 at Bates 228). During this conversation, Nowak informed Storm that "Andes will be local/regional rep." (7 Tr.2d 689:19–24 (Storm); DX 409 at Bates 228.) Storm testifies that the reference to Andes being a regional representative was because Select was mass market representative and any sales in mass market would violate Select's contract. (7 Tr.2d 707:5–19 (Storm).)

448. Later that morning, Storm and Hart had a phone conversation. (DX 1500, Tab K, call no. 60.) They discussed commissions, back orders, rumors regarding Paliafito, and that Mantae was operating under the Ninety-five/five Arrangement even though it was not signed. (DX 409 at Bates 228–227.)

449. The DX 409 states that Hart told Storm that:

1. "Rumor that they (Paliafito) can't fill orders is correct. Rumor that they won't fill orders is incorrect."

2. "Mantae is shipping goods to fill all back orders."

3. "Mantae is acting pursuant to the agreement even though not signed." (DX 409, at 227.)

450. [29] Ross called Joy Lee and Nowak at Nowak's office in New York, at Joy Lee's request. (DX 6; DX 1500, Tab K, call nos. 63, 67.)

451. Ross testified that, at the beginning of the phone call, Joy Lee "reiterated the need for us to work collectively in her pursuit to get the product back." (1 Tr. 80:16–18 (Ross).)

452. Ross states that she again asked Ross about his experience with Paliafito. Ross repeated his statement that he did not think he had basis for a complaint regarding Paliafito's performance and that he did not believe he had a complaint against Paliafito. (1 Tr. 80–81:19–25, 1 (Ross).)

453. At that point, Ross testified: "Joy Lee reiterated to me it's important that I join them, that the word of three was going to be better than the word of one in court and that is when Nowak interjected that it shouldn't be for me to decide whether or not I had a legal basis for complaint." (1 Tr. 81:1–6 (Ross).)

454. Ross stated he spoke directly to Nowak and told him "to please try to explain to Joy" that he, Ross, "could not be of any help to them in their suit" because he did not believe he had been slighted by Paliafito. Nowak said that was not for him to determine, but for the court to decide: "His [Nowak's] response to me was it shouldn't be for me to decide whether or not I had been slighted, that it should be for the court to decide." (1 Tr. 83:3–12 (Ross).)

455. Ross stated that during the conversation, Joy Lee told him that they would be meeting with Select later that day "to talk about the position they would take to sue

---

28. Joy Lee testified that she had also heard that Ross had a "very big argument" with John Paliafito, something that caused her to worry why the argument occurred. Because of the argument, she wanted to see what kind of problem Ross had and whether he had problems with delivery or defects, because she wanted the product to last in the sporting goods industry. (7 Tr. 1275:17–25, 1–18 (Joy Lee).)

29. Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraphs 450 through 464 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

Paliafito and get the product back." (1 Tr. 81:8–10 (Ross).)

456. Ross stated that Joy Lee "asked [Ross] to join in the lawsuit with Select against Paliafito." (1 Tr. 81:7–20 (Ross).) Ross testified that Joy Lee concluded the conversation by saying "that they would be meeting with Select's people and they'd get back to [Ross] and let [him] know what was going on," which Joy Lee did not do. (1 Tr. 83–84:23–25, 1–4 (Ross).)

457. Ross testified that Joy Lee: "made the specific statement that the word of three would be better than the word of one and that it was important to her and that if I intended to be a part of marketing the product in the future, that I would stand with them now." (1 Tr. 81–82:21–25, 1–2 (Ross).)

458. Joy Lee's testimony with respect to the conversations with Ross differs from that of Ross. Joy Lee testified that Ross was interested in the GRIP BALL product before Paliafito and, in fact, Joy Lee introduced Ross to Scott Hupe. This introduction was done to allow Paliafito to find someone to do the "best job for them." (12 Tr. 1375:6–16.)

459. Joy Lee testified that, after the dispute began with Paliafito, she contacted Ross, as she thought he was one who "believed this product before even anyone else believed." She had also heard that Ross had a "very big argument" with John Paliafito, something that caused her to worry why the argument occurred. Pursuant to the argument she wanted to see what kind of problem Ross had and whether he had problems with delivery or defects, because she wanted the product to last in the sporting goods industry. (12 Tr. 1375–1376:17–25, 1–18.) Thereafter, Joy Lee received a letter from Ross

and decided to call him. During the call she tried to determine what problems Ross had, if the problems were affecting filling his orders, and whether or not he was happy. She also expressed to Ross her complaints about Paliafito. (12 Tr. 1376:19—1377:19.)

## HH. JOY LEE AND NOWAK CALL PETROVICH AND ASK SELECT TO JOIN A SUIT AGAINST PALIAFITO

460. Less than five minutes after Joy Lee and Nowak ended their phone conversation with Mike Ross, they called Select Creations at Petrovich's office. (DX 1500, Tab K, call nos. 67 (Ross), 68–69 (Select); 4 Tr.2d 422–23:14–25, 1–8 (Joy Lee).)

461. Keith Andes was at the Lieberman, Rudolph & Nowak offices with Joy Lee and Nowak. Joy Lee explained that Andes was an ex-distributor whose contract was canceled by Paliafito, that Andes sued Mantae and Paliafito, and that Mantae settled with Andes by agreeing to give him a certain number of Games and sell him more Games. (DX 409 at Bates 226; 7 Tr.2d 690–91:25, 1–9 (Storm).) [30]

462. During the conversation, Storm told Nowak and Joy Lee about his conversation with Hart. (DX 409 at Bates 225; 7 Tr. 691–92:22–25, 1–2 (Storm).) [31]

463. Storm's notes indicate that Nowak and Lee informed Petrovich and Storm that Joy Lee: "wants Select. Tom [Meisenheimer] could be on her payroll." (DX 409 at Bates 224; 7 Tr.2d 692–93:16–25, 1–4 (Storm).) [32] Storm testified that the statement referred to a hypothetical situation; that if Joy Lee bought Paliafito or bought them out of their agreement, Select would provide mass market representation for Mantae. (7 Tr.2d 704:7–23 (Storm).)

---

**30.** It was also discussed that "Paliafito said keep Andes, he's good. Joy goes to meet with Andes and agrees to buy 30k—30,000—sets per month. Paliafito wants profit from 90k—800k back ordered. [The "90k" appears to refer to the Andes Settlement, while the "800K" refers to back orders]. Paliafito can't get $ to pay for these." (DX 409, at 226; 7 Tr.2d 691:5–9, 22–23 (Storm).)

**31.** It was also discussed that: "Nowak agrees orders can't be filled. Mantae will try and fill and Paliafito wants 5%; agreement never signed. Not signed because dispute as to commission

and amount as to Ks which will be handled by Mantae ... Wants to buy all Paliafito out. May sue Paliafito, they breached by not paying for product per contract." (DX 409, at 225; 7 Tr.2d 692:3–13 (Storm).)

**32.** It was also discussed that: "Hart and Bert still working on buy-out. Joy wants to lower cost because of need. If she buys Paliafito, will we [Select] rep? I will talk to Sam. She wants Select. Tom could be on her payroll." (DX 409, at 224; 7 Tr.2d 692:14–17 (Storm).)

464. During this conversation, Nowak asked Select to join in a lawsuit against Paliafito, if it planned to sue Paliafito. (7 Tr.2d 693, 715–16:9–13, 17–25, 1–3 (Storm); 8 Tr.2d 868:7–17 (Storm); DX 409 at Bates 223.)

465. Storm replied that it was "Sam's call whether Select sued Paliafito." (7 Tr.2d 715–16:24–25, 1–3 (Storm); 8 Tr.2d 864:8–10 (Storm); DX 409 at Bates 223; 8 Tr.2d 865:7–21.) Storm also stated that they informed MAI that they would not join MAI in a lawsuit against Paliafito. (8 Tr.2d 868:15–21 (Storm).)

466. Nowak told Storm during the conversation that he would fax Storm a draft of his complaint against Paliafito, and asked Storm if Storm would keep him posted on the sales representatives and commissions. Storm agreed to do so. (DX 409 at Bates 223; 7 Tr.2d 693, 717–18:16–25, 12–25, 1–6.)

467. Joy Lee or Nowak indicated that Joy Lee would meet with Petrovich personally. (8 Tr.2d 864:11–13 (Storm); DX 409 at Bates 223.)

468. Later, Joy Lee talked with Petrovich personally. (8 Tr.2d 864:14–16 (Storm).)

469. After the call, Nowak faxed Storm a draft complaint. (DX 408; 7 Tr.2d 685–86:19–24, 18–23 (Storm).) The first page of the facsimile is a note, dated September 14, 1991, from Keith Nowak, on stationery that says "From the Desk of Keith D. Nowak." The note itself says: "Bob—Attached is a rough draft of a complaint against Paliafito. Please review and discuss with me [Nowak] the claims to be made by Select." (DX 408 at Bates 262.)

## II. SEPTEMBER 17, 1991: TARGET MEETING

470.[33] On September 17, 1991, Hupe, Moss and Joy Lee were to meet in Minneapolis for a meeting with Carlson of Target. When Hupe arrived with Moss, he discovered that Nowak was also attending the meeting. (4 Tr. 692:14–20 (Hupe).)

471. At this meeting, Carlson informed Hupe that Target was experiencing problems with invoicing. (8 Tr.2d 797:15–25 (Carlson).) Hupe learned that Mantae had previously invoiced Target in contravention of the Ninety-five/five Agreement. (2 Tr.2d 165:2–13 (Hupe).) Levesque testified that the reason that MAI invoiced Target was that Carlson requested a copy of the invoice so that Target could commence its accounting process to pay the invoices early. Levesque could not get Paliafito to type up an invoice. Mike Barker said "he didn't have time to deal with it." (12 Tr. 1360:16—1361:24 (Levesque).)

472. Hupe assured Carlson that he would straighten out any problems. (PX 13/DX 209; 2 Tr.2d 163, 165:4–18, 14–16 (Hupe).)

473. However, Paliafito shipped 100,008 Games but invoiced 260,016 Games. (MAI EX 310; 12 Tr.2d 1375:9—1376:6 (Levesque).)

474. Later, Carlson told the group that he would prefer to open a letter of credit directly in favor of MAI for future orders. (8 Tr.2d 836–37:19–25, 1 (Carlson); 2 Tr.2d 165–66:17–25, 1–2 (Hupe).)

475. Hupe told him that the letter of credit would have to be opened to Paliafito. (2 Tr.2d 166:3–18 (Hupe).)

476. Hupe also made it clear to Moss that any Target letter of credit would have to be opened to Paliafito. (2 Tr.2d 166:3–14 (Hupe).)

## JJ. SEPTEMBER 18, 1991: JOY LEE, NOWAK, PETROVICH AND STORM MEET IN MILWAUKEE TO DISCUSS PROBLEMS WITH PALIAFITO AND EXECUTE THE SELECT/MANTAE AGREEMENT; GEORGE JOHNSON WRITES TO HART WITHDRAWING THE OFFER TO SETTLE THE ANDES CASE

477. In mid-September 1991, Joy Lee, Nowak, Storm and Petrovich met in Milwau-

---

**33.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraphs 470 through 476 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

kee to discuss problems with Paliafito and to execute an agreement (the "Select/Mantae Agreement"). (3 Tr. 485–86:1–25, 1–18 (Petrovich).) The Select/Paliafito Agreement was attached to the Select/Mantae Agreement. (3 Tr. 489:11–15 (Petrovich).)

478. The Select/Mantae Agreement was to ensure that Select got its commission on the Ninety-five/five Arrangement, an arrangement that Paliafito knew about. Paliafito knew MAI was to pay commissions. (DX 75.)

479. At this meeting, Sam Petrovich informed Nowak and Lee that he was considering suing Paliafito. (3 Tr. 500:2–8 (Petrovich).)

480. The Select/Mantae Agreement was executed without the prior written consent of Paliafito, as required under the Select/Paliafito Agreement. (3 Tr. 484:23–25 (Petrovich); 7 Tr.2d 667:8–11 (Storm); DX 65 § 9(3).)

481. Richard Hart had told Storm that he wanted to see a draft of a proposed Select/Mantae Agreement before it was executed. (9 Tr.2d 991:13–16 (Hart).)

482. Storm advised Hart that he needed a written agreement with MAI to pay commissions. Hart responded that he knew that Storm had to protect his client (9 Tr.2d 990:25—991:8 (Hart).) Hart also told Storm that Hart wanted to see a draft of any Select/Mantae agreement before it was executed. Storm never complied. (9 Tr. 991:9–16 (Hart).)

483.[34] On September 18, 1991, Andes's attorney, George Johnson, wrote a letter to Hart informing him that all offers to settle the Andes case for Mark and John Paliafito, Paliafito America, and WAAC had been withdrawn and that he would be forwarding to Hart an amended complaint shortly. He also informed Hart that the case had been settled with respect to Joy Lee and Mantae. (DX 206.)

## KK. SEPTEMBER 19, 1991: STORM WRITES LETTER NOTIFYING PALIAFITO OF BREACH OF SELECT AGREEMENT; COMMISSIONS DISPUTE IS RESOLVED

484. On September 19, 1991, the day after meeting with Nowak, Petrovich and Lee, Storm drafted a letter of complaint to Paliafito alleging a breach of the Select Agreement. (3 Tr. 492:7–13 (Petrovich); DX 76.) Storm faxed this letter to Hart on September 21, 1991. (DX 400; DX 1500, Tab F, call no. 154; 7 Tr. 665:7–11 (Storm).) Storm, however, testified that the letter of complaint was prompted, not by a meeting with Nowak and Lee but by a telephone call from Hart on September 19th, at which time Hart said he was sending out a breach letter to Storm. (7 Tr.2d 677–78:10–25, 1–4 (Storm).)

485. Storm and Hart had more than one conversation regarding this letter. (9 Tr.2d 982–83:18, 3–11 (Hart).)

486. Hart testified that in this letter, and in subsequent conversations with him, Storm failed to mention his previous meetings and discussions with MAI and Nowak, and never informed Hart that Mantae had asked Select to join with Mantae in any suit against Paliafito. (10 Tr.2d 1024:7–11 (Hart).) Storm testified that he told Hart about his discussions with MAI soon after they occurred. (8 Tr.2d 867:5–18 (Storm).)

487. At the end of September 1991, a dispute arose over Select commissions. John Burke and Robert Hooper of Select Creations West went over Paliafito's records with Hupe. When the three determined that Select was owed $32,000, Paliafito issued Select a check for that amount immediately. (9 Tr.2d 1012–14:24–25, 1–25, 1–9 (Hart).) Meisenheimer testified, however, that Select had problems with Paliafito relating to invoicing commissions dating back to April 10, 1991, which were never addressed by Paliafito. (13 Tr.2d 1505–06:4–25, 1–4 (Meisenheimer).)

**34.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraph 483 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

## LL. SEPTEMBER 23, 1991: MOSS TELLS TARGET TO TRANSFER ALL PAYABLES TO MANTAE AND PLACE HOLD ON PALIAFITO'S ACCOUNT; EDDIE KIM INSTRUCTS CARLSON TO OPEN LETTER OF CREDIT DIRECTLY IN FAVOR OF MAI; TARGET COMPLIES

488.[35] On September 23, 1991, Moss faxed a letter to Carlson asking Target to switch Target's accounts payable from Paliafito to Mantae. Carlson agreed to do this and wrote: "[t]ransfer all payables to Mantae from Paliafito—hold $100,000 under Paliafito vendor number." (8 Tr.2d 839:6–23 (Carlson); DX 464.) As Carlson testified, this meant that Target would withhold $100,000 payable to Paliafito, to cover returns and defects. (8 Tr.2d 857:1–19 (Carlson).)

489. Target did transfer all payables to Mantae from Paliafito. (8 Tr.2d 839:10–23 (Carlson); 2 Tr.2d 173–74:24–25, 1–14 (Hupe).)

490. Paliafito did not find out that the payables had been transferred to Mantae until Paliafito tried to collect past due invoices from Target. (2 Tr.2d 174:5–8 (Hupe).)

491. That same day, Eddie Kim at MAI faxed a letter to Target requesting that Target open all future letters of credit directly in favor of MAI. (DX 465; 8 Tr.2d 842:8–12 (Carlson); 2 Tr.2d 168–170:14–25, 1–9, 4–8 (Hupe).)

492. Neither Moss nor any one from Target or Mantae told Paliafito that Target opened a letter of credit in Mantae's favor. (2 Tr.2d 169:6–9 (Hupe).)

## MM. SEPTEMBER 24, 1991: MEISENHEIMER SCHEDULES OCTOBER 7, 1991 SALES MEETING

493. On September 24, 1991, Thomas Meisenheimer set up the October 7th sales meeting in Milwaukee. He worked with Joy Lee or Levesque in planning and setting up the meeting, and Joy Lee paid for at least part of it. Meisenheimer faxed a list, (DX 290), to Joy Lee informing her of all the people who would be attending the October 7th sales meeting for Select sales representatives and others involved in the sales and distribution of GRIP BALL. (DX 290, at 1–2.) He told Joy Lee to send him a check for $12,581 so that he could pay the costs for this meeting. In the letter, Meisenheimer stated: "If you send me a check for this today, I will take care of all arrangements and details." (DX 290, at 2; 6 Tr.2d 588–90:23–25, 1–8, 18–22 (Joy Lee).)

494. Meisenheimer put together the agenda for the October 7th sales meeting after discussing the subject with Sam Petrovich. (13 Tr.2d 1412–13:22–25, 1–19 (Meisenheimer).) Meisenheimer testified that the only conversation he had with Joy Lee regarding the agenda for the October 7th sales meeting was in relationship to plans for special projects she was going to fund for marketing programs related to the product. (13 Tr.2d 1513:7–11 (Meisenheimer).)

495. Meisenheimer testified that his discussion with Joy Lee was not in relation to the agenda and that the agenda was put together after discussions with Petrovich. (13 Tr.2d 1413:1–3 (Meisenheimer).)

## NN. SEPTEMBER 25, 1991: BRESSLER FAXES DRAFT COMPLAINT TO STORM

496. On September 25, 1991, Kenneth L. Bressler, an attorney for MAI, faxed a draft complaint of Mantae's planned lawsuit against Paliafito and Mark and John Paliafito to Storm. (PX 18; DX 1500, Tab F, call no. 186; 7 Tr.2d 722:12–24 (Storm).) The facsimile cover sheet contained the message: "Please call after you have had an opportunity to review." (PX 18, at 1.)

497. Storm testified that he highlighted the allegation in Mantae's draft complaint that Paliafito had represented that it "had

---

**35.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraphs 488 through 492 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

the wherewithal to purchase sufficient numbers of the GRIP BALL Game product from Mantae to satisfy demand in the marketplace" because it was new to him. (PX 18 ¶ 8; 7 Tr.2d 725:7–21 (Storm).)

498. Bressler's draft complaint also contained the following allegation:

Indeed, Paliafito's ability to distribute the Game is so poor that *Select Creations has sued Paliafito* in the United States District Court for Wisconsin for breach of Paliafito's Agreement with Select to supply a sufficient quantity of the game to meet reasonable orders placed by Select.

(PX 18 ¶ 13 (emphasis added).) When Storm received the draft complaint he crossed out the cited language because the statement was not true. (7 Tr.2d 727–28:16–25, 1–18 (Storm).)

## OO. SEPTEMBER 27, 1991: ANDES AND MAI FILE STIPULATION OF DISMISSAL, DISMISSING ALL CLAIMS BETWEEN THEM WHILE ALLOWING ANDES TO PROCEED AGAINST PALIAFITO

499.[36] On September 27, 1991, MAI and Andes filed a stipulation dismissing with prejudice any and all claims between Andes and MAI. (DX 211.)

500. The stipulation allowed Andes to proceed with its claims against Paliafito. (DX 211.)

## PP. SEPTEMBER 30, 1991: ANDES FILES AMENDED COMPLAINT AGAINST PALIAFITO

501. On September 30, 1991, Andes filed an amended complaint against Paliafito. (DX 212.)

502. This action is currently being litigated in the United States District Court for the Eastern District of Tennessee, as Case No. 3–91–343. (6 Tr.2d 536, 554:17–21, 9–23 (Andes).)

## QQ. SEPTEMBER 30, 1991: MEISENHEIMER SCHEDULES MEETINGS WITH GRIP BALL CUSTOMERS FOR JOY LEE WITHOUT PALIAFITO

503. On September 30, 1991, Tom Meisenheimer sent a fax, (DX 214), to Joy Lee listing the meetings that he had scheduled for her and representatives of Select Creations (including himself), with GRIP BALL customers: M.W. Kasch Company in Milwaukee, and Walgreen's in Chicago, on October 8, 1991; and Shopko in Green Bay, on October 9th. He told Joy Lee that he is also trying to schedule meetings for Joy Lee and himself with "Kay Bee, Toys–R–Us, Child World, etc." (DX 214.)

## RR. OCTOBER 1, 1991: MANTAE FILES SUIT IN NEW YORK

504.[37] On October 1, 1991, Mantae filed suit against Paliafito in New York state court (the "New York action"). (DX 49.) Paliafito was not served with the summons and complaint in the case, and did not know that Mantae had filed suit against it, until October 22, 1991. (DX 301.)

## SS. OCTOBER 2, 1991: TARGET TAKES PALIAFITO OFF VENDOR SHEET AND SUBSTITUTES MAI

505. On October 2, 1991, under instructions from Moss, Carlson removed Paliafito from its vendor sheets and replaced it with MAI. Target thus converted all of its on-orders or open orders to Mantae. (8 Tr.2d 843–44:15–25, 1–3 (Carlson); DX 468.)

**36.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraphs 499 through 500 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

**37.** Plaintiff and third party defendants Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraph 504 because they have not had the opportunity to engage in the necessary discovery to do so. Accordingly, they have reserved their right to object to these findings to the extent an attempt is made to use them at trial on the merits.

**TT. OCTOBER 3, 1991: HART WRITES TO JOY LEE NOTIFYING MANTAE THAT THEY ARE IN BREACH OF THE AGREEMENT**

506. On October 3, 1991, Hart sent a letter to Joy Lee notifying Mantae that it was in breach of the Agreement under Section 1.1 by directly contacting Paliafito's customers without Paliafito's knowledge or authorization, and under Section 1.1 and 18.2 by shipping goods to Keith Andes without Paliafito's knowledge or consent. (DX 215, at 1, A and B.)

**UU. OCTOBER 4, 1991: SELECT FILES FIRST WISCONSIN COMPLAINT AGAINST PALIAFITO**

507. On October 4, 1991, Select filed its first complaint for declaratory judgment against Paliafito in Wisconsin state court, claiming, among other things, that Paliafito unilaterally reduced Select's commissions, that Paliafito owed Select commissions, and that Paliafito failed to supply sufficient games to meet reasonable orders. (3 Tr. 517:8-19 (Petrovich); PX 2A ¶¶ 7, 22, 23, 24, 25.)

508. Petrovich had asked his attorney, Storm, to draft a complaint against Paliafito in early August. (3 Tr. 492, 500:14-17, 2-11 (Petrovich).)

509. Neither Select nor Storm ever informed Paliafito of this suit. (7 Tr.2d 671:8-11 (Storm).)

**VV. OCTOBER 7, 1991: JOY LEE, LEVESQUE, NOWAK, STORM, PETROVICH, BETTIS AND SELECT SALES REPRESENTATIVES MEET IN MILWAUKEE**

510. On October 7, 1991, Joy Lee, Levesque, Nowak, Storm, Petrovich, Meisenheimer, John Burke, Robert Hooper, Moss, Steve Composto, other sales representatives contracting with Select and others met at the Grand Hotel in Milwaukee to discuss Super Grip Ball and other products. (3 Tr. 521-22:1-25, 1-25 (Petrovich); 6 Tr.2d 590-91, 597:21-25, 1-11, 17-18 (Joy Lee); DX 88.)

511. Paliafito did not attend this meeting. Paliafito had not been invited to it, and had not been given notice of it. (3 Tr. 472, 522:12-16, 1-10 (Petrovich); 4 Tr. 643:13-19 (Petrovich); 4 Tr. 694:4-14 (Hupe); 2 Tr. 416:9-11 (Paliafito).) Petrovich testified that he decided not to have Paliafito attend because: (1) the meeting concerned more than just GRIP BALL; and, (2) at the last meeting, the reps spent a great deal of time complaining about non-payment of commissions. (3 Tr. 623:10-15).

512. Bettis testified, however, that a primary purpose of this meeting was to discuss what was going on with GRIP BALL. (1 Tr. 28-29, 33, 35:24-25, 1-9, 16-22, 6-13 (Bettis).) In addition, while there were several other items on the agenda, more than half of the agenda concerned GRIP BALL. (DX 292; DX 293.)

513. At this meeting, Joy Lee announced that "we" (presumably Mantae) had filed a lawsuit to terminate Paliafito. (6 Tr.2d 594-95:25, 1-23 (Joy Lee).)

514. At this meeting, Nowak, Storm, and Joy Lee were scheduled to give a joint presentation on Grip Toys, its current status, and "MAI/PAI legalities." (DX 292/DX 293 at F(1).) Meisenheimer testified that "MAI/PAI legalities" referred to the Patent and the parties' relationship. (13 Tr.2d 1513:14-17 (Meisenheimer).) Petrovich testified that Nowak primarily discussed knockoffs. (3 Tr. 533:7-13 (Petrovich).)

515. Joy Lee instructed the sales representatives to have their accounts switched from Paliafito's vendor number to Mantae's new vendor numbers. (DX 292/DX 293 at F(1)(d); 6 Tr.2d 597, 599-601:1-12, 8-25, 1-25, 1-12 (Joy Lee).)

516. Bettis testified that during the sales meeting, all of the sales representatives met with Joy Lee, Petrovich, and Meisenheimer. (1 Tr. 35:7-19 (Bettis).) Petrovich testified, however, that only he and Storm had individual meetings with the sales representatives. (3 Tr. 522:17—523:6 (Petrovich).)

517. When Brian Bettis asked why Paliafito was not there, Rob Hooper stated, "Paliafito who?" Others present laughed. (1 Tr. 34:4-18 (Bettis).)

518. During the meeting, Joy Lee also presented her new products to the group. (3 Tr. 532–33:12–25, 1–6 (Petrovich); DX 292/DX 293 at F(3).) Petrovich stated that he was interested in Joy Lee's new products because she was offering an opportunity to make more money if he worked with her. (3 Tr. 532–33:12–25, 1–6 (Petrovich).)

519. On or about October 7, 1991, Petrovich informed Nowak and Joy Lee of the pending lawsuit that Select had filed against Paliafito but had not yet served on Paliafito. (3 Tr. 520:19–25 (Petrovich); DX 88.)

### WW. OCTOBER 8, 1991: JOY LEE, LEVESQUE AND MEISENHEIMER MEET WITH M.W. KASCH CO.

520. On October 8, 1991, the day after the sales meeting, Joy Lee, Levesque, and Meisenheimer met with M.W. Kasch and discussed "future distribution plans for Super Grip Ball." (DX 80.) Levesque later wrote a letter, (DX 295), to M.W. Kasch Co. noting that Mantae believed that M.W. Kasch could "do an excellent job of both distributing and warehousing [Mantae's] products." (DX 295.)

521. On October 18, 1991, Storm faxed a copy of a memorandum on the meeting, which had been prepared by Meisenheimer, to Hart. (DX 80; 3 Tr. 528:15–20 (Petrovich).)

522. As Petrovich admitted, the memorandum does not give "a very candid explanation" as to how Meisenheimer knew that Joy Lee would be in the area. (3 Tr. 530:1–5 (Petrovich).)

### XX. OCTOBER 10, 1991: SELECT DISMISSES FIRST SUIT

523. On October 9, 1991, Storm, on behalf of Select, executed a notice of voluntary dismissal of the first Wisconsin lawsuit against Paliafito, which dismissal was filed on October 10, 1991. (PX 2B.)

### YY. MID–OCTOBER 1991: SELECT AND PALIAFITO AGREE ON COMMISSIONS; PALIAFITO PAYS ALL PAST–DUE COMMISSIONS

524. After Hart received Storm's letter alleging a breach of the Select Agreement on September 21, 1991, (DX 400), they had several phone conversations regarding the letter.

525. On October 10, 1991, Select faxed a commission summary, (DX 219), a breakdown listing commissions that Paliafito purportedly owed Select through September 30, 1991, to Hart.

526. On October 11, 1991, there was a conference call between Hart and Hupe, on one hand, and Storm and Petrovich, on the other hand, regarding the issue of commissions that Select believed it was owed. (2 Tr.2d 93–94, 112:10–25, 1–17, 1–9 (Hupe); 7 Tr.2d 671:12–16 (Storm); DX 219.)

527. The issue of commissions was a problem. No one at Select knew how to read the Select Agreement and, thus, ever knew when they were to be paid. (2 Tr.2d 94, 109–110:11–17, 22–25, 1–22 (Hupe).) Select never received copies of invoices from Paliafito, as Paliafito had promised so that Select could accurately determine what commissions were outstanding. (1 Tr.2d 55–56:12–25, 1–4 (Hupe); 13 Tr.2d 1505–1506:1–25, 1–4 (Meisenheimer).)

528. Under the Select Agreement, commissions would automatically accrue when Paliafito received and shipped an order; however, they were not payable until Paliafito received payment for the goods. Select and Paliafito had orally agreed that commission payments would be made once a month, usually on the second Friday of the month following the month in which Paliafito had been paid. (2 Tr.2d 109, 110:3–10, 9–21 (Hupe).)[38]

529.[39] At the conclusion of the conference call, Hupe informed Petrovich and Storm

---

**38.** All modifications of the Agreement, however, were to be in writing, signed by both parties. (DX 65 ¶ 12d.)

**39.** Plaintiffs Select, Petrovich and Meisenheimer state that they are not in a position to confirm the truth or falsity of paragraphs 529 through 531 because they have not had the opportunity to

that Paliafito would be sending Select several checks and the amounts of the checks. Petrovich indicated that he thought that the amount was fairly close to what he figured was actually due and payable. (2 Tr.2d 113:2–13 (Hupe).)

530. As a result of this teleconference, Paliafito issued several checks to Select which Select promptly deposited into its bank account. (3 Tr. 518–19:14–25, 1–17 (Petrovich).) These checks included a check for $52,491.56, a check for $172,851.64 and a check for $168,027.75. (DX 402; 2 Tr.2d 112–13:16–25, 1 (Hupe).)

531. From the day of the conference call until this Select litigation began, no one from Select contacted anyone at Paliafito and claimed that Paliafito owed Select additional amounts. (2 Tr.2d 113:2–13 (Hupe).)

532. During the conference call neither Petrovich nor Storm informed Paliafito that Select had filed a lawsuit against Paliafito or that a sales meeting including GRIP BALL had occurred on October 7th. (3 Tr. 509:8–10 (Petrovich); 2 Tr.2d 113:14–24 (Hupe); 7 Tr.2d 671:8–11 (Storm).)

### ZZ. OCTOBER 11, 1991: NOWAK FAXES INDEMNIFICATION AGREEMENT TO CARLSON AT TARGET

533. On October 11, 1991, Nowak faxed a draft indemnification agreement to Carlson at Target. In this draft indemnification letter, Mantae agreed to indemnify Target for any payment made by Target to Mantae. (DX 469; 8 Tr.2d 846: 20–23 (Carlson).)

534. This draft indemnification letter was sent to Target prior to a meeting between Carlson and Joy Lee. (DX 469, at 1.)

### AAA. OCTOBER 21, 1991: PALIAFITO NOTIFIES MANTAE OF MANTAE'S ALLEGED BREACHES OF THE AGREEMENT

535. On October 21, 1991, Hart faxed a letter to Joy Lee notifying Mantae of breach of contract. Paliafito notified Mantae that they had breached the Agreement by arrang-

ing for a meeting with M.W. Kasch; by stating that Mantae terminated Paliafito; by stating that all future purchases of the Game would be through Mantae, not Paliafito; by directly meeting with the customers; by organizing and attending a meeting with Select's sales representatives; and by filling customers' orders without the knowledge and consent of Paliafito. (DX 226.)

### BBB. OCTOBER 22–24, 1991: MANTAE SERVES NEW YORK COMPLAINT ON PALIAFITO; COMPOSTO TELLS TOYS–R–US TO CHANGE VENDOR CODES FROM PALIAFITO TO MANTAE

536. On October 22, 1991, Mantae served its New York complaint on Paliafito. (DX 301.)

537. On October 23, 1991, Steve Composto notified Jeff Stack, the buyer at Toys–R–Us, that: "Mantae America has made a decision to eliminate their distributor for Grip Balls, and market and distribute the product on their own. Jeff, please cancel all of the orders you have for MAI/Paliafito Inc. Replacement orders should issued to MAI/Grip Toys Inc." This letter was copied to Nowak, Joy Lee, and Meisenheimer. (DX 297.)

538. On October 24, 1991, Meisenheimer distributed a memorandum, (DX 298), to all sales representatives, via facsimile, instructing them to notify customers that they should submit all orders to MAI/Grip Toys, Inc. and that payment should be made to that same entity. (DX 298.)

### CCC. OCTOBER 24, 1991: LEVESQUE INFORMS BARKER THAT MANTAE WILL NOT DELIVER PRODUCT TO PALIAFITO; SELECT FILES SECOND WISCONSIN COMPLAINT

539. When Paliafito was served with Mantae's complaint, Levesque informed Barker that Mantae would no longer deliver product to Paliafito. (2 Tr. 416–17:12–25, 1–5 (Paliafito).)

540. Hart testified that Paliafito had bought product or was prepared to buy prod-

---

engage in the necessary discovery to do so. Accordingly, they have reserved their right to object

to these findings to the extent an attempt is made to use them at a trial on the merits.

uct from Mantae until the time Mantae refused to sell Paliafito more product. (9 Tr.2d 995:1–3 (Hart).)

541. That same day, Select filed its second complaint against Paliafito. This complaint, the subject of the instant lawsuit, seeks, in part, a declaration that the Select Agreement is in full force and that Paliafito must pay Select the commissions due it. (DX 403.)

### DDD. SEPTEMBER 19, 1991—OCTOBER 29, 1991: COMMUNICATIONS BETWEEN SELECT AND MANTAE

542. At the hearing in this case, Petrovich testified that he could not recall whether he had any phone conversations with Nowak or Joy Lee from September 19, 1991 to October 6, 1991, and from October 9, 1991 to October 29, 1991. (3 Tr. 530, 535:21–24, 7–9 (Petrovich).)

543. Petrovich admitted that Meisenheimer made calls to Joy Lee and Nowak to set up the October 7th sales meeting, but could not recall whether Meisenheimer or Storm made any calls to Joy Lee or Nowak from October 9, 1991 to October 29, 1991. (3 Tr. 531, 535:9–13, 7–15 (Petrovich).)

544. Petrovich absolutely denied that Select had sent orders to Mantae during this period. (3 Tr. 495:7–11 (Petrovich).)

545. During this period, Select Milwaukee had 113 phone communications, totaling 511 minutes, with Mantae and Mantae's attorneys. Select, Moss and Select's attorneys, on one hand, and Mantae and Mantae's attorneys, on the other hand, had 633 phone communications totaling 2,176 minutes during this period. (DX 1500, Tabs A & D.)

546. There is no evidence, however, as to the content of the calls or who made them.

### EEE. OCTOBER 28–31, 1991: PALIAFITO MOVES NEW YORK STATE COURT TO REINSTATE IT AS EXCLUSIVE DISTRIBUTOR FOR THE GAME; SELECT SERVES COMPLAINT HERE ON PALIAFITO

547. On October 28, 1991, Paliafito filed an Order to Show Cause for a Preliminary Injunction, Including a Temporary Restraining Order, in the New York state court action. In this Order, Paliafito sought, in relevant part, to be reinstated as the exclusive distributor for the Game. (DX 302.) Paliafito's motion for preliminary injunction was denied.

548. On October 29, 1991, Select served its second complaint on Paliafito.

549. Storm faxed a copy of the complaint to Nowak. (Select's Ans. ¶ 76.)

550. In Mantae's opposition to Paliafito's motion for a preliminary injunction in the New York action, Mantae's counsel, Lieberman, Rudolph & Nowak, attached a copy of the complaint to show that Paliafito had "caused" Select, its largest sales representative, to sue it to collect past due commissions. (DX 303.)

551. Mantae's counsel also stated that "Select ... is unwilling to work with Paliafito." Select, however, in its complaint, sought a declaration that the Select Agreement was in full force. (DX 303, at 12; DX 403 ¶¶ 15, 23, 51, 52, 53, 64, 65, 66, 74.)

552. On November 13, 1991, Associate Justice Herman S. Cahn of the New York Supreme Court was to hold a hearing in New York on Paliafito's motion. Mantae brought to the hearing the following witnesses: Petrovich, Moss, Thomas Ertel, composto, and John Burke. (3 Tr. 547–48:16–25, 11–16 (Petrovich).)

553. Petrovich testified that he agreed to testify on Mantae's behalf only after Nowak threatened to subpoena him during a phone call. (3 Tr. 540–41:3–25, 1 (Petrovich).) Petrovich testified that Nowak told Petrovich that Nowak had the power to issue a subpoena that could require Petrovich, residing in Wisconsin, to attend the New York hearing. (3 Tr. 543–44:4—25, 1–16 (Petrovich).)

554. Storm testified that Nowak said he would subpoena Petrovich for a deposition in Wisconsin and that Nowak never said to him that he would subpoena Petrovich to fly to New York. (8 Tr.2d 879:23—880:9; 882:9–12 (Storm).)

## FFF. NOWAK SUBMITS AFFIDAVITS, WITH THE COOPERATION AND ACQUIESCENCE OF AFFIANTS, TO NEW YORK STATE COURT

### 1. Petrovich's affidavit

555. On November 14, 1991, Petrovich discussed his affidavit, (DX 66), with Nowak over interstate wires. Nowak prepared the initial draft and faxed it to Petrovich in Milwaukee. Petrovich called in his changes to Nowak's secretary, Clara. He then faxed the signature page to Nowak. Petrovich knew that the affidavit was to be filed with the New York state court. (3 Tr. 556–58:2–25, 1–25, 1–14 (Petrovich).)

556. In his affidavit, (DX 66), Petrovich made, and Nowak procured and tendered to the Court, the following statements:

(a) that "during those [mid-September] meetings Select, at no time, attempted to convince MAI to file suit, nor did MAI attempt to convince Select to file suit against [Paliafito]," (*Id.* ¶ 14);

(b) that "Select did meet with Mantae some time in mid-September, and perhaps once after that to discuss the problems being mutually experienced by both parties," (*Id.*);

(c) that "Paliafito unilaterally decided to reduce Select's commission rate by one half," (DX 66 ¶ 9);

(d) that Paliafito "failed to provide timely commission payments to Select's sales representatives," (*Id.* ¶ 6);

(e) that Paliafito did not provide timely commission payments to Bob Uecker by failing to "forward any royalty payments for Bob Uecker until October 1991," (*Id.* ¶ 10); and

(f) that Select did not conspire with Mantae to destroy Paliafito.

(*Id.* ¶ 14.)

557. The first statement above, (a), may be false. On September 14, 1991, Joy Lee and Nowak asked Petrovich and Storm if they would join Mantae in a lawsuit against Paliafito, and Nowak faxed Storm a copy of Mantae's draft complaint against Paliafito, with a cover sheet that asked Storm to review the complaint and "discuss with [No-wak] claims to be made by Select." (DX 411; DX 408; DX 409; DX 410; 7 Tr.2d 685:19–24 (Storm).) On September 25, 1991, Kenneth L. Bressler, an attorney for Mantae, faxed a draft complaint to Storm alleging that Select had already brought suit against Paliafito. (DX 18.)

558. The second statement above, (b), is misleading. Select met several times with Mantae in July through October 1991, and had hundreds of phone conversations.

559. The fifth statement above, (e), appears to be false. The Select Agreement required Paliafito to pay commissions to Bob Uecker within thirty days of the close of the calendar quarter for which the payment is calculated. (DX 65 § 5(A).) The payment to Uecker was calculated on sales made after his commercial began to run. (DX 65 § 4(B).) The Uecker commercial did not begin to run until late May (and its effects were not felt until July). Hart testified that he did not know that any games were sold prior to the end of the second quarter. (9 Tr.2d 985–86:12–25, 1–2 (Hart).) Thus, Paliafito did not have to pay the Uecker commissions until thirty days after the close of the third calendar quarter, *i.e.*, November 1, 1991.

560. Paliafito paid the Uecker commissions in accordance with the terms of the Select Agreement. (9 Tr.2d 986:3–5 (Hart); DX 65 § 5A; DX 90.)

### 2. Moss' affidavit

561. On November 18, 1991, Paul Moss, president of Paul Moss, Inc. (a/k/a "Paul Moss & Co., Inc."), a Select sales representative, faxed his affidavit, (DX 97), to Lieberman, Rudolph & Nowak using interstate wires and knowing that such affidavit would be submitted by Nowak to the New York state court. In his affidavit, Moss made, and Nowak procured and tendered to the Court, the following statements:

(a) that, "as of Labor Day, 1991 I had only received approximately $10,000 in commissions when approximately $200,000 were due as of July, 1991," (*Id.* ¶ 7); and

(b) that Paliafito caused the problems relating to the shipping of Games and invoicing.

(*Id.* ¶ 9.)

562. The first statement above, (a), may be false. Hupe testified Moss had received approximately $150,000 in commissions as of August 31, 1991. (DX 502; DX 96; 4 Tr. 691–92:22–25, 1–13 (Hupe).)

### 3. Joy Lee's affidavit

563. On November 18, 1991, Joy Lee executed her affidavit. She then faxed the signature page by interstate wires to Lieberman, Rudolph & Nowak. In her affidavit, (DX 272), Joy Lee made, and Nowak procured and tendered to the Court, the following representations:

(a) that Mantae required, and made known to Paliafito its requirement of, a first class distributor able to maintain a sufficient level of inventory for the Game to meet market demand, (*Id.* ¶ 3);

(b) that she prepared a draft termination letter, (DX 27), and showed it to Mark Paliafito on May 30, 1991, (*Id.* ¶ 12);

(c) that Paliafito "had failed to comply with Section 2 of the Agreement as upon termination [July 12, 1991], they had not yet paid the $250,000 payment owed for July 1, 1991; in addition, at least two of the other payments required under Section 2 were paid late," (*Id.* ¶ 15);

(d) that Mantae accepted payment terms different than those contained in Section Seven of the Agreement only "under protest and continually complained to [Paliafito] that such differing terms were unacceptable," (*Id.* ¶ 16);

(e) that, on July 12, 1991, Paliafito owed Mantae "over $500,000, and the total amount due MAI was not paid within the contractual cure period," (*Id.* ¶ 17); and

(f) that, due to actions taken by Paliafito, Mantae ended up in litigation with New Market Concepts, Inc. and was threatened with litigation by Joneek, a division of Joelson Industries.

(*Id.* ¶ 23, 24.)

564. The first statement above, (a), may be false. Mark Paliafito testified that Joy Lee never stated that Mantae had certain "requirements" of its distributor, and Paliafito never stated that it would meet her "requirements." (1 Tr. 138–39:10–25, 1–20 (Paliafito).)

565. The second statement above, (b), may be false. Mark Paliafito testified that Joy Lee never showed him the draft termination letter, (DX 27), saying that this was not necessary. Joy Lee, however, testified otherwise.

566. It appears the third and fourth statements above, (c) and (d), may be false. Paliafito paid the final rights payment on July 8th or 9th, 1991 and such payment cleared Paliafito's account on July 11th. (DX 18; DX 86; DX 717 (listing the three checks of DX 18 totaling $250,000 with notation "associated with sales rights").) Only one other rights payment was late. (DX 17.) Mark Paliafito testified that Joy Lee directed that this payment could be late. (2 Tr. 325:2–14 (Paliafito).) Mark Paliafito testified that Mantae accepted all payments for Games and for the rights without reservation or protest. (1 Tr. 167:16–19 (Paliafito); 2 Tr. 261:2–16 (Paliafito).)

### GGG. OCTOBER 30—DECEMBER 6, 1991: TELEPHONE COMMUNICATIONS BETWEEN SELECT AND MAI

567. Petrovich testified that he could not "say for sure," but that he had "probably ... a few" phone calls, and "perhaps" there had been a few faxes to or from Joy Lee and Nowak, in the period from October 30, 1991 to November 13, 1991. (3 Tr. 535–36:25, 1–5 (Petrovich).) Petrovich did not know whether Meisenheimer had telephone calls to MAI or Nowak during that time period. (3 Tr. 536:8–10 (Petrovich).)

568. During this period, Select Milwaukee had a total of thirty-eight telephone communications with MAI and its attorneys totaling 224 minutes. Select, its attorneys, and Paul Moss, on the one hand, and MAI and its attorneys, on the other, had 346 calls totaling 1,721 minutes. (DX 1500, Tabs A & D.)

569. In the period from November 14, 1991 to December 3, 1991, Petrovich testified

that he had one telephone call with Joy Lee on December 3, 1991 and no communications with Nowak, apart from his conversations regarding his affidavit. (3 Tr. 559:14–22 (Petrovich).)

570. During the period from November 14, 1991 to December 6, 1991, Select, its attorneys, and Moss, on the one hand, and MAI and its attorneys, on the other hand, engaged in 281 telephone communications totaling 1,859 minutes. (DX 1500, Tabs A & D.)

## II. CONCLUSIONS OF LAW

### A. CHOICE OF LAW

■ 1. A federal court sitting in diversity jurisdiction follows the choice of law rules of the forum state. *Diesel Service Co. v. Ambac Int'l Corp.*, 961 F.2d 635, 637 (7th Cir. 1992) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).)

■ 2. Under Wisconsin law, parties to a contract may expressly agree that the law of a particular jurisdiction shall govern their contractual relationship. *See CSS–Wisconsin Office v. Houston Satellite Sys., Inc.*, 779 F.Supp. 979, 983 (E.D.Wis.1991) (Gordon, J.) (citing *Bush v. Nat'l School Studios, Inc.*, 139 Wis.2d 635, 642, 407 N.W.2d 883 (1987).) The Agreement between MAI and MCL, on the one hand, and Paliafito, on the other, provides in Section 20.5 that it shall be governed by the laws of California. Accordingly, California law applies to Paliafito's claim for breach of contract against MAI, MCL, and the Lees (Count IV).

■ 3. Moreover, because the Agreement contains an integration clause, Section 20.3, a claim for fraudulent inducement must satisfy the fraud exception to California's parol evidence rule. *See* Cal.Code Civ.Pro. § 1856(g). This is a substantive doctrine. *See Banco do Brasil, S.A. v. Latian, Inc.*, 234 Cal.App.3d 973, 1000, 285 Cal.Rptr. 870, 885 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2967, 119 L.Ed.2d 588. Accordingly, Paliafito's claim for fraudulent inducement (Count III) is governed by California law.

■ 4. In the absence of a contractual choice of law provision, Wisconsin law applies the "grouping of contacts" approach; that is, the local law of the state with which the contract has the most significant relations. *Dresser Indus. v. Gradall Co.*, 702 F.Supp. 726, 731 (E.D.Wis.1988) (Warren, C.J.) (citing *Urhammer v. Olson*, 39 Wis.2d 447, 450, 159 N.W.2d 688, 689 (1968).)

■ 5. The following factors are used to determine the place with the most significant relationship: (1) place of contracting; (2) place of performance; (3) place of the subject matter of the contract; (4) domicile, nationality, place of incorporation, and place of business of the parties; (5) law under which the contract will be most effective; and (6) other contacts presented in the given case. *Dresser Indus.*, 702 F.Supp. at 731 (citing *Peterson v. Warren*, 31 Wis.2d 547, 558, 143 N.W.2d 560, 564 (1966).)

■ 6. Because Select is a Wisconsin corporation doing business in Wisconsin, and because orders for the Game were ultimately channeled through Select, the laws of Wisconsin govern Paliafito's claim for breach of contract against Select (Count VII).

■ 7. For tort claims, where the laws of two states are essentially the same, courts apply the law of the forum state. *See Railway Express Agency, Inc. v. Super Scale Models, Ltd.*, 934 F.2d 135, 139 (7th Cir.1991) (applying Wisconsin choice of law rules for tortious interference claim because Wisconsin and New York law recognized essentially the same elements for the claim).

■ 8. In the event of a conflict, Wisconsin law applies the "center of gravity" or "grouping of contacts" doctrine. *Tillett v. J.I. Case Co.*, 580 F.Supp. 1276, 1278 (E.D.Wis.1984) (Warren, J.) (citing *Wilcox v. Wilcox*, 26 Wis.2d 617, 133 N.W.2d 408 (1965)), *aff'd,* 756 F.2d 591 (7th Cir.1985).

■ 9. The factors under this doctrine include: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *Tillett*, 580 F.Supp. at 1278

(quoting *Heath v. Zellmer*, 35 Wis.2d 578, 596, 151 N.W.2d 664 (1967).)

■ 10. Because the laws of Wisconsin and California are essentially the same with respect to Paliafito's remaining common law actions, Wisconsin law applies to its claims for: tortious interference (Count V), constructive trust (Count VI), and breach of fiduciary duty (Count VIII). Moreover, because many of the overt acts in furtherance of the conspiracy are alleged to have taken place in, or to have arisen out of, acts in Wisconsin, Wisconsin law applies to Paliafito's claim for conspiracy (Count IX).

### B. PALIAFITO'S MOTION FOR ATTACHMENT AND PRELIMINARY INJUNCTION

■ 11. Presently before the Court is Paliafito's Motion for a Writ of Attachment and Injunctive Relief[40] against the third party defendants. Paliafito requests the Court, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure: (1) to issue a writ of attachment authorizing the United States Marshal to attach assets owned by the third party defendants Lees, MCL, and MAI, up to the amount of $10,000,000; (2) to require the Lees, MCL, and MAI to place a sufficient amount of assets in this district to enable the Court to effectuate the writ; (3) to enjoin the Lees, MCL, and MAI from transferring funds or other assets out of the United States without Court approval; and (4) to appoint a receiver.

#### 1. Attachment

12. Federal Rule of Civil Procedure 64 authorizes the Court to grant all remedies under the laws of the State of Wisconsin which provide for seizure of persons or property for the purpose of securing satisfaction of a potential judgment, including the remedy of attachment.[41]

13. Wisconsin Statutes Section 811.02 provides that a "writ of attachment shall be issued on the request of the plaintiff at any time before final judgment and after a summons and complaint are filed." Sections 811.03 and 811.06 set forth the requirements for attachment. Section 811.03(1) provides in part:

811.03. Basis for attachment

(1) On contract or judgment. Before any writ of attachment shall be executed the plaintiff or some one in the plaintiff's behalf shall make and annex thereto an affidavit setting forth specific factual allegations to show that the defendant is indebted, or that property of the defendant is available, to the plaintiff in a sum exceeding $50 specifying the amount above all setoffs, and that the same is due upon contract or upon a judgment.

\*   \*   \*   \*   \*   \*

(f) That the defendant is a foreign corporation; ...

\*   \*   \*   \*   \*   \*

14. Thus, in order to obtain a writ pursuant to a contractual claim under § 811.-03(1)(f), a party must present evidence that:

(a) the party against whom attachment is sought is indebted or has property that is available to the party seeking attachment;

(b) the claim of the party seeking attachment exceeds $50.00, specifying the amount owed above all setoffs;

---

**40.** Paliafito also filed a motion for summary judgment against both the third party defendants and Select. However, because discovery is still partially stayed in this action, Paliafito's motion for summary judgment is premature. This Court will issue a scheduling order setting forth a discovery period and window for filing summary judgment motions in the order which resolves the remaining pending motions.

This Court also notes that conflicting evidence, creating genuine issues of material fact on many of Paliafito's claims, has been raised by the third party defendants. Accordingly, this Court suggests that the parties limit any future motion for summary judgment to those claims where no material issues of fact exists.

**41.** Federal Rule of Civil Procedure 64 provides in relevant part:

[A]ll remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought.

(c) the party whose assets are to be attached is a foreign corporation.

15. Section 811.03(2) provides:

Tort action. In tort actions the affidavit shall state that a cause of action in tort exists in favor of the plaintiff and against the defendant, that the damages sustained exceed fifty dollars specifying the amount claimed and either:

(a) That the defendant is not a resident of this state; or that his residence is unknown and cannot with due diligence be ascertained; or ·

(b) That the defendant is a foreign corporation.

16. Thus, in order to obtain a writ of attachment pursuant to a tort claim a party must present evidence that:

(a) a cause of action in tort exists in favor of the party seeking the writ and against the party whose assets are to be attached;

(b) the damages sustained exceed $50.00, specifying the amount claimed;

(c) the party whose assets are to be attached (i) is not a resident of Wisconsin, (ii) has no residence which is known or can, with due diligence, be obtained, or (iii) is a foreign corporation.

17. In addition, Section 811.06 requires a party seeking attachment to provide a bond as security to pay for any costs that may be imposed on the party against whom attachment is sought as a result of attachment. Section 811.06 provides in part:

Before the writ of attachment shall be executed a bond on the part of the plaintiff in the sum of at least two hundred and fifty dollars executed by sufficient surety, shall be delivered to the officer, to pay all costs that may be awarded to the defendant and all damages which he may sustain by reason of the attachment. The affidavit of the surety annexed to such bond shall state that he is a resident and householder or freeholder within the state and worth double the sum specified in the bond in property therein above his debts and ex-clusive property exempt from execution. . . .

18. By the affidavit of Mark Paliafito, Paliafito states that it stands ready to provide sufficient security for an attachment order to issue. Paliafito's statement meets the requirements of Section 811.06, so long as Paliafito's surety meets the requirements of that section.

19. Chapter 811 does not require that a plaintiff make a pre-attachment showing of a likelihood of success on the merits.[42] However, Section 811.19 requires a court to hold a hearing on any motion to vacate or modify a writ of attachment as soon as possible. Section 811.19 provides in part:

A motion to vacate or modify shall be heard forthwith by the court. On the motion, the burden of proof shall be upon the plaintiff. . . .

20. Section 811.18 sets forth the standard of review at a post attachment hearing. Section 811.18 provides:

811.18 Vacation or modification of writ

The court or the presiding judge thereof may at any time vacate or modify the writ of attachment upon motion of the defendant for any sufficient cause. A motion to vacate or modify may be combined with a motion to increase the plaintiff's security under § 811.07.

21. Paliafito did not make a request for attachment to commence pre-hearing. Moreover, MAI and Select have opposed attachment, thereby requesting the Court to review Paliafito's request for attachment. Accordingly, the Court will apply the standards set forth in Sections 811.18 and 811.19 in resolving Paliafito's motion for attachment. Thus, Paliafito has the burden of proof on all the required elements for attachment. In addition, the Court reads the requirements of Section 811.03(1) and (2), relating to the existence of a cause of action, and the "any sufficient cause" language for modification or vacation in Section 811.18, to mean that Paliafito must make a showing of the likelihood of its success on the merits similar to that

---

**42.** Accordingly, it appears that if Paliafito had pressed the Court, it could have received a writ of attachment prior to any hearing on the likelihood of its success on the merits.

required by Federal Rule of Civil Procedure 65.

### a. Pursuant to breach of contract claim

22. MAI argues that Paliafito should not be allowed to seek attachment pursuant to its breach of contract claim because its original request for attachment was based solely on its tort claims.

23. As MAI notes, a motion to amend a motion is left to the discretion of the trial judge. In using this discretion, the trial judge should consider prejudice to adverse parties, the fair and just adjudication of the case, and the speed in resolving the case. *See* 5 C. Wright and A. Miller, *Federal Practice and Procedure: Civil,* § 1194 (1990). MAI notes that according to Wright and Miller:

> In theory, a motion may be amended at any time before the judge has acted upon the motion, although it is particularly inappropriate after briefs have been interposed by the opposing parties, oral arguments have been heard, or other forms of reliance have been built up on the basis of the original motion.

5C Wright & Miller, § 1194, at 51.

24. In this case, however, Paliafito requested to include its attachment claim under Section 811.03(1) before MAI was required to submit its final briefing on Paliafito's motion. In addition, it appears clear from the evidentiary hearing that all parties addressed the likelihood of Paliafito's success on the merits of its breach of contract claim against MAI.

25. Nonetheless, the Court will deny Paliafito's request for attachment pursuant to its breach of contract claims. Section 811.03(1) requires the party requesting attachment to present evidence stating the specific amount to be attached, *i.e.,* amount due under the contract, less setoffs. *See, e.g., Hawes v. Boyd,* 64 Wis. 152, 25 N.W. 21 (1885) (no attachment will lie in an action in which the amount due cannot be determined without an accounting). Paliafito's briefs fail to present a clear account of the money allegedly owed it under the contract, less setoffs. Accordingly, the Court must deny Paliafito's request for attachment on its breach of contract claims.

### b. Pursuant to tort claims

26. As referred to above, Sections 811.03(2), 811.18 and 811.19 require a party seeking attachment pursuant to tort-based claims to demonstrate:

> (a) the party has a reasonable likelihood of success on the merits of its causes of action in tort against the party whose assets are to be attached;
> 
> (b) the damages sustained exceed $50.00, specifying the amount claimed;
> 
> (c) the party whose assets are to be attached (a) is not a resident of Wisconsin, (b) has no residence which is known or can, with due diligence, be obtained or (c) is a foreign corporation.

### i. Likelihood of success on the merits

27. The Court finds that Paliafito has demonstrated more than a negligible likelihood of success on the merits on the following tort-based claims: (1) RICO, under 18 U.S.C. § 1962(c); (2) RICO, pursuant to 18 U.S.C. § 1962(d); (3) fraudulent inducement; (4) tortious interference with contract.[43]

---

**43.** This Court particularly finds, however, that Paliafito has failed at this point in the case to demonstrate the likelihood of its success on the merits of its claim under Wisconsin Statutes Section 134.01 for conspiracy to injure its business. In order to make out a conspiracy under Wisconsin law, Paliafito must show that MAI's conduct was "intend[ed] to cause harm for harm's sake." *Maleki v. Fine–Lando Clinic Chartered,* 162 Wis.2d 73, 469 N.W.2d 629 (1991). In *Maleki,* the Wisconsin Supreme Court held that "an essential element of the cause of action [of conspiracy to injure a business] is the malicious motive of the conspirators sought to be charged." *See id.* at 88, 469 N.W.2d 629. In addition, the *Maleki* court stated that "[f]or conduct to be malicious under conspiracy law it must be conduct intended to cause harm for harm's sake." *See id.* at 86, 469 N.W.2d 629. The *Maleki* court also indicated that "if there is a combination of persons and they act, even in part as the result of malicious motives and cause harm, the injury is actionable." *See id.* at 88, 469 N.W.2d 629. Here it appears clear, however, that if Select and the third party defendants conspired to get rid of Paliafito, they acted solely for economic reasons, *i.e.,* to take the valuable GRIP BALL distribution rights from Paliafito.

### (A) 18 U.S.C. § 1962(c)

28.  Section 1962(c) provides, in part:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . .

18 U.S.C. § 1962(c).

■ 29.  To establish a violation of 18 U.S.C. § 1962(c), a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (cited in *Hartz v. Friedman,* 919 F.2d 469, 471 (7th Cir.1990)).

30.  Section 1961(4) of RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

■ 31.  Paliafito presents evidence that the "enterprise" here is the association in fact made up of the following corporations: MAI, MCL, Grip Toys, MAI Ltd., Puff Pac Production, Best International, and Best General Merchandise.  Paliafito presents evidence that this association is engaged in the importation of the Game from the Republic of Korea into the United States, the licensing of the right to market and distribute the Game in the United States, and the sale and marketing of the Game in the United States, and is thus an "enterprise engaged in, or the activities of which affect, interstate or foreign commerce" within the meaning of 18 U.S.C. § 1962(c).  *See United States v. Masters,* 924 F.2d 1362, 1366 (7th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991) (an association in fact may be composed of a consortium of organizations).

32.  Moreover, Paliafito presents evidence that MAI, MCL, and the Lees are "persons employed by, or associated with" the enterprise within the meaning of 18 U.S.C. § 1961(3) and 1962(c).  *See Haroco, Inc. v. American Nat'l. Bank & Trust Co.,* 747 F.2d

384, 401 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) ("In the association in fact situation, each participant in the enterprise may be a 'person' liable under RICO, but the association itself cannot be.  By contrast, a corporation obviously qualifies as a 'person' under RICO and may be subject to RICO liability.").

■ 33.  18 U.S.C. § 1961(5) defines a "pattern of racketeering activity" as "requir[ing] at least two acts of racketeering activity . . . occurring within ten years" of each other.  However, a "pattern of racketeering activity" requires more than merely two predicate acts.  *Olive Can Co. v. Martin,* 906 F.2d 1147, 1150 (7th Cir.1990); *Jones v. Lampe,* 845 F.2d 755, 756 (7th Cir.1988).

■ 34.  A party attempting to establish a civil RICO claim must prove a pattern of racketeering activity that shows both continuity plus relationship among the predicate acts.

The pattern requirement is difficult to define and requires courts to use common sense.  *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, [239–41] 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989); *United States Textiles, Inc. v. Anheuser-Busch Companies,* 911 F.2d 1261 (7th Cir. 1990).  In *H.J., Inc.,* the Supreme Court said that the continuity plus relationship test first described in *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), was still valid.  *H.J., Inc.,* [492 U.S. at 238–39] 109 S.Ct. at 2900.  Predicate acts are related if the acts " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *H.J., Inc.,* [at 239–41] 109 S.Ct. at 2901 (quoting 18 U.S.C. [Sect.] 3575(e) (definition of pattern for Dangerous Special Offender Sentencing Act)).  Continuity is more difficult to explain.  The Supreme Court said multiple schemes were not necessary, but plaintiffs had to prove a "continuity of racketeering activity or its threat."  *Id.*  Whether there is continuity depends

on the facts of each case. *Id.* [at 241–43, 109 S.Ct.] at 2902.

*Hartz v. Friedman,* 919 F.2d 469, 472 (7th Cir.1990).

35. The Court finds that Paliafito has presented evidence that MAI, MCL, and the Lees have participated, directly or indirectly, in the conduct of the association's affairs through a pattern of racketeering activity.

36. This pattern consists, among other things, of multiple acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, respectively. The acts making up the pattern were in furtherance of a scheme to defraud and involve the use of the United States mails or wires. *See United States v. Dempsey,* 768 F.Supp. 1256, 1268 (N.D.Ill. 1990) (listing elements to mail and wire fraud statutes).

37. The predicate acts on which Paliafito has made a showing of its likelihood of success on the merits include:

(a) the omission from the patent application of March 8, 1990 of the fact that a nearly identical item was on sale in the United States at least since August 1988, in violation of 37 C.F.R. § 1.56(a);

(b) the use of the United States mails to send items such as samples, supplies of packaging, and catalogues relating to the Game, in which the Game is identified as employing the trademarked "Velcro" material, when in fact it does not use this material;

(c) falsely representing to Paliafito and others that the Game employs the trademarked "Velcro" material;

(d) falsely representing to Paliafito and others that MAI had previously sold as many as 500,000 units of the Game in 1990, when in fact it had only sold approximately 200,000 units;

(e) knowingly undervaluing the price of the Game on customs invoices in order to reduce the amount of customs duties; and

(f) falsely and knowingly representing to the United States Customs Service that MAI and MCL are unrelated companies when in fact they are related.[44]

### Fraudulent procurement of a patent

38. On March 8, 1990 Miryoung Lee, through her attorney Nowak, submitted a patent application to the United States Patent and Trademark Office ("PTO") for a catch pad and ball game. *See* DX 104. Paliafito presents evidence that this application failed to disclose that a virtually identical version of the Game had been sold by Aljac Enterprises more than a year prior to the application. Paliafito presents evidence that Lee and Nowak knew of this version because Best International, the predecessor to MAI, had purchased the game in August 1988.[45] This omission may constitute a breach of Lee and Nowak's duty of candor to the PTO, *see* 37 C.F.R. § 1.56(a), and, thus, may have defrauded the PTO.

39. Because proceedings before the PTO are *ex parte,* the patent applicant and her agents stand in a relationship of trust to the PTO. *See A.B. Dick Co. v. Burroughs Corp.,* 617 F.Supp. 1382, 1394 (N.D.Ill.1985), *aff'd in part,* 798 F.2d 1392 (Fed.Cir.1986).

40. Accordingly, applicants and their agents owe the PTO "a duty of absolute candor and good faith." *Procter & Gamble Co. v. Kimberly–Clark Corp.,* 740 F.Supp. 1177, 1196 (D.S.C.1989), *aff'd,* 907 F.2d 159 (Fed.Cir.1990; *see also Hycor Corp. v. Schlueter Co.,* 740 F.2d 1529, 1538 (Fed.Cir. 1984) ("'[t]he highest standards of honesty and candor on the part of applicants in presenting such facts to the office are thus necessary elements in a working patent system'").

44. The Court finds that the remaining predicate acts alleged by Paliafito either lack sufficient likelihood of success on the merits to support attachment or are not predicate acts under RICO.

45. The Court notes that MAI presents evidence that Aljac's version of the Game, which was substantially similar to MAI's, was not sold in the United States until 1989, less than one year before the patent application. However, because Paliafito must only show that it has a reasonable chance of success on the merits, MAI's evidence does not defeat Paliafito's request for attachment.

■ 41. This "duty of candor and good faith" rests on "the inventor, on each attorney or agent who prepares or prosecutes the application, and on every other individual who is substantially involved in the preparation or prosecution of the application" to disclose to the PTO "information they are aware of which is material to the examination of the application." 37 C.F.R. § 1.56(a).

■ 42. Fraud on the Patent Office occurs when an applicant, or her agent: (a) makes a misrepresentation or omission to the PTO; (b) which was material; (c) involving information that was known, or should have been known, to the applicant; and (d) which was committed with the requisite intent. *See N.V. Akzo v. E.I. Dupont de Nemours*, 810 F.2d 1148, 1153 (Fed.Cir.1987) (citing *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 698 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984)).

43. Information is material "where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a).

44. Under the United States Patent Code, an inventor is entitled to a patent for the invention, unless "the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b).

45. Genauer testified that virtually identical products—Genauer's "catch pad and ball games"—were on sale in the United States in 1988, more than one year prior to Lee's patent application. Miryoung Lee and Nowak's failure to disclose this information may constitute fraud on the PTO.

46. Alternatively, because Paliafito presents evidence that both versions of the "catch pad and ball game" sold by Genauer were on sale in the United States more than a year prior to Miryoung Lee's application, the versions might have constituted prior art over which Lee's claim had to be patentable under

35 U.S.C. § 103. *See Schreiber Mfg. Co., Inc. v. Saft America, Inc.*, 704 F.Supp. 759, 767 (E.D.Mich.1989) ("whatever is on sale more than a year prior to filing patent application becomes part of the prior art over which the claim must be patentable").

47. Given Paliafito's evidence of the strong likeness of Genauer's versions to the patented Game, the existence of Genauer's products was material, in that it would have been "important in deciding whether [Joy Lee's claimed invention was too obvious in light of prior art] to allow the application to issue as a patent." *See* 37 C.F.R. § 1.56(a). Thus, Miryoung Lee and Keith Nowak's failure to inform the PTO of this possible prior art in the patent application might have worked a fraud on the PTO.

48. Paliafito presents evidence that Lee and Nowak made use of the United States mails in committing this fraud by mailing the patent application and the inventor's declaration to the PTO.

49. Moreover, Paliafito presents evidence that Nowak made use of the interstate wires in prosecuting this application when he caused to be faxed to the PTO the "Petition to Make Special under 37 C.F.R. § 1.102(d)." In that petition, Nowak fraudulently represented that he "has made or caused to be made a careful and thorough search of the prior art or has good knowledge of the pertinent prior art" and that he "believes all of the claims in the application are allowable."

50. MAI argues that there can be no real dispute that the PTO was aware of the Aljac product prior to issuing the '617 Patent. MAI notes that the '617 Patent makes express reference to the Korean patent number for the Aljac product—Korean Patent No. "59[9]11." [46] However, the patent application also states that the Korean patented product differs substantially from the Game. Based on the Court's cursory look at the two products and the testimony of Genauer, the Court finds MAI's assertion to the PTO may have been untrue.

---

**46.** U.S. Patent No. 4,995,617, issued to Miryoung Lee, actually refers to Korean Patent No. "5911." It appears that this may be a typographical error

and that the actual reference should be to Korean Patent No. "59911."

51. MAI also argues that 18 U.S.C. § 1341 does not apply because the government does not have a property interest in the Patent. In support of this argument, MAI cites *McNally v. United States*, 483 U.S. 350, 359 n. 8, 107 S.Ct. 2875, 2881 n. 8, 97 L.Ed.2d 292 (1987). However, the cited language in *McNally* is inapplicable to this case because it refers to another statute, 18 U.S.C. § 371, which applied only to frauds against the federal government. *See United States v. Stoneman*, 870 F.2d 102 (3d Cir.1989); *United States v. Munna*, 871 F.2d 515 (5th Cir. 1989); *United States v. Bortnovsky*, 879 F.2d 30 (2d Cir.1989).

*Misappropriation of the "Velcro®" trademarks*

52. Based on the evidence produced at the hearing, the Court finds that it could be determined that MAI, MCL, and the Lees were aware that the Game does not employ the trademarked "Velcro" material and that VIBV and VUSA never granted them a license to use the registered "Velcro®" trademarks in connection with the Game. (*See* DX 26.) [47]

53. Paliafito also presents evidence that MAI, MCL, and the Lees sent units of the Game, packaging supplies, and Game catalogues bearing the "Velcro®" trademark through the U.S. mails and interstate wires. (*See* DX 23, DX 24.) By using the "Velcro" trademark without authorization, MAI, MCL, and the Lees may have defrauded VIBV, VUSA, and unwitting consumers.

54. Additionally, Paliafito presents evidence that MAI, MCL, and the Lees falsely represented to Paliafito and others, through use of the interstate mails and wires, that the Game did contain "Velcro®" brand touch fasteners and by implication, that they had obtained a license from VIBV or VUSA to use the registered "Velcro®" trademark.

*Fraud on the United States Customs Service*

55. Paliafito presents fairly strong evidence that the Lee companies, including MAI, MCL, Puff Pac Production, MAI Ltd., and Best General Merchandise, may have defrauded the Customs Service through two separate schemes.

56. The first alleged scheme involved undervaluing the price of the Game on customs invoices on shipments sent to MAI as importer. *See United States v. Twenty–Five Packages of Panama Hats*, 231 U.S. 358, 34 S.Ct. 63, 58 L.Ed. 267 (1913) (a party who intentionally undervalues the price listed on an invoice submitted to Customs violates Section 592 of the Tariff Act of 1930, 19 U.S.C. § 1592(a); *see also Intra–Mar Transport Corp. v. United States*, 42 C.C.P.A. 94, 1954 WL 6086 (1954). Paliafito presents evidence that the Mantae exporters charged MAI between $03.00 and $04.50 per Game, depending on type, while unrelated importers, such as Paliafito, paid between $04.25 and $06.80 per Game. (*See* DX 2500.)

57. Soon after MAI started to bring product into the United States, the Customs Service served a request upon MAI inquiring whether MAI and MCL were related, and if so, asking it to describe the relationship and its bearing on the price of the product. The relationship between an exporter and an importer may impact the level of scrutiny that the Customs Service applies to import transactions. *See* 19 U.S.C. § 1401a(b)(2)(B).

58. Kang Ho Lee, on behalf of and as vice-president of MAI, sent a letter, presumably through the United States mails, disavowing any relationship between MAI and MCL.[48] (*See* DX 253 ("Mantae America, Inc. and Mantae Co. Ltd. are not related. Mantae Co. Ltd. manufactures the product and

---

**47.** This Court notes that MAI presents invoice sheets indicating that velcro was shipped to MAI. However, the name appears on the invoices as a merely generic, not trademarked, term. MAI also notes the testimony of Mark Paliafito that the material used by MAI could be called velcro. Again, however, the term velcro was used in a generic, not trademarked, sense.

**48.** MAI notes that Paliafito has presented no evidence demonstrating that the letter in question was placed in the U.S. mails. Given that this Court must merely determine the likelihood of Paliafito's success on the merits and the good chance that the letter was sent through the U.S. mails, however, this Court will presume, for the purposes of Paliafito's motion, that the letter was sent through the U.S. mails.

Mantae America, Inc. is the exclusive importer to the U.S. Market. Similarity of name is coincidental.").) This statement may have been made in order to deflect a Customs inquiry of the alleged fraud perpetrated by the Lee companies.

59. In the second alleged scheme to defraud, the Lee companies would send shipments to Paliafito, an unrelated importer of record. For certain shipments, the price of the product on the invoice would be lower than that agreed to by MAI and Paliafito. (*See* DX 41; DX 32.)

### Fraud on Paliafito

60. Paliafito presents evidence that MAI, MCL, and the Lees may have used the United States mails and interstate wires to defraud or attempt to defraud Paliafito out of money and property in the following ways:

(a) falsely representing that 500,000 games were sold in 1990 and that the Game employed the trademark "Velcro" brand touch fasteners;

(b) falsely representing that they intended to grant Paliafito the exclusive rights to market and distribute the Game;

(c) offering the distribution rights to Hasbro, Boreson and Associates, and Sports Motion without stating that Paliafito possessed the exclusive rights to the Game and without informing Paliafito at the time that these solicitations were being made; and

(d) wrongfully inducing Paliafito's attorney, Nowak, to settle the Andes litigation on terms contrary to Paliafito's wishes and on a basis that allowed the suit to continue against Paliafito alone.

61. The above schemes, and their predicate acts, appear sufficiently related and continuous to form a pattern of racketeering activity. *See H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) (setting forth standards).

62. As Paliafito notes, the predicate acts appear to be related in that they all are alleged to have been perpetrated by the Lees (on behalf of MAI, MCL, or both), and they all involve the common effort to enhance or exploit the revenue-generating capacities of the Lee companies, through the marketing and sale of the Game, or otherwise. *See Banks v. Wolk,* 918 F.2d 418, 425 (3rd Cir. 1990) ("[W]hen a plaintiff alleges predicate offenses in furtherance of multiple schemes, we should avoid interpreting the relatedness requirement too narrowly.... [T]he relatedness requirement should not insulate defendants who merely vary the methods by which they defraud their victims.").

In addition, the predicate acts appear continuous in that they involve multiple and varied schemes, span over two years, and include a number of distinct victims. *See Morgan v. Bank of Waukegan,* 804 F.2d 970, 976 (7th Cir.1986) (reciting relevant factors); *see also Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1279 (7th Cir.1989) ("More than the number of predicate acts, proof that the defendants used several unlawful means of achieving the scheme's goal separates this case from ordinary business fraud cases.").

63. Paliafito presents evidence that these acts have produced distinct injuries. Paliafito presents evidence that the Patent and Trademark Office was defrauded; that the United States Treasury and the United States Customs Service were defrauded; that VIBV and VUSA experienced a diminution of the property rights to their trademarks, *see* FF at ¶¶ 130–32; that consumers paid a premium for the false patent and trademark "rights" of the Game; and that Paliafito may have overpaid for the right to distribute the Game as a result of the Lees alleged frauds.

### (B) 18 U.S.C. § 1962(d)

64. Section 1962(d) of RICO provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

65. Paliafito's evidence regarding the conduct of the Lees, MAI, and MCL provides circumstantial evidence of agreement amongst the Lees, MAI, and MCL to participate in the affairs of the association in fact composed of the interrelated Lee companies through a pattern of racketeering activity. *See United States v. Campione,* 942 F.2d 429,

437 (7th Cir.1991) ("RICO proscribes any agreement whose object is the conducting of or participation in the affairs of an enterprise through a pattern of racketeering activity").

66. Paliafito presents evidence from which a finding could reasonably be made that MAI, MCL, and the Lees knew that the object of the agreement was to participate in the affairs of the association in fact through a pattern of racketeering activity. *See Heany v. Associated Bank, N.A.,* No. 88–C–913, Slip Op. at 19, 1990 WL 446707 (E.D.Wis. July 13, 1990) (to state a claim for conspiracy under 18 U.S.C. § 1962(d), a plaintiff must show (1) agreement to commit the predicate acts, and (2) knowledge that those acts are part of a pattern of racketeering activity).

### (C) Fraudulent inducement

■ 67. Paliafito presents evidence that the Lees, MCL, and MAI induced Paliafito to enter into the Agreement by falsely representing:

(a) that the Game employed "Velcro" hook and loop fasteners, (*see* FF at ¶ 130);

(b) that MAI had sold approximately 500,000 units of the Game in 1990, (*see* FF at ¶ 172); and

(c) that MAI and MCL intended to grant Paliafito the "exclusive right" to market and distribute the Game in the United States.

(*See* FF at ¶ 220.)[49]

68. It is possible that the Lees, MCL, and MAI made the foregoing statements knowing them to be false, and with the intent that Paliafito rely upon them in entering into, and performing under, the Agreement. *See Pulver v. Avco Fin. Serv.,* 182 Cal.App.3d 622, 640, 227 Cal.Rptr. 491, 500 (2d Dist. 1986) (listing elements of fraud).

69. Paliafito presents evidence that it relied on these misrepresentations to its detriment. (*See* FF at 176.) For example, its agreement to sell 1,500,000 units during 1991 was based on the Lees' representation that they had sold 500,000 in 1990. Had the Lees informed the Paliafito group that they only sold 200,000, it is likely that a lower threshold would have been imposed, leading to less onerous financing demands upon Paliafito. Moreover, as Paliafito notes, it is likely that it would not have agreed to pay as much for the exclusive distribution rights had it known that only 200,000 Games were sold in 1990, not 500,000 as represented. Furthermore, Paliafito relied on MAI and MCL's representation that Paliafito would be the exclusive distributor of the Game. It is unlikely that Paliafito would have expended $1,000,000 had it known that MAI, MCL, and the Lees planned to license others, such as Sports Motion and Boreson.

### (D) Tortious interference with contract and prospective economic relations

■ 70. Paliafito presents evidence that MAI may have interfered with Paliafito's contracts and prospective economic relations. In particular, Paliafito presents evidence that MAI, MCL, and the Lees may have interfered with and induced Paliafito's customers to breach their contracts with Paliafito and may have interfered with Paliafito's prospective economic advantages, in the following ways:

(a) by instructing Paul Moss to have Target Stores transfer to MAI all payables owing to Paliafito;

(b) by instructing Paul Moss to have Target Stores switch the vendor of record from Paliafito to MAI;

(c) by instructing Select's sales representatives at the October 7, 1991 sales meeting to direct their retail customers to cancel existing orders issued to Paliafito and to have these orders reissued to MAI/Grip Toys, Inc.;

(d) by instructing Select's sales representatives at the October 7, 1991 sales meeting to direct their retail customers to switch the vendor of record from Paliafito to MAI; and

(e) by meeting with retail customers throughout October without Paliafito's knowledge or consent in order to make

---

49. The third party defendants present evidence and arguments regarding Paliafito's alleged fraudulent activity. However, attachment under Section 811.03(2), unlike that under Section 811.03(1), does not involve setoffs. Accordingly, this evidence is irrelevant to Paliafito's request for relief under Section 811.03(2).

arrangements for direct shipments from MAI.

71. The third party defendants argue, however, that Paliafito cannot state a claim for tortious interference because the third party defendants' actions were "privileged."

72. The third party defendants note that, in Wisconsin, tortious interference claims are governed by the Restatement (Second) Torts. *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 516 (7th Cir.1990); *Liebe v. City Finance Co.*, 98 Wis.2d 10, 295 N.W.2d 16 (Ct.App.1980).

73. Under the Restatement, a tortious interference claim requires a showing of an intentional interference with an existing contract that causes the third party not to perform the contract. Restatement (Second) Torts § 766(a).

74. The interference must be "unprivileged." Restatement (Second) 766(a). Generally, the existence of a privilege is determined by: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interest sought to be advanced by the actor; (e) the social interest sought to be advanced; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

75. The third party defendants argue that MAI and the Lees' conduct in soliciting former Paliafito customer orders was privileged. They state that while MAI took steps to have Paliafito's existing customer accounts switched over to MAI, this was done because Paliafito had been lawfully terminated as an MAI distributor and because Paliafito had failed to remit proceeds required under the parties' Ninety-five/five Arrangement.

76. The Court concurs with the third party defendants that they present at least some evidence that the contract between themselves and Paliafito was terminated before their "interfering" actions and that Paliafito may have improperly withheld funds under the Ninety-five/five Arrangement. Paliafito presents evidence, however, that the parties' contract may have never been properly terminated and that the parties may have intended to continue to operate under the Agreement although under a modified form. Accordingly, the Court finds that Paliafito's tortious interference claim has a reasonable likelihood of success on the merits.

### ii. Damages sustained

77. Paliafito alleges that it has sustained damages in excess of $10,000,000 as a result of the third party defendants' actions. This may be true. However, it appears that a substantial part of Paliafito's alleged injuries are due to breach of contract allegations and allegations of tortious conduct found not to give rise to attachment. Accordingly, the Court will order Paliafito to submit a brief, not longer than ten pages in length, double-spaced, outlining its alleged damages due to claims which the Court has found to be worthy of attachment. Third party defendants and Select will be allowed to submit response briefs, again no longer than ten pages in length, double-spaced.

### iii. Foreign status

78. Paliafito presents unrebutted evidence that none of the third party defendants reside in the United States. Accordingly, the Court finds that Paliafito has met its burden under the third element. Based on the above, the Court will grant Paliafito's motion for writ of attachment but order the parties to submit additional briefing regarding the proper moment of attachment.

### 2. Injunctive relief

79. Paliafito also requests the Court (1) to enjoin the Lees, MCL and MAI from transferring funds or other assets out of the United States without court approval, and (2) to require the third party defendants to place a sufficient amount of assets in this district to effectuate the writ of attachment.

80. Paliafito notes that federal courts are empowered to restrain the removal of assets from the United States through injunctive relief. *See In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1259 (7th Cir.1980) (citing *United States v. First National City Bank*, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965)).

81. In response, the third party defendants argue that *In re Uranium* and *First*

*National City Bank* are inapplicable to this case. They note that in *In re Uranium*, default judgments had already been entered against the defendants. In addition, they note that *First National* involved public interests and that the Supreme Court stated that "Courts of equities may, and frequently do, go much further both to give and withhold relief in furtherance of the public interests than they are accustomed to go when only private interests are involved." *See First National City Bank* at 383, 85 S.Ct. at 531.

82. The third party defendants' statements regarding both cases are correct. However, their statements do not make the general holding in *In re Uranium*, that federal courts are empowered to restrain the removal of assets from the United States through injunctive relief, inapplicable. Although the *In re Uranium* court noted that the defendants were in default, it did not rely upon that default in its statement that federal courts can restrain the removal of assets through injunctive relief. Similarly, while the United States Supreme Court stated in *First National City Bank* that the public interests may affect a court's decision of whether to give or withhold injunctive relief, it did not state that a lesser public interest would prevent a court from restraining the removal of assets.

83. In order for the Court to determine whether to grant Paliafito's requested injunctive relief, the Court must apply the traditional test for injunctive relief, as articulated by the Seventh Circuit. *See Schwinn Bicycle Company v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1181 (7th Cir.1989). A party requesting a preliminary injunction must demonstrate:

(a) whether the party has an adequate remedy at law;

(b) whether the party will suffer irreparable harm if the injunction is not granted and whether this harm is greater than any irreparable harm to defendant if the injunction is granted;

· (c) whether the party has some likelihood of success on the merits and how likely that success is "because this affects

the balance of the harms" between the parties; and

(d) the consequences of an order granting or denying a motion for preliminary injunction on the public interests.

### a. Whether Paliafito has adequate legal remedy

84. Paliafito notes that a district court may require a defendant to bring assets into the jurisdiction to be attached. *In re Feit & Drexler*, 760 F.2d 406, 415 (2d Cir.1985)·(district court's order requiring defendant to transfer property to an escrow agent, regardless of the property's location, upheld; *Inter–Regional Financial Group, Inc. v. Hashemi*, 562 F.2d 152, 154–55 (2nd Cir. 1977) (it was proper for district court to direct defendant to bring stock certificates into the state for attachment), *cert. denied*, 434 U.S. 1046, 98 S.Ct. 892, 54 L.Ed.2d 798 (1978); *see Roso v. Saxon Energy Corp.*, 758 F.Supp. 164, 170 & n. 3 (S.D.N.Y.1991) (court granted injunction requiring defendant to assist in the return of funds from Swiss bank accounts so that they would not be dissipated).

■ 85. It is within a federal court's inherent equitable powers to restrain the removal of assets from the United States, *see In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1259 (7th Cir.1980), as well as to enjoin a defendant from encumbering or otherwise dissipating any assets until after trial, *see EBSCO Indus., Inc. v. Lilly*, 840 F.2d 333, 336 (6th Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988).

86. The court may exercise this power prior to judgment in order to preserve the status quo. *See United States v. First National City Bank*, 379 U.S. 378, 384, 85 S.Ct. 528, 531, 13 L.Ed.2d 365 (1965) (upholding district court's order prohibiting foreign bank from transferring or releasing defendant's accounts).

87. Paliafito argues that it will be irreparably harmed if the Court does not enjoin the Lees, MCL and MAI from removing assets from the United States. Paliafito states that if the Court does not enjoin the Lees, MCL and MAI from taking funds out of the coun-

try, any judgment on the merits may prove meaningless as Paliafito will have no assets upon which to execute its judgment.

88. In response, the third party defendants assert that their business ties to America are too strong to make it profitable for them to simply take their assets from the country to avoid a potential judgment. In particular, the third party defendants note the evidence that:

(a) Joy Lee has been in this country for fourteen years, well before GRIP BALL, and plans to stay;

(b) Joy Lee's two children, ages nine and five, are U.S. citizens, and live and attend school in California;

(c) third party defendants are vigorously defending themselves in this suit;

(d) third party defendants Joy Lee and MCL appeared voluntarily in this suit despite the fact that service in Korea would have been difficult and time consuming for Paliafito;

(e) MAI is satisfying a settlement of a lawsuit with NMC and is actively pursuing a patent infringement claim against Drybranch;

(f) since Paliafito filed for an attachment, MAI has brought over $850,000 into the country;

(g) since Paliafito filed for an attachment, MAI has increased the size of its warehouse in this country;

(h) since Paliafito filed for an attachment, MAI has brought Games into this country and, as of the time of the hearing, had approximately $3,700,000 in inventory;

(i) since Paliafito filed for an attachment, Joy Lee purchased a $265,000 house in California;

(j) since Paliafito filed for an attachment, MAI donated 50,000 Games to the Special Olympics in January 1992, a donation it agreed to in August 1991, before the litigation began.

89. The Court concurs with the third party defendants that at least some evidence has been presented that Joy Lee and her companies will not flee to Korea if a large judgment is rendered against them. There is also strong evidence, however, indicating otherwise. Paliafito presents evidence that:

(a) MAI and the Lees remit virtually all funds generated from the sale of Grip Ball back to Korea;

(b) despite profits of over $5,000,000 in 1991, MAI maintains only a scant bank account in America, the balance of which was approximately $200,000 in March 1992;

(c) the Lees operate a web of corporate shells through which monies can be transferred and hidden; and

(d) on at least one occasion, Miryoung Lee threatened a potential judgment creditor that if he should bring suit and win, she would simply take his money and leave the country.

90. The Court believes that this evidence, particularly the fact that the third party defendants keep little money in the United States, indicates that a strong possibility exists that Paliafito would have no adequate remedy at law without some sort of injunctive relief.

91. The Court's issuance of a writ of attachment should resolve many of Paliafito's concerns. Given the third party defendants' lack of assets in the United States, however, it appears that the Court will be required to order the third party defendants to bring additional assets into this jurisdiction to make attachment possible. Once sufficient assets are attached, the Court sees no reason to prevent the removal of other unattached assets of the third party defendants. In addition, the third party defendants assert that Paliafito is already well secure in that it is holding money in accounts receivable belonging to MIA in excess of $1,800,000. As stated above, however, Paliafito disputes whether the $1,800,000 belongs to MAI and argues that that amount is insufficient to secure its potential judgment of $10,000,000.

92. Based on the above, the Court will order the third party defendants to make available for attachment a sufficient amount of funds to effectuate the writ of attachment. However, the Court will not issue an order preventing the third party defendants from removing assets from the United States once

a sufficient amount of their assets has been attached.

### 3. Appointment of receiver

93. Pursuant to Federal Rules of Civil Procedure 64, 65, and 66, and 28 U.S.C. § 754, Paliafito requests the Court to appoint a receiver (a) for the limited purpose of taking custody of the assets transferred into this jurisdiction by MAI, MCL, and the Lees, and (b) for the limited period between the time of entry of the Court's order granting injunctive relief and the entry of final judgment relating to the Lees, MAI, and MCL under Federal Rule of Civil Procedure 58, or upon such earlier order of the Court.

■ 94. In determining whether to appoint a receiver, courts consider the following factors:

(a) fraudulent conduct on the part of the defendant;

(b) imminent danger that property will be lost or squandered;

(c) the inadequacy of available legal remedies;

(d) the probability that harm to the plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment;

(e) the plaintiff's probable success in the action and the possibility of irreparable injury to the interests in the property;

(f) whether the interests of the plaintiff and others sought to be protected will, in fact, be well served by the receivership.

*Consolidated Rail Corp. v. Fore River Railway Co.*, 861 F.2d 322, 326–27 (1st Cir.1988).

■ 95. The Court finds that this case meets all of the required factors for appointment of a receiver. First, there is a substantial possibility of fraudulent conduct by the third party defendants. Second, there is a real danger that property may be lost or taken from the Court's reach. Third, there may be an inadequacy of legal remedies due to the third party defendants' lack of assets in America and ability to remove them to Korea. Fourth, given that the Court has already determined that attachment is proper, little harm should visit the third party defendants due to the appointment of a re-ceiver. In contrast, failure to appoint a receiver may prevent the smooth administration of attachment and may hurt both Paliafito and the third party defendants. Fifth, as stated above, Paliafito has a reasonable chance of success on many of its tort claims. Sixth, the interests of Paliafito will be served well by the appointment of a receiver, since he or she will act to protect the attached assets of the third party defendants.

### C. THIRD PARTY DEFENDANTS' MOTION FOR ATTACHMENT, PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT

96. Also before the Court is the third party defendants' motion for attachment, preliminary injunction and attachment. In this motion, the third party defendants seek an order:

(a) issuing a writ of attachment authorizing the United States Marshal to attach assets in the possession of third party plaintiff Paliafito America, Inc. ("PAI") which belong to MAI under the Ninety-five/five Agreement, but which PAI is refusing to turn over, up to the amount of $1,678,829.67;

(b) requiring PAI to place a sufficient amount of assets in this district to enable the Court to effectuate the writ;

(c) enjoining PAI from using said $1,678,829.67 to pay legal fees in connection with this or any other action or otherwise dissipating such amount; and

(d) summary judgment that PAI is liable to MAI under the Ninety-five/five Arrangement for $1,678,829.67.

■ 97. The Court finds that it is proper to grant the third party defendants' motion for attachment. The third party defendants have shown that it is likely that the amount of $1,678,829.67 is owing under the Ninety-five/five Arrangement. In addition, there appear to be no setoffs owed Paliafito under that agreement. Finally, Paliafito is clearly not a resident of this state. *See* § 811.-03(2)(a).

■ 98. Moreover, the Court finds it proper to issue an order enjoining Paliafito (a) from using the sum of money to pay legal

fees or (b) from otherwise dissipating the amount. Expenditure of the $1,678,829.67 may leave the third party defendants without adequate legal remedy and irreparably harmed. In contrast, Paliafito would not be irreparably harmed if an injunction is issued since such an injunction will cause no dissipation of assets. Finally, the public interest will be served by the Court's ability to ensure the effectuation of contract law.

99. The Court, however, will deny without prejudice the third party defendants' motion for summary judgment because discovery has not been completed in this matter. *See* footnotes *passim, supra.*

### III. SUMMARY

For the reasons above, the Court **GRANTS IN PART** Paliafito's motion for attachment. The Court **ORDERS** Paliafito to submit a brief, no longer than ten (10) pages in length, double-spaced, demonstrating the amount of its alleged damages due to the alleged tortious conduct that the Court found worthy of attachment. Paliafito should file this brief, and a proposed order, within ten (10) days of the signing of this Order. Select and the third party defendants shall have an additional ten (10) days to submit responsive briefs, each no longer than ten (10) pages in length, double-spaced. The Court will thereafter determine the amount of the third party defendants' assets to be attached.

The Court also **GRANTS IN PART** Paliafito's motion for preliminary injunction. The Court will order the third party defendants to make available for attachment sufficient assets to effectuate the writ of attachment.

The Court **GRANTS** the third party defendants' motion for attachment and **GRANTS** their motion for preliminary injunction.

The Court further **GRANTS** Paliafito's motion for appointment of a receiver. The Court **ORDERS** Paliafito to submit a brief, no longer than two (2) pages in length, double-spaced, nominating a neutral receiver and giving reasons therefor, within ten (10) days of the signing of this Order. Select and the third party defendants shall have an additional ten (10) days to submit responsive

briefs, of the same size, stating their acceptance or rejection of the nominated receiver, and their reasons therefor. The receiver will take into custody the assets made available for attachment, under both Paliafito's and the third party defendants' motions for attachment. As to the former, once the determined amount of assets has been attached, the receiver shall permit the third party defendants to exchange unattached assets for attached assets of equal value. This switching of assets should help minimize the costs of attachment to the third party defendants' business.

The Court **DENIES AS PREMATURE** Paliafito's and the third party defendants' motions for summary judgment.

**SO ORDERED.**

### ORDER

Throughout this Court's Decision and Order of December 1, 1992 in the above-captioned case, the Court used the term "third party defendants" to refer generally to the Lee and Mantae defendants. (*See, e.g.,* Decision and Order at 1364, paragraph number 78.) The actual third party defendants to the lawsuit, however, include Sam Petrovich and Tom Meisenheimer, affiliated with Select.

Pursuant to Rule 60(a), Fed.R.Civ.P., and in the interest of clarity, the Court would make *nunc pro tunc* December 1, 1992, the following corrections to its Decision and Order of December 1, 1992: (1) at page 1307 n. 3, "Plaintiffs Select, Petrovich and Meisenheimer" should be changed to "Plaintiff and third party defendants Petrovich and Meisenheimer;" and (2) throughout, unless specifically stated otherwise, "third party defendants" should be changed to "the Lees, MCL and MAI."

**SO ORDERED.**